Robert A. GEORGINE, et al.

v.

AMCHEM PRODUCTS, INC., et al.

v.

ADMIRAL INSURANCE COMPANY, et al.

Civ. A. No. 93–0215.

United States District Court,
E.D. Pennsylvania.

Aug. 16, 1994.

As Modified Sept. 2, 1994.

**254**

Gene Locks, Greitzer & Locks, Philadelphia, PA, for plaintiffs.

John D. Aldock, Shea & Gardner, Washington, DC, for defendants.

### MEMORANDUM OPINION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

LOWELL A. REED, Jr., District Judge.

#### TABLE OF CONTENTS

INTRODUCTION ........................................................ 254
HISTORY OF THIS LITIGATION ......................................... 257
FINDINGS OF FACT .................................................... 261
 I. THE CLASS AND THE CLASS REPRESENTATIVES ................. 261
 A. The Class ....................................... 261
 B. The Representative Plaintiffs..................... 261

 II. BACKGROUND OF THIS CLASS ACTION............................ 262
 A. History of the Asbestos Litigation.................... 262
 B. Early Background Which Led to the Georgine Negotiations ........... 264

III. FAIRNESS OF THE SETTLEMENT ................................. 267
 A. Introduction ...................................................... 267
 B. The Negotiations Between CCR and Class Counsel ................... 267
 C. Eligibility for Compensation........................................ 268
 (1) Asbestos Exposure Requirements .............................. 268
 (2) Medical Requirements/Criteria ................................ 269
 (a) Overall Fairness of the Medical Criteria .................... 270
 (b) The Major Specific Medical Issues ......................... 272
 (i) "Pleural" Claims ....................................... 272
 (ii) Lung Cancer ........................................ 273
 (c) Subsidiary Medical Issues................................. 274
 (i) Mesothelioma ........................................ 274
 (ii) Lung Cancer ........................................ 275
 (iii) Other Cancer........................................ 275
 (iv) Non–Malignant Conditions ............................ 275
 D. Compensation Procedures .......................................... 276
 (1) Compensation Schedule ....................................... 276
 (2) Case Flow Maximums......................................... 278
 (3) Extraordinary Claim Procedure ............................... 280
 (4) Other Issue ................................................. 281
 E. Alternative Compensation Procedures .............................. 281
 F. Releases; Deemed Releases; Contribution and Indemnity Claims ...... 282
 G. Miscellaneous Provisions .......................................... 284
 (1) Right to Additional Compensation.............................. 284
 (2) No Joint and Several Liability Among the Settling Defendants for Unpaid Claims ............................................... 284
 (3) Withdrawal Rights............................................ 284
 (4) Attorneys' Fees ............................................. 285
 (5) Annual Audit................................................ 285
 (6) Operational Date ............................................ 286
 H. CCR Defendants' Ability to Meet The Financial Obligations Required by The Stipulation ................................................ 286
 (1) Overview.................................................... 286
 (2) Mr. Laeri's Initial Involvement in Matters Relating to the Stipulation 286
 (3) The CCR Defendants' Estimated Obligation to Compensate Claims Under the Stipulation ....................................... 287
 (4) The CCR Defendants' Estimated Obligation to Compensate Present Claims and Claims Filed Through 1993........................ 287
 (5) The CCR Defendants' Estimated Obligation to Pay Costs Involved in Disposing of All Claims ...................................... 288
 (6) The CCR Defendants' Estimated Total Obligation and the Ten–Year Estimates Concerning the Payment of this Obligation .......... 288
 (7) The CCR Defendants' Insurance Coverages..................... 288
 (8) The Likelihood That The CCR Defendants Can Meet Their Obligations Under the Stipulation................................. 289
 I. Benefits to Non–Impaired Claimants................................ 291

IV. ADEQUACY OF CLASS COUNSEL ................................... 293
 A. Selection, Qualifications, and Conduct of Class Counsel ................ 293
 B. Conflict of Interest................................................ 294
 (1) Settlement of Present Cases and Future Claims ................. 294
 (2) Futures Provisions in the Inventory Settlement Agreements ...... 299
 (3) Other Issues Relating to Conflict of Interest ................... 303
 (a) Class Counsel's Supervisory and Oversight Duties ........... 304
 (b) Class Counsel's Economic Interest in the Class.............. 304
 (c) The AFL–CIO's Monitoring Role .......................... 304
 (d) Fair Allocation of Resources Provision ...................... 305
 (e) CCR's Stated Intention to Settle Present Cases ............. 305
 (f) Definition of the Class.................................... 305
 (g) Lack of Provision to Modify Medical Criteria................ 305
 (h) Class Counsel's Role in the Notice Plan ..................... 305

 (i) Class Representatives Preparation for Depositions ........... 305
 C. Collusion ........................................................ 305
 (1) Overview....................................................... 305
 (2) The Value of the Inventory Settlements ......................... 307
 (3) Benefits to the Class under Georgine vs. the Tort System ........ 310
 (4) Comparison of Compensation Paid to Inventory Claimants to What
 They May Have Received Under Georgine ..................... 310
 D. Prior Conduct of Class Counsel .................................... 311

V. ADEQUACY OF NOTICE ......................................... 311

CONCLUSIONS OF LAW ............................................ 314

 I. CLASS CERTIFICATION ......................................... 314
 A. Standards for Final Class Certification............................. 314
 B. Numerosity ....................................................... 315
 C. Commonality and Predominance of Common Questions ................ 315
 D. Typicality ........................................................ 316
 E. Superiority ....................................................... 316
 F. Adequacy of Representation........................................ 316
 G. Consistency of Interests of Representative Plaintiffs and the Class..... 317
 H. No Need for Subclasses ........................................... 318

 II. FAIRNESS OF THE SETTLEMENT ................................. 319
 A. Introduction ...................................................... 319
 B. Background of the Settlement...................................... 321
 (1) Maturity of the Litigation ...................................... 321
 (2) Asbestos Litigation in the Present Tort System .................. 322
 (3) Negotiation of the Settlement .................................. 322
 C. Specific Terms of the Stipulation .................................. 322
 (1) Compensation Schedule and Procedures, Eligibility .............. 322
 (2) Releases, Contribution and Indemnity Provisions ................ 323
 (a) General Principles........................................ 323
 (b) Severance of Contribution Claims.......................... 323
 (c) Release Provisions ....................................... 324
 D. Reaction of the Class ............................................. 324
 E. Conclusion....................................................... 325
 III. ADEQUACY OF COUNSEL ........................................ 326
 A. Legal Standard ................................................... 326
 B. Conflict of Interest............................................... 326
 C. The Futures Provisions in the Inventory Settlements ................ 330
 D. Collusion ........................................................ 331
 E. Prior Conduct of Class Counsel ................................... 331
 F. Conclusion....................................................... 331

 IV. ADEQUACY OF NOTICE ......................................... 332
 A. General Notice to Class .......................................... 332
 B. Notice to Longshoremen and Related Class Members................ 332
 C. Conclusion Regarding Notice to Class ............................. 333

 V. FINAL OMNIBUS CONCLUSIONS OF LAW REGARDING PROPOSED
 SETTLEMENT..................................................... 334

CLOSING DISCUSSION............................................... 334

## INTRODUCTION

This is a class action claiming damages for asbestos-related personal injuries or wrong- ful death. Currently before the Court is the determination of whether the proposed set- tlement of the class action is fair to the class.

■ This Court has previously concluded that it has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the named parties are of diverse citizenship and the amount in controversy for each class member exceeds $50,000. *Carlough v. Amchem Products*, 834 F.Supp. 1437 (E.D.Pa.1993).[1] Although certain Objectors to the proposed settlement have continued to press their claims that this Court lacks subject matter jurisdiction over this action, nothing has been brought to the Court or introduced into the evidentiary record of this case to change the Court's conclusion in its memorandum opinion. Therefore, the pending motion to dismiss for lack of subject matter jurisdiction (Document No. 1059) will be denied.[2]

Based upon the evidence of record and the Court's findings of fact and conclusions of law, and for the reasons discussed below, this Court concludes that all of the requirements of Fed.R.Civ.P. 23 have been met and that the settlement of this class action is fair to the class and should be approved pursuant to Fed.R.Civ.P. 23(e) as fair to the class.

### HISTORY OF THIS LITIGATION

This proceeding was instituted on January 15, 1993, with the filing of the complaint, an answer, and a stipulation of settlement setting forth the terms of a proposed settlement between plaintiffs and twenty defendant companies represented by the Center for Claims Resolution ("CCR" or the "CCR defendants").[3] Concurrent with the filing of the action, plaintiffs and defendants filed a joint

motion for conditional class certification seeking temporary certification under Rule 23(b)(3) of an opt-out class only for the purposes of seeking approval of the proposed settlement. The parties also filed a joint motion for appointment of a special master to assist the Court during the discovery process, and to review sensitive and confidential information relevant to these proceedings.

In this action, the plaintiff class is seeking compensation related to claimed injury or death of its members due to alleged occupational exposure to asbestos or asbestos products supplied by the CCR defendants. The complaint seeks compensatory and punitive damages on the following legal theories: (1) negligent failure to warn, (2) strict liability, (3) breach of express and implied warranty, (4) negligent infliction of emotional distress, (5) enhanced risk of disease, (6) medical monitoring, and (7) civil conspiracy. Complaint, Dkt. No. 1 (Jan. 15, 1993) at 18–27.

On January 29, 1993, the Honorable Charles R. Weiner of this Court conditionally certified an opt-out class consisting of:

1. All persons (or their legal representatives) who have been exposed in the United States or its territories (or while working aboard U.S. military, merchant or passenger ships), either occupationally or through occupational exposure of a spouse or household member, to asbestos or to asbestos containing products for which one or more of the defendants may bear legal liability and who, as of January 15, 1993,

1. On December 22, 1993, the settling parties stipulated to the substitution of Robert A. Georgine for Edward J. Carlough as a representative plaintiff in this class action. *See* Stipulation to Amend Complaint To Add a Class Rep. and to Provide for the Withdrawal of a Class Rep., Dkt. No. 589 (Dec. 22, 1993) at 1.

2. Certain Objectors claim that testimony of those representative plaintiffs without any presently manifested asbestos-related disease to the effect that they support the deferral of compensation to themselves and other non-impaired class members demonstrates that the $50,000 amount-in-controversy requirement for diversity jurisdiction has not been met. As this Court explained in its October 6, 1993 opinion, however, the fact that a plaintiff settles his or her claim for less than the jurisdictional amount, or chooses to defer receipt of cash compensation, does not deprive a federal

court of diversity jurisdiction. *See also In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 734 (2d Cir.1992); *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 157–58, 163 (2d Cir.1987); *In re A.H. Robins Co.*, 88 B.R. 742 (E.D.Va.1988); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 167 (S.D.Ohio 1992).

Moreover, as to whether exposure to asbestos constitutes injury in fact, the Court of Appeals for the Sixth Circuit has, since this Court's October 6, 1993 opinion, addressed the issue and adopted the same view as this Court. *See In re UNR Indus., Inc.*, 20 F.3d 766, 770 (7th Cir.1994) (Court held that persons exposed to asbestos had constitutionally justiciable claims).

3. CCR is a not-for-profit corporation maintained by the defendant companies for the processing of asbestos-related claims.

reside in the United States or its territories, and who have not, as of January 15, 1993, filed a lawsuit for asbestos-related personal injury or damage, or death in any state or federal court against the defendant(s) (or against entities for whose actions or omissions the defendant(s) bear legal liability).

2. All spouses, parents, children, and other relatives (or their legal representatives) of the class members described in paragraph 1 above who have not, as of January 15, 1993, filed a lawsuit for the asbestos-related personal injury, or damage, or death of a class member described in paragraph 1 above in any state or federal court against the defendant(s) (or against entities for whose actions or omissions the defendant(s) bear legal liability).

Order, Dkt. No. 11 (Jan. 29, 1993) at 3. Occupational exposure for purposes of class membership is defined as follows in the Stipulation of Settlement (as amended September 24, 1993) ("Stipulation"):

An Exposed Person has been occupationally exposed to asbestos when that individual's job responsibility involved working with or around asbestos or asbestos-containing products. These exposures usually occurred in industrial settings or during construction activities. "Occupational exposure" to asbestos does not include "environmental exposure," such as that potentially experienced by office workers in buildings where asbestos products were present.

Amendment to the Stipulation at 1 (Exhibit SP–301).[4] Judge Weiner's Order of January 29, 1993 conditionally certifying the class also appointed as plaintiffs' class counsel Ronald L. Motley and Joseph F. Rice (of Ness, Motley, Loadholt, Richardson & Poole in Charleston, South Carolina) and Gene Locks

(of Greitzer and Locks in Philadelphia, Pennsylvania) (hereinafter "Class Counsel").[5]

Also on January 29, 1993, Judge Weiner assigned to me (hereinafter "this Court" or "the Court") the task of conducting fairness proceedings and of determining whether the proposed settlement is fair to the class pursuant to Fed.R.Civ.P. 23(e). Order, Dkt. No. 12 (Jan. 29, 1993).[6] Judge Weiner granted the joint motion of plaintiffs and defendants (the "Settling Parties") for appointment of a special master, and appointed Professor Stephen Burbank of the University of Pennsylvania Law School to act as special master. Order, Dkt. No. 13 (Jan. 29, 1993).

Early in these proceedings, three individual class members ("the Wiese Objectors") moved to intervene as plaintiffs in order to object to the proposed settlement. Judge Weiner ultimately denied formal intervention but granted *all* objecting class members full rights to participate in all aspects of these proceedings, including "the right to appear through counsel, participate in the fairness hearing and conduct discovery." Mem. Op. and Order, Dkt. No. 292 (Apr. 15, 1993) at 25–26.

On March 9, 1993, Owens–Illinois, Inc. and several other former suppliers or manufacturers of asbestos-containing products who are not named as defendants in this class action also moved to intervene, in order to address issues related to future contribution and indemnity rights of these companies in this underlying multi-jurisdictional asbestos litigation. Pursuant to a stipulation reached between the CCR defendants and the non-party asbestos companies, the motions to intervene were withdrawn and Owens–Illinois, Pittsburgh Corning Corporation and W.R. Grace & Co.–Conn. were granted *amicus curiae* status.

Based on the pleadings, motions and memoranda filed by the Settling Parties, and

---

4. An exhibit identified at the fairness hearing is referenced herein as Settling Parties' Exhibit (abbreviated "SP") or Objectors' Exhibit (abbreviated "O"), followed by a sequential number, such as "Exhibit SP–301."

5. At the same time he appointed Messrs. Motley, Rice and Locks as class counsel, Judge Weiner also held that "[t]he Court may in the future

appoint additional counsel if it is deemed necessary and advisable." Order, Dkt. No. 11 (Jan. 29, 1993) at 3.

6. *See also* Mem.Op. and Order, Dkt. No. 292 (April 15, 1993 (Weiner, J.) at 18 n. 12 (stating that this Court shall pass upon the fairness to the class of the proposed settlement).

various Objectors and *Amici*, this Court issued an Order setting forth a schedule for presentation of the issues to be resolved in this action. Order, Dkt. No. 346 (May 13, 1993). The Scheduling Order established a two-step process. First, the Court would consider objections relating to the exercise of subject matter jurisdiction over the action, and would also consider whether the proposed settlement satisfied a threshold standard of fairness justifying the issuance of notice to the class. The Order provided that if the Court found the exercise of jurisdiction to be proper and that preliminarily the settlement was fair for purposes of issuing notice to the class, the second step of the process would involve a period of discovery followed by a formal fairness hearing.

The first part of the two-part fairness inquiry began when the Court ordered Class Counsel and the CCR defendants to submit to the Court written proffers, accompanied by affidavits or declarations, setting forth the Settling Parties' contentions as to the fairness of the settlement and a description of what the Settling Parties intended to establish at the final fairness hearing and by what means. Order, Dkt. No. 379 (June 2, 1993). Thereafter, the Court received extensive briefs from the Objectors, *Amici*, and the Settling Parties on the issues of whether the exercise of subject matter jurisdiction by the Court was proper and whether the proposed settlement was fair for the preliminary purpose of issuing notice to the class. After due notice, oral argument was held on these issues on August 23, 1993, in which counsel for the Settling Parties, Objectors and *Amici* participated.

Pending the decision regarding subject matter jurisdiction and preliminary fairness, in August 1993, the Settling Parties filed their joint motion for approval of notice to the class detailing the proposed program for notifying the class of the pendency of this action and of the terms of the proposed settlement. *See* Joint Motion, Dkt. No. 445 (August 16, 1993). After receiving extensive briefs from the Settling Parties, Objectors, and *Amici*, the Court held a hearing on matters relating to class notice on October 5, 1993, in which the Settling Parties, Objectors and *Amici* again participated.

On October 6, 1993, this Court issued a memorandum opinion addressing objections related to the subject matter jurisdiction of the Court, finding that the Court's exercise of jurisdiction over this action is proper. *Carlough v. Amchem Products*, 834 F.Supp. 1437 (E.D.Pa.1993). On October 27, 1993, this Court issued another memorandum opinion finding that "[the settlement] appears to be the product of serious, informed, noncollusive negotiations, it has no obvious deficiencies, it does not improperly grant preferential treatment to class representatives or segments of the class, and it clearly falls within the range of possible approval." *Carlough v. Amchem Products*, 1993 WL 472812, *2, 1993 U.S.Dist. LEXIS 15280, *4 (E.D.Pa. Oct. 27, 1993).[7]

In the October 27, 1993 memorandum opinion, this Court also approved the proposed program of class notice, finding that, with several modifications ordered by the Court, the notice program would satisfy the requirements of Fed.R.Civ.P. 23(e) and 23(c)(2) and the requirements of the Due Process Clause of the United States Constitution. The Court ordered that notice to the class be disseminated beginning November 1, 1993, and continuing for eight weeks.[8] Class

---

7. In September 1993, the American Federation of Labor and Congress of Industrial Organizations ("AFL–CIO") announced its support of the proposed settlement and on September 29, 1993, was granted leave by the Court to appear as *amicus curiae*. The AFL–CIO noted in its motion that it had long been active in assisting its members in receiving compensation for asbestos-related injuries and in seeking reform of the current system of asbestos litigation.

Concurrent with the AFL–CIO's Motion for Leave To Appear as *Amicus Curiae*, the Settling Parties filed an amendment to the stipulation, making several changes in the Stipulation, one of which gives the AFL–CIO an oversight role in the implementation of the compensation system established by the Stipulation. The amendment would give the AFL–CIO the right to participate in annual audits of the compensation system, as well as giving the union a role in selecting arbitrators and medical panel members under the Stipulation.

8. On October 29, 1993, the Wiese Objectors moved the U.S. Court of Appeals for Third Circuit for an emergency stay of notice to the class, after this Court declined to certify for immediate

members were given three months, from November 1, 1993 through January 24, 1994, to exclude themselves from the class if they so chose. The Court also ordered the Settling Parties to file both an interim report (on December 6, 1993), and a final report (on February 16, 1994), regarding implementation of the Court-approved notice program.

After the Court's rulings regarding jurisdiction, preliminary fairness and class notice, the second part of the two-step fairness process previously described began, that is intensive discovery followed by a final fairness hearing. Discovery proceeded as follows: The Settling Parties first provided to the Objectors certain information relevant to the fairness of the settlement. Objectors then were given the opportunity to obtain additional information through ordinary discovery mechanisms including interrogatories, requests for production of documents and depositions.[9]

After the close of discovery, written objections to the settlement were filed with the Court on February 8, 1994, and the formal fairness hearing began on February 22, 1994. Counsel for the Settling Parties, several lawyers representing various Objectors, and counsel for various *Amici* participated at the fairness hearing. Under the direction of the Court, the Objectors closely coordinated their activities throughout the fairness proceedings.

Because of the complexity of the issues involved, and to give all interested parties a full and fair opportunity to present their views, the fairness hearing was extensive and protracted, involving the testimony of some twenty-nine witnesses (live or by deposition) during 18 hearing days over a period of over five weeks. The Court heard testimony from participants in the settlement negotiations, several representative plaintiffs, two high-ranking officers of the CCR, medical experts, financial experts, legal ethics experts, and representative asbestos plaintiffs' attorneys. Numerous exhibits were also submitted. The substance of the testimony covered, among other things: the decades-long history of asbestos litigation in the United States; the details of the handling of asbestos litigation in the current tort system; the negotiation and operation of the proposed settlement and various objections to certain of its provisions; the competence and adequacy of Class Counsel; the medical conditions caused by exposure to asbestos and the reasonableness of the medical criteria set forth in the settlement; the ability of the CCR defendants to meet their financial obligations under the Stipulation through insurance proceeds or otherwise; and the negotiation and operation of settlements reached between Class Counsel and the CCR defendants to settle in the present tort system the inventory of pending claims of clients represented by Class Counsel and their affiliated law firms.

interlocutory appeal its Order approving class notice. Along with the emergency motion to stay, the Wiese Objectors filed a petition for writ of mandamus. On November 2, 1993 the Court of Appeals for the Third Circuit denied the emergency motion to stay, allowing class notice to go forward as outlined in the Court's Order. The Wiese Objectors voluntarily dismissed their mandamus petition shortly thereafter.

9. Objectors were given all the data that had been provided by the CCR defendants to Class Counsel during the negotiation of the proposed settlement which included highly sensitive data regarding the CCR defendant's settlement history and financial condition. Objectors were also provided with redacted copies of settlement agreements that had been entered between the CCR defendants and Class Counsel (and attorneys affiliated with Class Counsel) settling a number of pending asbestos cases. Objectors were given the aggregate amount paid by the CCR defendants under these settlements, although information involving the particular medical information and settlement amounts involved in each individual case—confidential both to the CCR defendants and the individual plaintiffs—was given to the Special Master for review. Objectors were given the opportunity to probe into facts surrounding the proposed settlement through depositions of relevant persons.

Notwithstanding questions relating to their standing to participate in this class action, the *Amici* asbestos suppliers and manufacturers were given access to all written materials provided by the Settling Parties to the Objectors, and attended nearly all of the depositions that took place, although their questioning of some deponents was limited to issues related to contribution and indemnity.

In all, thousands of pages of documents were produced and over thirty depositions took place during the discovery period.

In May, 1994, this Court received voluminous post-hearing submissions from the Settling Parties, Objectors and *Amici.* On May 23, 1994, the Court heard day-long final oral arguments on the fairness of and objections to the proposed settlement.

The Settling Parties now urge this Court, pursuant to Fed.R.Civ.P. 23, to: (1) certify the class pursuant to Fed.R.Civ.P. 23(b)(3); (2) approve the proposed stipulation of settlement as fair, adequate, and reasonable; (3) conclude that Class Counsel adequately represented the class in the negotiation of the settlement and during the pendency of this action; and (4) approve the adequacy of the notice program as implemented by the settling parties.

The following constitute the findings of fact and conclusions of law of this Court which support its ultimate conclusion that the Settling Parties have satisfied all the requirements of a Fed.R.Civ.P. 23 opt-out class action, that the class as defined should be finally certified, and that the settlement should be approved pursuant to Fed.R.Civ.P. 23(e) as fair to the class. Because this Court conducted the entire fairness proceedings, made the jurisdictional determination, afforded the Settling Parties, the Objectors and the *Amici* appropriate due process, and saw and heard the witnesses and examined the evidence first hand, it is intended for purposes of judicial comity and efficiency that these findings of fact and conclusions of law be accorded the status of an adjudication of an Article III Court of co-ordinate jurisdiction.

## FINDINGS OF FACT [10]

### I. THE CLASS AND THE CLASS REPRESENTATIVES

#### A. *The Class*

1. The Court adopts the factual definition of the class as quoted above and as defined in Judge Weiner's Order of January 29, 1993. Order, Dkt. No. 11 (Jan. 29, 1993) at 3.

2. Although the exact size of the class is unknown, it is undisputed that there are many tens of thousands of class members. Over the past fifteen years, the CCR defen-

dants have been named in over 180,000 asbestos personal injury claims. *See* Response of CCR Defendants To Order To Show Cause, Dkt. No. 173 (Mar. 17, 1993) at 6. One group of objectors to the proposed settlement have conceded that the numerosity requirement is satisfied. *See* Brief in Support of Wiese Objectors' Motion To Decertify, Dkt. No. 160 (Mar. 16, 1993) at 4.

#### B. *The Representative Plaintiffs*

3. Representative plaintiff Ty Annas is 70 years of age and currently resides in Woodleaf, North Carolina. Mr. Annas has not presently manifested an asbestos-related disease but was exposed to products supplied by the CCR defendants from 1951 through at least 1973, during the course of his employment as a construction worker. Annas 2/24/94 Tr. at 221, 224–27.

4. Representative plaintiff Robert A. Georgine resides in Silver Spring, Maryland and is President of the Building Construction Trades Department of the AFL–CIO. He was exposed to asbestos products supplied by the CCR defendants during the course of his employment as a lather beginning in 1950. Mr. Georgine has not presently manifested an asbestos-related disease. Georgine 2/28/94 Tr. at 4, 7, 13–19.

5. Representative plaintiff Anna Baumgartner is a resident of Baltimore, Maryland and recently lost her husband, John, to asbestos-related mesothelioma. Mr. Baumgartner's disease resulted in part from his exposure to the CCR defendants' asbestos products in the course of various industrial employment. Baumgartner 1/6/94 Dep. at 10–14, 54–57. Both Mr. and Mrs. Baumgartner were representative plaintiffs when this class action was filed. Mr. Baumgartner died while the action has been pending.

6. Mrs. Nafssica Kekrides is 54 years of age and resides in Florida. Kekrides 1/12/94 Dep. at 8, 10. Her husband Pavlos died of asbestos-related mesothelioma on April 18, 1993. *Id.* at 9. Mr. Kekrides was exposed to asbestos products supplied by the CCR defendants during the course of his employ-

---

**10.** To the extent that the following findings of fact include conclusions of law or mixed findings of fact and conclusions of law, those findings and conclusions are hereby adopted by this Court.

ment as a painter, from 1967–1981. *Id.* at 11. Like John Baumgartner, Pavlos Kekrides was also a representative plaintiff and died during the pendency of this case.

7. Ambrose and Joanne Vogt reside in Pasadena, Maryland. Vogt 2/24/94 Tr. at 144. Mr. Vogt is 42 years of age and has been an insulation worker for some 22 years, during which time he has been exposed to asbestos products supplied by the CCR defendants. *Id.* at 144. Mr. Vogt is a member of the International Association of Heat and Frost Insulators and Asbestos Workers. *Id.* He has not presently manifested an asbestos-related disease. *Id.* at 145.

8. Mrs. LaVerne Winbun is 73 years of age and resides in Louisville, Kentucky. Winbun 1/6/94 Dep. at 9. Her husband died of asbestos-related mesothelioma in November 1991, caused in part by exposure to asbestos products supplied by the CCR defendants. *Id.* at 10.

9. Carlos and Dorothy Raver reside in Finksburg, Maryland. Mr. Raver has worked as a laborer for Congoleum Corporation for 31 years, during which time he has been exposed to asbestos products supplied by the CCR defendants. Raver 1/11/94 Dep. at 10–11. Although a doctor has identified asbestos-related pleural changes in Mr. Raver's lungs (*id.* at 48–49), he suffers no physical disability or impairment from those changes. *Id.* at 25.

10. Timothy and Gay Murphy reside in Louisville, Kentucky. Murphy 1/6/94 Dep. at 11. Mr. Murphy is 41 years of age and was exposed to asbestos products supplied by the CCR defendants during the course of his employment as an insulation worker. Complaint, Dkt. No. 1 (Jan. 15, 1993) at 9–10. Mr. Murphy has not presently manifested an asbestos-related disease. Murphy 1/6/94 Dep. at 58.

11. Fred A. Sylvester, a resident of South Carolina, was a representative plaintiff in this action until his death, from asbestos-related mesothelioma, on March 13, 1994. Complaint, Dkt. No. 1 (Jan. 15, 1993) at 11;

Motion to Substitute Party, Dkt. No. 1042 (May 2, 1994) at 1. Mr. Sylvester had been a sheet metal worker and was exposed to defendants' asbestos products in the course of that employment. Complaint, Dkt No. 1 (Jan. 15, 1993) at 11.

12. In sum, the representative plaintiffs hail from a variety of jurisdictions and represent a wide range of occupations, medical conditions, and exposure to the CCR defendants' products, and all the representative plaintiffs are members of the class. All have expressed their support of the terms of the proposed settlement.

## II. BACKGROUND OF THIS CLASS ACTION

### A. *History of the Asbestos Litigation* [11]

13. The Court of Appeals for the Third Circuit has observed that asbestos litigation has been "an unparalleled situation in American tort law." *In re School Asbestos Litig.*, 789 F.2d 996, 1000 (3d Cir.1986). The Judicial Panel for Multidistrict Litigation ("MDL Panel") has summarized what it terms the "most objectionable aspect of asbestos litigation":

> "dockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether."

*In re Asbestos Prods. Liab. Litig. (No. VI),* 771 F.Supp. 415, 419 (J.P.M.L.1991) (quoting *Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation* 1–3 (1991)).

14. The Court of Appeals adds the following, citing the observations of a Philadelphia Common Pleas Judge:

> Results of jury verdicts are capricious and uncertain. Sick people and people who died a terrible death from asbestos are being turned away from the courts, while people with minimal injuries who may nev-

---

**11.** The history of asbestos litigation and the background of the *Georgine* negotiation are ably augmented and amplified by Judge Weiner's memo-

randum opinion and order of April 15, 1993. Mem.Op. and Order, Dkt. No. 292 (April 15, 1993) (Weiner, J.) at 3–10.

er suffer severe asbestos disease are being awarded hundreds of thousands of dollars, and even in excess of a million dollars. The asbestos litigation often resembles the casinos 60 miles east of Philadelphia, more than a courtroom procedure.

*In re School Asbestos Litig.*, 789 F.2d at 1001.

15. Personal injury and wrongful death litigation related to asbestos had its real beginnings in the late 1960's. During the decade from the late 1960's through the late 1970's, plaintiffs' counsel around the country were crafting the initial theories of liability against various asbestos suppliers, conducting discovery, and identifying the various medical conditions that could be attributed to asbestos exposure.

16. After this beginning, the period from the late 1970's through the mid–1980's saw a steep increase in the number of claims against asbestos suppliers. The fundamental legal theories and liability cases against various defendants had been established, and litigation against these companies intensified dramatically. By the early to mid–1980's, however, major problems began to appear on the horizon in the asbestos litigation. Fitzpatrick 2/22/94 Tr. at 73, 74.

17. First, facing enormous liabilities and overwhelming costs to defend thousands of asbestos-related claims, many asbestos producers were on the road to bankruptcy, including a number of companies previously considered to be immune from financial difficulty. Hatten 3/17/94 Tr. at 35–36 (comparing shock the day Johns–Manville Corporation went bankrupt to "the day Kennedy was shot")[12]; *In re Asbestos Prods. Liab. Litig.*, 771 F.Supp. 415, 420 (J.P.M.L.1991) (more than a dozen asbestos producers bankrupt by 1991) (citation omitted); Fitzpatrick 2/22/94 Tr. at 67, 74 (bankrupt asbestos manufacturers customarily sued in these cases included, among many others, Johns–Manville, Celotex, Eagle Pitcher, H.K. Porter, Carey Canada, Keene Corp., and Unarco).

18. During this same time period, asbestos dockets across the country were growing exponentially, and plaintiffs began to face substantial delay in having their claims resolved. *Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation*, 7–12 (1991) (Exhibit SP–208). Further, transaction costs began to far outpace compensation to victims. *Id.* at 12–14 (1984 Rand Corporation study, which is credited here, reliably found that only 37–39% of money paid by asbestos defendants went to victims, with 61–63% going to transaction costs). *See also* Fitzpatrick 2/22/94 Tr. at 77 (the majority of the dollars being spent on asbestos litigation was going to the lawyers).

19. Beginning near 1986–1987 (around the time of the Court of Appeals' comments in the *Asbestos Schools* case cited above), numerous plaintiffs and defense counsel, commentators, and courts began to recognize the enormous problems facing all involved in the asbestos litigation. There were legions of examples of erratic verdicts in the tort system; mesothelioma victims would sometimes receive nothing while persons with no impairment would receive six and seven figure verdicts. Although by this time state and federal courts were already burdened by many asbestos claims, amazingly 1986 saw the rate of filing of new asbestos suits *quadruple.* Fitzpatrick 2/22/94 Tr. at 72–73 (filing rate jumped from around 500 new cases per month prior to 1986, or 6,000 per year, to 2000 new cases per month after 1986, or 24,000 per year).

20. In 1987, the Federal Judicial Center convened a conference of judges as well as plaintiffs' and defense counsel to discuss the problems with the asbestos litigation as well as the possibility for some type of global resolution. Discussed at that meeting were many of the conditions outlined above, including the growing backlog of cases, the fact that new cases were being filed at a much greater rate than existing cases could be tried or settled, the fact that transaction costs greatly outweighed victims' recoveries,

---

**12.** Robert R. Hatten is an experienced asbestos plaintiffs' attorney and was presented by the Settling Parties. The Court finds that Mr. Hatten is qualified to testify regarding his experience in asbestos litigation in the tort system.

and the growing number of bankrupt defendants. *Id.* at 76–77.

## B. *Early Background Which Led to the Georgine Negotiations*

21. At the time of the Federal Judicial Center meeting in 1987, Lawrence Fitzpatrick, now the President and Chief Executive Officer of the CCR, was Vice President of Law for the Asbestos Claims Facility ("ACF"), also known as the Wellington Group.[13] Like the CCR, the ACF was formed by a number of asbestos defendants for the purpose of coordinated processing of asbestos claims. Fitzpatrick 2/22/94 Tr. at 63–65. All the members of the CCR were formerly members of the ACF. *Id.* at 69.

22. After the Federal Judicial Center meeting in 1987, Mr. Fitzpatrick had several discussions with Mr. Motley, who the CCR considered to be the most prominent member of the plaintiffs' bar with the largest asbestos practice in the country, regarding the possibility of global settlement that was urged at the Judicial Center meeting. Fitzpatrick 2/22/94 Tr. at 78. There is no suggestion in the record that Fitzpatrick formally set out to choose a plaintiffs' attorney with whom to negotiate a global plan to settle cases. These discussions were in the nature of brainstorming the entire problem. Mr. Fitzpatrick and Mr. Motley had a number of telephone conferences and exchanged a number of documents, but did not begin any negotiations at that time. *Id.* Unfortunately, by this point the members of the ACF were not in agreement as to how best to try to resolve the asbestos claims against them, and the ACF was dissolved in October 1988. The CCR was formed shortly thereafter and included a number of former ACF companies who shared the same philosophy on the asbestos litigation. *Id.* at 66–69.

23. In 1990, the Federal Judicial Center convened another conference to address the asbestos litigation. This conference also included judges, academics and counsel representing plaintiffs and defendants. By this time, the asbestos problem had worsened, as new case filings and bankruptcies had contin-

ued unabated and the backlog of cases now numbered more than 70,000. Fitzpatrick 2/22/94 Tr. at 82–83; Hatten 3/17/94 Tr. at 44. The 1990 Judicial Center conference was an "enormously significant event in the history of the asbestos litigation" in that those involved came away with the clear impression that "business as usual" would no longer be acceptable given the dramatic proportions of the problem. Fitzpatrick 2/22/94 Tr. at 84.

24. In the wake of the 1990 conference, the members of the plaintiffs' bar, the defense bar, and the judiciary all took preliminary steps toward national action on the asbestos problem. A number of federal judges formed what became known as the *ad hoc* committee of asbestos judges. Fitzpatrick 2/22/94 Tr. at 84–85. In addition, the plaintiffs' bar and defense bar both organized committees and held meetings to discuss global settlement possibilities. *Id.* at 87–88.

25. In July, 1990, members of the plaintiffs' bar filed a Rule 23(b)(1)(B) limited fund class action in Beaumont, Texas, *Linscomb v. Pittsburgh Corning Corp. et al.,* on behalf of all present and future persons with asbestos-related claims, against many of the major asbestos defendants. Fitzpatrick 2/22/94 Tr. at 86. Lead class counsel for that action was Mr. Motley. Defendants were vigorously opposed to a single litigation class action, such as *Linscomb*, as the vehicle for global resolution of the asbestos litigation. *Id.* at 86–87. Nonetheless, there were some negotiations between plaintiffs' counsel and defendants at the time of *Linscomb*, and several concepts emerged that later would reappear in other national settlement proposals. First, it was then recognized that any global resolution should address future asbestos claims as well as present claims. Second, it was then recognized that objective medical criteria should be sought to determine victims' compensation equitably and to treat like victims alike. *See* Hatten 3/17/94 Tr. at 71. The *Linscomb* case was never certified as a class action and was later transferred to Judge Weiner as part of the multidistrict litigation ("MDL") proceed-

---

**13.** Mr. Fitzpatrick attended and addressed the 1987 Federal Judicial Center conference. Fitz- patrick 2/22/94 Tr. at 77.

ings pending in this Court involving all asbestos-related personal injury claims.

26. In addition to the Judicial Conference meeting and the filing of the *Linscomb* class action, the year 1990 saw two other major events in the asbestos litigation. First, in September 1990, Chief Justice William H. Rehnquist appointed a panel of federal judges (the *Ad Hoc* Committee on Asbestos Litigation) to study the asbestos litigation and produce recommendations. Second, in November 1990, eight federal district judges with significant asbestos experience sent a letter to the Judicial Panel for Multidistrict Litigation ("MDL Panel") urging the Panel to reverse its prior rulings on the issue and to consolidate the federal asbestos litigation in a single judicial district. Exhibit SP–206. Consolidation, these judges argued, would among other things "facilitate global settlements," and allow the transferee court to "fully explore ... national disposition techniques such as classes and sub-classes under Rule 23." *Id.* at 1.

27. In March 1991, the Rehnquist Committee issued its report. Exhibit SP–208. The report was a ringing condemnation of the asbestos litigation process in the tort system. The Committee stated:

> [T]he [asbestos] situation has reached critical dimensions and is getting worse. What has been a frustrating problem is becoming a disaster of major proportions to both the victims and the producers of asbestos products, which courts are ill-equipped to meet effectively.

*Id.* at 2. The Committee noted that an astonishing *six* percent of all civil cases filed in the federal courts in 1990 were asbestos-related (over 13,000 new federal cases), and that nearly two new asbestos cases are filed each year for every one case that is resolved. *Id.* at 7–8. The report concluded:

> The volume and complexity of asbestos cases have resulted in the violation of a basic tenet of American justice and the spirit of the Civil Justice Reform Act of 1990: speedy and inexpensive resolution of cases.

*Id.* at 10.

28. The Rehnquist Committee also expressed its hope that some alternative dispute resolution mechanism for processing asbestos claims could be fashioned. *Id.* at 14, 27–39. Dean Mary Kay Kane of the Hastings Law School was the Reporter for the Rehnquist Committee and testified in this case at the fairness hearing that the judges on the Committee considered the following factors to be of the kind preferable in such mechanism: that it provide for compensation to future asbestos claimants, that it pay claims quickly with low transaction costs, that it pay cash compensation only to those claimants who suffer some actual disability or impairment related to asbestos exposure, and that it have sufficient funds to guarantee compensation for all exposed persons who in the future develop such impairment or disability. Kane 2/22/94 Tr. at 164–71. This Court credits Dean Kane's testimony.

29. Shortly after the release of the Rehnquist Committee Report, the MDL Panel, accepting the recommendation of the eight judges with heavy asbestos dockets, issued an order on July 29, 1991 transferring all federal personal injury asbestos litigation to Judge Weiner of this Court for coordinated or consolidated pretrial proceedings. *In re Asbestos Prods. Liab. Litig.*, 771 F.Supp. 415 (J.P.M.L.1991). The Panel voiced its hope that the MDL transfer might foster global settlements of the "asbestos mess," noting that transfer "offer[s] a great opportunity to all participants who sincerely wish to resolve these asbestos matters fairly and with as little unnecessary expense as possible." *Id.* at 424. At the time of the MDL transfer, almost 30,000 claims were pending in the federal courts, with two times that number pending in the state courts. *Id.* at 416, 421.

30. After the MDL transfer, plaintiffs' and defendants' steering committees were formed for the MDL litigation. Fitzpatrick 2/22/94 Tr. at 99–100. Judge Weiner appointed Mr. Motley and Mr. Locks co-lead counsel of the Plaintiffs' Steering Committee after their election by committee members. *Id.* at 99; Exhibit SP–1020 at 6. It has not been shown that either CCR or any party to the instant case influenced the selection of these attorneys as co-lead counsel in the MDL litigation. Likewise, counsel for the

CCR defendants were active participants on the Defendants' Steering Committee, along with counsel for other asbestos defendants. Fitzpatrick 2/22/94 Tr. at 100.

31. In addition to the general discussions which had occurred between Mr. Motley and Mr. Fitzpatrick from 1987–1990, the natural genesis of the discussions leading to the negotiations for a settlement in this case was in the global settlement negotiations which began between the Plaintiffs' and Defendants' Steering Committees in the consolidated MDL litigation before Judge Weiner. The primary purpose of the settlement talks in the consolidated MDL litigation was to craft a national settlement that would provide an alternative resolution mechanism for asbestos claims. Fitzpatrick 2/22/94 Tr. at 100.

32. Perhaps the major issue facing those in the asbestos litigation was and is the filing of thousands of claims by workers with minimal x-ray changes associated with asbestos-exposure (*i.e.,* "pleural changes"), but with no physical impairment. During the MDL negotiations in 1991, there were significant differences of opinion within and between the Plaintiffs' and Defendants' Steering Committees about when and how to compensate these non-impaired "pleural claimants." Fitzpatrick 2/22/94 Tr. at 100–01. However, one possible concept emerged then as a starting point for further negotiation. Although plaintiffs' and defense counsel differed over whether immediate cash compensation should be provided to non-impaired pleural claimants who had *already* brought claims and entered the tort system, CCR believed there was a general consensus that pleural claimants in the *future* should receive some package of insurance-like benefits, including a waiver of the statute of limitations, and some reasonable assurance that there would be money, among other things, in return for deferring their receipt of cash compensation unless and until their condition worsened and they suffered some actual impairment. *Id.* at 105–06. No specific medical criteria for delineating impaired from non-impaired claimants was agreed to, but the general concept of negotiating such criteria was then a consensus among the affected parties. *Id.*

33. In late 1991, discussions between the MDL Plaintiffs' Steering Committee (and its co-chairs Messrs. Locks and Motley) and the Defendants' Steering Committee came to a head. Fitzpatrick 2/22/94 Tr. at 114. The Defendants' Steering Committee made an offer in November 1991, which would have provided plaintiffs' counsel with a single sum of money to resolve all present and future cases. It was proposed that non-impaired pleural claimants who had already filed claims in the tort system would receive some modest sum, and future pleural claimants would be deferred in exchange for a package of benefits as described above. *Id.* at 115–17.

34. The Plaintiffs' Steering Committee reported to the defendants that they had rejected the Defendants' Steering Committee's global settlement offer for two reasons. First, the Plaintiffs' Steering Committee felt that it would have difficulty dividing the sum of money among various claimants. Second, and closely related, it was felt that as to lawsuits already pending in the tort system, individual plaintiffs' counsel across the country would insist on negotiating these cases individually with defendants rather than accepting a sum determined by the MDL Plaintiffs' Steering Committee. Fitzpatrick 2/22/94 Tr. at 115.

35. Although some progress had been made in the MDL discussions concerning a global resolution of the asbestos crisis, these efforts ultimately broke down due to the inability of either side to get beyond the lowest common denominator on their points of agreement. Hatten 3/17/94 Tr. at 80. CCR believed, however, that significant progress had been made in the MDL discussions and hoped that a fair, equitable, and reasonable solution to the crisis could be found. CCR therefore determined to, and did, continue the discussions with lawyers known to CCR to be two of the most respected and active firms in the asbestos litigation, Ness, Motley and Greitzer and Locks, who were chosen by the Plaintiffs Steering Committee and approved by Judge Weiner as co-lead counsel in the MDL consolidated litigation. Ultimately, after another year of discussions and negotiations, the result was the

filing of this class action and the Stipulation of Settlement that is now before this Court. There was no contradictory history of this litigation presented by any Objectors before the Court, and most of this history is a matter of public record.

36. At the time of the settlement negotiations and the filing of this class action, the asbestos litigation was probably the most mature mass tort litigation in this country. The liability and medical issues had been the subject of massive discovery and trial and settlement experience, the results of which were known to Class Counsel and CCR.

## III. FAIRNESS OF THE SETTLEMENT

### A. *Introduction*

37. The Stipulation of Settlement in this proceeding is a 106–page document (with a 9–page amendment) which essentially sets up a schedule of benefits and an administrative procedure for compensating class members if and when they meet certain asbestos exposure and medical requirements.

38. Claims for compensation under the Stipulation are to be submitted to the staff of the CCR, who will process those claims in accord with the specific procedures set forth in the Stipulation. As explained below, there are numerous provisions for resolving disputes concerning application of the Stipulation to individual claimants, and there is also a provision for annual monitoring of the administration of the Stipulation by Class Counsel and by representatives of the AFL–CIO.

39. The Stipulation is an intricate document, with many provisions that were not debated during the course of the fairness hearing. This Court need not address here each such provision. Rather, this Court will focus on the negotiations which led to the Stipulation, on the primary provisions of the Stipulation, and on those provisions that have

generated complaint from the Objectors and certain *Amici.*

### B. *The Negotiations Between CCR and Class Counsel*

40. As is amply reflected by the complexity of the Stipulation, the testimony in the record and the parties' knowledge of this very mature litigation, the negotiations resulting in the Stipulation were difficult, lengthy, and time-consuming. Many discussions took place among parties of like interests to those here. Virtually no provision of the Stipulation was not the subject of significant negotiation. Rooney 2/28/94 Tr. at 200; Fitzpatrick 2/23/94 Tr. at 183–87; Hatten 3/17/94 Tr. at 89–91. The terms of the Stipulation changed substantially during the negotiations. Hatten 3/17/94 Tr. at 93; Hatten 3/18/94 Tr. at 9–11.

41. The negotiations included a substantial exchange of information as well. In March 1992, the CCR negotiators began to share certain confidential data with Class Counsel in order to further the negotiations. Rooney 2/28/94 Tr. at 178–80; Exhibits SP–500 through SP–502. The CCR had never before shared such confidential data with any plaintiffs' counsel. Rooney 2/28/94 Tr. at 179. The data furnished to these counsel consisted of certain schedules giving detailed information concerning the CCR defendants' historic settlement averages and the numbers of claims settled and filed against the CCR defendants over time. Rooney 2/28/94 Tr. at 178–80; Exhibit SP–502.[14]

42. In late October 1992, information on the insurance coverage available to CCR members was provided to Class Counsel. Rooney 3/3/94 Tr. at 79–80. Representatives of Peterson Consulting Limited Partnership, the firm that handles all insurance billing and coverage analysis for the CCR members, began meeting in October 1992 with Meadowcroft Associates, financial consultants employed by Class Counsel for this proceeding. Murray 3/11/94 Tr. at 174–76.

14. These schedules were used during negotiations of both the Compensation Schedule (Exhibit B to the Stipulation) and the Case Flow Maximums (Exhibits A and A* to the Stipulation).

The data base from which these schedules were compiled includes information on filings and disposition of claims against CCR members over several years. Murray 3/11/94 Tr. at 91. The schedules supplied to Class Counsel during the negotiations were checked for accuracy. *Id.* at 94.

43. Messrs. Locks, Motley and Rice also consulted other asbestos plaintiffs' counsel for their views on various provisions in the Stipulation during the negotiations. Hatten 3/17/94 Tr. at 89–99; Hatten 3/18/94 Tr. at 13–15, 163–65; Freeman 3/10/94 Tr. at 70.[15]

44. The Settling Parties' negotiations leading to the medical criteria were as well protracted and vigorous, commencing with agreement on certain general principles early in the discussions, but only concluding in a final agreement on all medical issues several months later, only a few days prior to filing the class action suit. Rooney 2/28/94 Tr. at 208–09; Rooney 3/1/94 Tr. at 248–49; Rooney 3/3/94 Tr. at 92. Class counsel did not consult with medical experts during the negotiations, but they had had many years of extensive and sophisticated experience with the medical issues that were being negotiated, and prior to the negotiations had from time to time consulted with a number of medical experts. Rooney 3/3/94 Tr. at 168–69.

45. As a result of the negotiations, changes were made in the medical criteria that made them more favorable to claimants. Hatten 3/17/94 Tr. at 92–93. One of the CCR defendants' objectives was to provide monetary compensation only to persons with "an asbestos-related malignancy or demonstrable impairment." Rooney 2/28/94 Tr. at 230. Class Counsel, on the other hand, did not want a "hard and fast rule with respect to qualification of an individual" claimant. *Id.* One result of the negotiations was to add a provision for Exceptional Medical Claims (described below) for those claimants who would not otherwise qualify for compensation under the objective medical criteria. *Id.* at 230–31.

## C. *Eligibility for Compensation*

46. The basic requirements that a claimant must meet for cash compensation under the Stipulation are (1) evidence of occupationally-related exposure to asbestos products supplied by one or more CCR defendants sufficient to meet the asbestos exposure criteria, and (2) evidence of a medical condition sufficient to meet the medical criteria. Exhibits SP–300, Part III.A at 12 and SP–509 at 2; Rooney 2/28/94 Tr. at 228. There is no requirement that a claimant prove any legal liability on the part of any CCR defendant. All liability defenses are waived by defendants except for exposure as aforesaid.

### (1) Asbestos Exposure Requirements

47. Under Parts IV.A and IV.C of the Stipulation, the asbestos exposure requirements are at least no more burdensome than they are under the law that would apply to the claimant's suit if it were in the tort system. Stipulation, Parts IV.A and IV.C at 19; Rooney 2/28/94 Tr. at 228–29. Disputes over whether sufficient occupational exposure has been shown by particular claimants are to be resolved by a single arbitrator selected by Class Counsel (with input from the AFL–CIO) and the CCR defendants. The exposure requirements serve the purpose of compensating those who have actual exposure to asbestos while excluding those with only trivial (*i.e.*, not medically significant) exposure to asbestos, Churg 3/3/94 Dep. at 31, and thus are fair and reasonable.

48. At the fairness hearing, the Objectors presented only minimal testimony in opposition to the exposure requirements. Oliver 3/14/94 Tr. at 144. Because it is factually clear that the exposure requirements will for some claimants be less burdensome to meet than in the tort system, and for others will mirror the tort system, such objections are not credited by the Court.[16]

---

**15.** Professor John P. Freeman, an expert and fact witness of the Settling Parties, testified that he attended a meeting held in Charleston, South Carolina in which Class Counsel briefed other plaintiffs' counsel on the terms of the settlement. Freeman 3/10/94 Tr. at 70.

**16.** Certain *Amici* asbestos suppliers and manufacturers have also objected to Part III.B.4 of the Stipulation, which states that asbestos exposure information (or similar data), which is furnished to the CCR by a class member seeking compensation, will be held confidential by the CCR. *See* SP–300, Part III.B.4 at 14–15. Based on the testimony, this Court finds that such confidentiality provisions are not unusual in settlement agreements in the asbestos litigation. Rooney 3/9/94 Tr. at 245–46. Furthermore, the Court finds that there is nothing in this confidentiality provision that would prevent a third-party from seeking access to the information in question

## (2) Medical Requirements/Criteria

49. Part V of the Stipulation contains a comprehensive set of medical criteria that the CCR defendants are to use in determining whether a claimant qualifies for compensation. Exhibit SP–300, Part V at 21–48, and SP–301 at 2–5. Part V thus serves to implement the requirement of Part III.A that a claimant submit "evidence that the Exposed Person meets the medical criteria for one of the Compensable Medical Categories, as defined in Part V, ... or should be identified as an Exceptional Medical Claim, under the procedure set forth in Part V.D" Part V contains five subparts.

50. Subpart A, "General Provisions," defines certain commonly used medical terms that are used in the medical criteria. These definitions are clear and accurate.

51. Subpart B, "Compensable Medical Categories," contains the basic medical criteria claimants are to meet to be eligible for cash compensation and includes four types of disease deemed associated with asbestos exposure. These are "mesothelioma" (a form of cancer of the lining of the lung or abdomen), "lung cancer," certain "other cancers" (such as colon-rectal tumors), and "non-malignant conditions" (defined as "asbestosis" and "bilateral pleural thickening"). Exhibits SP–300 at 25–26, 29–33 and SP–301 at 2–5. Each section in this subpart specifies the objective criteria that diagnosing physicians are to find in order for claimants' conditions to be currently compensable under the Stipulation.

52. Subpart C, "Disputes," provides for the resolution of disagreements as to the correctness of medical diagnoses by physicians under Subpart B. Exhibits SP–300 at 33–43 and SP–301 at 5, 8–9. In general, this subpart specifies that the Class Counsel (with input from the AFL–CIO), and the CCR defendants are to select, by agreement or arbitration, panels of physicians with designated specialties, depending upon the type of disease involved, who will review disagreements between claimants and the CCR defendants as to whether physicians' diagnoses are correct and meet the medical criteria in

the Stipulation. An initial review of claimant's diagnosis is to be made by one such panel member, assigned by rotation, and an additional review may be had at the request of either the claimant or the CCR defendants by two other panel members. To prevail in such a dispute where a diagnosis by a claimant's physician appears on its face to meet the medical criteria, the CCR defendants have the burden of showing that the diagnosis is "clearly erroneous," a burden that the defendants otherwise would not have in the tort system.

53. Subpart D, "Exceptional Medical Claims," provides for consideration of medical claims that do not automatically meet the prescribed medical criteria for compensation. Exhibit SP–300 at 43–47. Under this subpart, Class Counsel (with input from the AFL–CIO), and the CCR defendants are to select, by agreement or arbitration, an "Exceptional Medical Panel" of five physicians with particular specialties who will review on an annual basis "exceptional" claims submitted to the CCR defendants. In such cases, the diagnosing physicians believe that the claimants should be compensated because they suffer from conditions specified in one of the four compensable medical categories under Subpart B, notwithstanding the fact that, for one reason or another, the claims do not meet the specific medical criteria prescribed in the Stipulation for that category. Rules are prescribed regarding the diagnostic materials to be submitted with such claims and the procedures to be followed by the Exceptional Medical Panel. Exhibit SP–300 at 43. There are "caps" on the number of such exceptional claims that can be allowed in any one year, ranging from 5% of the "qualifying" mesothelioma claims for that year, as set forth in Part VIII of the Stipulation, to 20% of the qualifying lung cancer claims and another 20% of the other cancer claims for that year. Exhibit SP–300 at 47. Provision is made for a person whose claim is denied to resubmit a claim after two years if new supporting evidence becomes available. Exhibit SP–300 at 46–47.

54. The Exceptional Medical Panel is intended to, and does, identify claims that for

through a subpoena or other legal process.

Thus, the Court does not credit this objection.

reasons beyond the control of the claimant do not satisfy the requirements for a given compensable medical category. The Exceptional Medical Panel is required to exert every reasonable effort to implement the intent of the requirements of the compensable medical categories, which is to act as a "screen" to ensure inclusion only of exposed persons with asbestos-related conditions associated with those requirements. Exhibit SP–300 at 45.

### (a) Overall Fairness of the Medical Criteria

■ 55. The Court received testimony from seven expert medical witnesses regarding various aspects of the medical criteria in Part V.B, "Compensable Medical Categories." The Settling Parties presented the testimony of Dr. Paul Epstein, a board-certified pulmonologist from the University of Pennsylvania, who, among other things, served as Chair of an American Medical Association panel that recently published Guidelines to the Evaluation of Pulmonary Impairment (Epstein 3/8/94 Tr. at 6); Dr. James Crapo, a board-certified pulmonologist from Duke University, who is a former President of the American Thoracic Society (Crapo 1/13/94 Dep. at 92); Dr. Andrew Churg, a board-certified pathologist from the University of British Columbia, who, among many scholarly works, is author of a text entitled *Pathology of Occupational Lung Disease,* and who, among his professional qualifications, serves as the Chair of the U.S.–Canadian Mesothelioma Reference Panel (Churg 3/3/94 Dep. at 11–12); and Dr. Victor Roggli, a board-certified pathologist from Duke University, who is a member of the U.S.–Canadian Mesothelioma–Reference Panel, and who, among other scholarly works, is the author of a text entitled *Pathology of Asbestos Associated Diseases* (Roggli 3/8/94 Tr. at 223). *See* Exhibits SP–700 through SP–703. All these physicians have from time to time testified as experts over the years in the ongoing asbestos tort litigation, and all except Dr. Crapo regularly consult and testify for both plaintiffs and defendants. Epstein 3/8/94 Tr. at 9; Churg 3/3/94 Dep. at 23–24; Roggli 3/8/94 Tr. at 229. Drs. Epstein, Crapo, Churg and Roggli are competent experts because they have the knowledge, skill, experience, training and education to form an opinion on issues relating to their field of expertise.

56. All four of these experts reviewed the medical criteria in Part V and gave their professional opinions that the provisions are fair and reasonable, particularly in the context of the objectives of the Settling Parties to achieve a workable administrative system for the handling of future claims. It was the professional opinion of all four experts that the Stipulation will fairly include as eligible for compensation substantially all persons who have asbestos-related malignancies or other asbestos-related conditions involving demonstrable impairment. Epstein 3/8/94 Tr. at 32–33; Crapo 1/13/94 Dep. at 123, 138–40; Churg 3/3/94 Dep. at 25–27; Roggli 3/9/94 Tr. at 6–9.

57. All four of the Settling Parties' experts are also of the opinion that the medical criteria in the Stipulation would not exclude from cash compensation substantial numbers of persons with asbestos-related cancer or asbestos-related impairment. Dr. Epstein believes that although no compromise agreement can be perfect, this Stipulation will compensate "most of the people, the large majority, the overwhelming majority of individuals who have been truly damaged by exposure to asbestos ..." Epstein 3/8/94 Tr. at 33–34. Dr. Crapo reviewed the Stipulation to see if it excluded individuals with a significant asbestos-related disability or injury, and could not "find any significant process that should be compensated that doesn't fall in [the Stipulation]." Crapo 1/13/94 Dep. at 117. *see also* Churg 3/3/94 Dep. at 27; Roggli 3/9/94 Tr. at 7–9.

58. The Settling Parties' medical experts also emphasized that the Exceptional Claims Panel would serve to include meritorious claims which would not qualify under the specific medical criteria. Epstein 3/8/94 Tr. at 33–34; Crapo 1/13/94 Dep. at 125–26.

59. The Objectors proffered three expert witnesses regarding the medical criteria: Dr. Christine Oliver, a board-certified internist on the staff of the Massachusetts General Hospital and an Assistant Professor of Medicine at the Harvard Medical School (Oliver 3/14/94 Tr. at 71); Dr. Samuel Hammar, a practicing pathologist and teacher of patholo-

gy at the University of Washington (Hammar 2/3/94 Dep. at 6–7); and Dr. Kaye Kilburn, a board-certified internist from the University of Southern California (Kilburn 2/2/94 Dep. at 151). Dr. Hammar has performed independent research on asbestos-related disease, and while some years ago he performed litigation consulting work with an asbestos manufacturer (Johns–Manville), his primary litigation consulting work for some years has been for plaintiffs' counsel. Hammar 2/3/94 Dep. at 8–12, 16–18. Dr. Oliver and Dr. Kilburn have testified in the ongoing asbestos litigation (*e.g.*, Oliver 3/14/94 Tr. at 166–67; Kilburn 2/2/94 Dep. at 157–58), generally for plaintiffs' counsel. Drs. Oliver, Hammar, and Kilburn are competent experts because they have the knowledge, skill, experience, training and education to form an opinion on issues relating to their field of expertise.

60. Dr. Oliver was not asked for an opinion as to the overall fairness or reasonableness of the medical criteria in the Stipulation. Dr. Hammar, when asked his "overall opinion" simply described the Stipulation as a "well-organized" document which "set forth a certain amount of criteria" to determine "which persons fell into [certain categories] ..." Hammar 2/3/94 Dep. at 27 (he opined that certain medical criteria were "arbitrary" or "incorrect"). When Dr. Kilburn was asked his opinion of the Stipulation as a whole, he responded that "virtually every paragraph [was] objectionable, one way or another," and that the agreement "was a lousy, reprehensible, and diabolically cunningly designed document to take the rights and privileges away from the asbestos-exposed workers of America." Kilburn 2/2/94 Dep. at 24–25.

61. Based upon the testimony of these seven experts, the Court finds and accepts the testimony that the medical criteria of the Stipulation, viewed as a whole, meet the objectives of the Settling Parties of compensating substantially all claimants with asbestos-related cancer or asbestos-related impairment. Epstein 3/8/94 Tr. at 34–35; Crapo 1/13/94 Dep. at 98, 123; Roggli 3/9/94 Tr. at 4–5. In achieving these objectives, the medical criteria in the Stipulation present a sound and workable compromise of current medical and scientific opinion on important and sometimes difficult issues related to asbestos exposure and disease. *Id.* This finding is amply supported by the uniform and comprehensive opinions of the four experts presented by the Settling Parties in which they reviewed all the potentially controversial criteria.

62. The Court does not credit the testimony of the Objectors' medical experts. The three experts presented by the Objectors were not united in their overall view of the medical criteria, although they agreed with each other on certain specific issues. Nor did these three experts give meaningful opinions as to the reasonableness of the medical criteria in the context in which the criteria were put forth by the Settling Parties—that is, as a compromise of vigorously disputed complex issues in a large class settlement designed to provide a fair and workable system of handling future claims for asbestos-related malignancies and other demonstrable asbestos-related impairment. Rather, with the exception of Dr. Kilburn, whose diatribe against the medical criteria in their entirety appeared immoderate and contrary to the weight of the scientific evidence and therefore unpersuasive, the Objectors' experts merely pointed to specific aspects of the medical criteria that they questioned either as a purely scientific matter divorced from consideration of the settlement as a whole, or as less desirable provisions than others that might have been negotiated by the Settling Parties. *E.g.*, Oliver 3/14/94 Tr. at 171–72, 177–78. In sum, the Court finds that the testimony of the Objectors' medical experts is unpersuasive in the context of the task before the Court.[17]

---

17. There were virtually no substantive objections voiced to four portions of Part V: "A. *General Provisions*," "C. *Disputes*," "D. *Exceptional Medical Claims*," and "E. *Waiver of Medical Qualifications*." One medical expert witness for the Objectors, Dr. Christine Oliver, questioned certain provisions of Part V.A regarding the need for prescribed techniques for giving chest x-rays ("four views" of the chest and "graded quality one" films) and administering pulmonary function tests (use of bronchodilators), *see* Exhibit SP–300, Part V.A.8 and 10 at 23–24. Oliver 3/14/94 Tr. at 116–20. These points were adequately answered by an expert witness for the

### (b) The Major Specific Medical Issues

63. Two specific medical issues, involving two types of potential claimants, require closer attention: (1) compensation for claimants who only evidence pleural changes without impairment, *i.e.,* "pleural thickening" and "pleural plaques," and therefore do not meet the stated criteria for compensation in Part V.B.4 ("Non–Malignant Conditions"), and (2) compensation for claimants with lung cancer who only produce evidence of some asbestos exposure or pleural changes, or both, and who therefore do not meet the stated criteria for compensation in Part V.B.2 ("Lung Cancer").

### (i) "Pleural" Claims

64. As a result of the negotiations described above,[18] the non-malignant medical criteria in Part V.B.4 (in the subdivisions captioned "clinical evidence of asbestosis" and "pathological evidence of asbestosis") require either evidence of interstitial, or parenchymal, scarring on x-ray accompanied by abnormal pulmonary function test results, or comparable pathological evidence of scarring by tissue analysis to qualify for payment. Exhibit SP–300, Part V.B.4.b.c. A showing of pleural thickening can lead to immediate compensation in certain circumstances— where it is bilateral (*i.e.,* on both lobes of the lung), extensive, and accompanied by abnormal pulmonary function test results, as set out in Part V.B.4.d. The Settling Parties concede that these particular medical criteria would, in varying degrees, be more stringent than those used by some courts. Rooney 3/1/94 Tr. at 252–63. That concession is accepted by the Court.

65. This Court will consider the objections to the Stipulation centering on the issue of excluding pleural claims from qualifying for immediate cash compensation. The Objectors offered two expert witnesses in support of the objections, Drs. Oliver and Kilburn. The core of Dr. Kilburn's and Dr. Oliver's position, as reflected in their testimony, is that (1) they define "asbestosis" as including more individuals than those who qualify for immediate cash compensation under the Stipulation, and (2) they claim that individuals with pleural changes alone can have functional impairment and would therefore be improperly excluded from compensation. Kilburn 2/2/94 Dep. at 76, 156; Oliver 3/14/94 Tr. at 94–95, 126–30, 142–43, 210.

66. Neither the objections to the exclusion of pleural claims from qualifying for immediate cash compensation nor Drs. Kilburn and Oliver, however, has either adequately considered this issue in the context of the overall fairness and reasonableness of the compromise struck by the Settling Parties in the agreement, or in terms of the benefits received by those not receiving immediate cash compensation but receiving a group of non-cash benefits. *E.g.,* Oliver 3/14/94 Tr. at 171–72, 177–78.

67. Moreover, after reviewing and crediting the testimony of the four medical experts presented by the Settling Parties, this Court finds that Dr. Kilburn's and Dr. Oliver's opinions regarding asbestosis, pleural changes and impairment in those with pleural changes are in substantial disagreement with many of their colleagues and with a large and well-respected authoritative body of medical literature. Oliver 3/14/94 Tr. at 212–13; Kilburn 2/2/94 Dep. at 76; Epstein 3/8/94 Tr. at 25, 59–60, 207–08; Churg 3/3/94 Dep. at 62; Roggli 3/9/94 Tr. at 36. These Objectors' opinions are not accepted as persuasive in the context of the task before the Court. The Settling Parties' experts' opinions regarding pleural changes, on the other hand, reflected the prevailing view in the medical literature and are accepted by the Court. Epstein 3/8/94 Tr. at 25, 59–60.

---

Settling Parties, Dr. Epstein, who is a board-certified pulmonary specialist. Epstein 3/8/94 Tr. at 5, 40–42. The Court finds Dr. Epstein's testimony persuasive and the provisions of Part V.A fair and reasonable.

18. Early in the negotiations, the CCR defendants insisted upon a medical impairment line that would generally exclude immediate cash compensation for persons with asbestos-related pleural changes alone. The Settling Parties reached an understanding in principle several months prior to the final agreement that there would be medical criteria that set some such impairment line and defined compensable "asbestosis" accordingly. *See* Rooney 3/1/94 Tr. at 157, 3/3/94 Tr. at 5; *see also* Finding of Fact ("FOF") ¶ 44.

68. Based on the testimony of the Settling Parties' experts, the Court finds that pleural changes alone "will in the vast majority of the cases cause no symptoms[,]" "no change in physiology, and [ ] will not have any effect on the individual's life span." Epstein 3/8/94 Tr. at 25, 58; *see also* Epstein 3/8/94 Tr. at 58–60, 207–08; Crapo 1/13/94 Dep. at 45–47, 162–63; Churg 3/3/94 Dep. at 34, 62; Roggli 3/9/94 Tr. at 36–37.

69. Having credited the testimony of the Settling Parties' experts on this point, the Court finds that the Stipulation should not be considered unfair because individuals with "evidence of pleural thickening or pleural plaques alone" will not receive immediate cash compensation.[19]

70. Ultimately, having reviewed and credited the testimony of the Settling Parties' experts, the Court finds that the Stipulation's working definition of "asbestosis" and the exclusion from immediate cash compensation of claims for pleural changes alone are reasonable, particularly when the Stipulation also provides for a group of benefits for these claimants (as described and discussed below).

#### (ii) Lung Cancer

71. The second issue on which there appeared to be considerable disagreement between the Settling Parties and the Objectors was the reasonableness of the medical criteria for attributing a lung cancer to asbestos exposure in Part V.B.2. The Stipulation lists five medical criteria the presence of which will allow a claimant with lung cancer to qualify for compensation: (1) "clinical evidence of asbestosis" under Part V.B.4.b; (2) "pathological evidence of asbestosis" under Part V.B.4.c; (3) evidence of "bilateral pleural thickening" under Part V.B.4.d; (4) evidence of bilateral pleural thickening or plaques coupled with sufficient occupational exposure under Part V.B.2.c; (5) and favor-

able resolution by the Exceptional Medical Panel under Part V.D. Exhibits SP–300, Part V.B.2 at 26–27 and SP–301 at 2–3.

72. The medical criteria in the Stipulation would not automatically permit compensation of persons with lung cancer who simply produce some evidence of asbestos exposure, as reflected in a work history, or as reflected by pleural changes alone, or as reflected by some milder abnormality in a chest x-ray or pulmonary function test result than would qualify as "asbestosis" under the medical criteria, unless such a claim based upon a showing of exposure would be found persuasive to the Exceptional Medical Panel under Part V.D. Exhibit SP–300, Parts V.B.2 and V.D.

73. Two of the three medical experts offered by the Objectors, Drs. Oliver and Kilburn, explained that it was their medical opinion that a person "need have only a history of exposure" and "appropriate latency" to attribute his lung cancer to asbestos exposure. Oliver 3/14/94 Tr. at 230; *see also* Kilburn 2/2/94 Dep. at 146–48.

74. The third expert produced by the Objectors, Dr. Hammar, however, testified that it was his opinion that, in order to attribute lung cancer to asbestos exposure, "there has to be a concentration of asbestos in the lung tissue great enough to cause the disease asbestosis, and that can either be in the form of fibers per gram of lung tissue ... or asbestos bodies per gram of lung tissue." Hammar 2/3/94 Dep. at 40–41. The medical criteria in the Stipulation, however, do not provide for automatic compensation for lung cancer on the basis of such pathological or tissue analysis alone.

75. Dr. Hammar also testified that if the Exceptional Medical Panel were able to evaluate cases where there was an elevated fiber burden such as he described but no asbestosis, he would find the lung cancer criteria reasonable. Hammar 2/3/94/ Dep. at 94.[20]

---

**19.** It is important to note that pleural claimants are not uncompensated. They will receive a group of benefits under the Stipulation which is explained below. *See* FOF ¶¶ 171–76.

**20.** Dr. Hammar also expressed some concern over the 20% cap on the number of lung cancer claims that may qualify for compensation through the Exceptional Medical Panel. Ham-

mar 2/3/94 Dep. at 84–86. Dr. Hammar guessed that "maybe 30% of the cases that [he has] seen as a pathologist would" have significant concentrations of asbestos fibers in their lungs but would not have pathological evidence of asbestosis. After reviewing Dr. Hammar's testimony, and this particular provision of the Stipulation, this Court finds that the number caps on the claims payable through the Exceptional Medical

After reviewing Dr. Hammar's testimony and the testimony of the Settling Parties' experts on this point, the Court finds that method described by Dr. Hammar for attributing lung cancer to asbestos exposure would be persuasive to the Exceptional Medical Panel.

76. All seven medical experts who testified on this point recognized that there was a difference of opinion in the medical community as to whether underlying asbestosis is required before a lung cancer may be attributed to asbestos exposure or whether it is sufficient that there be exposure sufficient to cause asbestosis, whether or not the claimant has actually contracted asbestosis. *See, e.g.,* Hammar 2/3/94 Dep. at 45, 47–48. However, all four of the Settling Parties' experts found the medical criteria in the Stipulation to be a reasonable compromise between the mainstream opinions, and none of the four faulted the criteria for not permitting lesser evidence, such as recommended by Drs. Oliver and Kilburn. Churg 3/3/94 Dep. at 49–50, 52–53, 54–57 (describing the mainstream medical opinions); Crapo 1/13/94 Dep. at 86; Epstein 3/8/94 Tr. at 52–53, 55–57; Roggli 3/9/94 Tr. at 42–60, 134–47.

77. Having reviewed and credited the testimony of the Settling Parties' experts, this Court finds that the position of Drs. Oliver and Kilburn on this point is in substantial disagreement with the vast majority of their colleagues and with a large, well-respected and authoritative body of medical literature. *E.g.,* Churg 3/3/94 Dep. 57.

78. Given the provision in the Stipulation for the Exceptional Medical Panel, this Court finds that few, if any persons with lung cancer that is claimed to be attributable to asbestos exposure would be denied compensation under the Stipulation. Epstein 3/8/94 Tr. at 56–57; Roggli 3/9/94 Tr. at 48–60; Hammar 2/3/94 Dep. at 94.

79. Ultimately, having reviewed and credited the testimony of the Settling Parties' experts on this point, this Court finds that the lung cancer qualifying criteria in the Stipulation are fair and reasonable.

Panel represent a fair and reasonable compro-

### (c) Subsidiary Medical Issues

80. Various objections were made to other specific portions of the medical criteria in the Stipulation that, for purposes of discussion, may be grouped as follows: (i) Mesothelioma, Part V.B.1, (ii) Lung Cancer, Part V.B.2, (iii) Other Cancer, Part V.B.3, and (iv) Non–Malignant Conditions, Part V.B.4.

### (i) Mesothelioma

81. The Objectors raised the following concerns regarding the medical criteria for mesothelioma prescribed in Part V.B.1 of the Stipulation: that the criteria may not be clear enough to include "pericardial" mesotheliomas (Hammar 2/3/94 Dep. at 31; Oliver 3/14/94 Tr. at 144); that the criteria should be clarified to include specific references to compensation for mesotheliomas of the "tunica vaginalis" and diagnosis of mesotheliomas by "electron microscopy" (Hammar 2/3/94 Dep. at 30–31); that a latency period of ten years may not provide for the possibility that a person with mesothelioma would be diagnosed less than ten years after first exposure (Hammar 2/3/94 Dep. at 33–34); and that the criteria's insistence upon pathological diagnoses, *i.e.,* from tissue analysis, as opposed to diagnosis merely by clinical observation may not be fair (Oliver 3/14/94 Tr. at 145).

82. The Settling Parties' experts testified on these issues, and having reviewed and credited their testimony, this Court finds that the mesothelioma criteria are fair and reasonable and that the objections to the mesothelioma criteria are not supported by persuasive evidence. Churg 3/3/94 Dep. at 30; Epstein 3/8/94 Tr. at 47; *see also* Hammar 2/3/94 Dep. at 31 ("pericardial" mesothelioma is "very rare"); Hammar 2/3/94 Dep. at 30–31 (mesotheliomas of the "tunica vaginalis" are probably implicitly included in the mesothelioma criteria); Hammar 2/3/94 Dep. 33–34 (a latency period for mesothelioma of less than ten years is "a very rare thing."); Oliver 3/14/94 Tr. at 145 (most cases of mesothelioma are diagnosed from pathological evidence and not merely by clinical observation).

mise.

### (ii) Lung Cancer

83. This Court has already made findings regarding the basic qualifications for compensability for asbestos-related lung cancer under Part V.B.3 of the Stipulation. FOF ¶¶ 71–79. The Objectors also raised the following concerns regarding specific aspects of the criteria: that the requirement in Part V.B.2.a that lung cancer diagnoses be made by a board-certified pathologist, pulmonary specialist, or oncologist may be unnecessary (Oliver 3/14/94 Tr. at 156–57); and that the twelve-year latency requirement for lung cancer in Part V.B.2.b may be unfair because the Objectors' experts believed that lung cancer can occur within shorter periods after first exposure to asbestos (Hammar 2/3/94 Dep. at 35–36; Kilburn 2/2/94 Dep. at 172–73; Oliver 3/14/94 Tr. at 157).

84. Having reviewed the Objectors' experts' testimony on these issues, having found their testimony unpersuasive, and having credited the testimony of the Settling Parties' expert who testified as to one of the issues, this Court finds that the lung cancer criteria are fair and reasonable. Epstein 3/8/94 Tr. at 51 (testifying as to the latency requirement for lung cancer); *see also* Hammar 2/3/94 Dep. at 36 (acknowledging that he had seen "very few" lung cancer cases that he thought were asbestos-related but that had shorter latency periods).

### (iii) Other Cancer

85. Part V.B.3 of the Stipulation provides for compensation for certain types of cancer other than lung cancer and mesothelioma. Some of the Objectors asserted that still other types of cancer can be asbestos-related and should be compensated under the agreement, such as: kidney cancer, pancreatic cancer, oral pharyngeal tumors, and lymphoma. Kilburn 2/2/94 Dep. at 165–66; Oliver 3/14/94 Tr. at 161 (would only add kidney cancer); Hammar 2/3/94 Dep. at 61–62 (same).

86. The Settling Parties' experts testified on these issues and agreed that there was not sufficient scientific evidence to associate kidney cancer with asbestos exposure. Roggli 3/9/94 Tr. at 40; Crapo 1/13/94 Dep. at 96; Epstein 3/8/94 Tr. at 30–31. Having reviewed and credited their testimony, this Court finds that the medical criteria for other cancer are fair and reasonable and that the objections regarding the exclusion of certain other cancers are not supported by persuasive evidence.

### (iv) Non–Malignant Conditions

87. Beyond the objections regarding the basic impairment criteria for non-malignant conditions that have been discussed earlier in these findings, some of the Objectors, supported by one or more of their medical experts, raised the following specific concerns regarding the non-malignant conditions criteria in Part V.B.4 of the Stipulation: that the latency requirement in Part V.B.4.a "will be a problem" for certain class members (Oliver 3/14/94 Tr. at 121); that the requirement that diagnoses of non-malignant conditions be made by board-certified internists, pulmonary specialists or pathologists is not necessary (Oliver 3/14/94 Tr. at 122); that the requirement in Part V.B.4 that x-rays be read by a "certified B-reader" is not necessary (Kilburn 2/2/94 Dep. at 162); that the requirements for abnormal pulmonary function test results in Part V.B.4 are not adequate to take account of some persons, chiefly smokers, who have both "restrictive" disease from asbestos exposure and "obstructive" disease and whose total lung capacity may therefore be normal (Oliver 3/14/94 Tr. at 138–39; Hammar 2/3/94 Dep. at 52–53); that the requirement of in Part V.B.4.c of evidence of asbestos bodies in the tissue sample for a pathological finding of asbestosis may be unfair (Hammar 2/3/94 Dep. at 53); that the Stipulation should provide compensation for "fear of cancer" and "medical monitoring" of persons with exposure to asbestos but who do not manifest a qualifying condition (Kilburn 2/2/94 Dep. at 160, regarding medical monitoring); and that the Stipulation should compensate persons with benign "pleural effusions" because they may be caused by asbestos exposure and they may cause impairment (Kilburn 2/2/94 Dep. at 162–64).

88. Having reviewed the Objectors' experts' testimony on these issues, having found their testimony does not support a conclusion that the medical criteria for non-

malignant conditions are unfair or unreasonable, and having credited the testimony of the Settling Parties' experts who testified as to several of these issues, this Court finds that the medical criteria for non-malignant conditions are fair and reasonable. Epstein 3/8/94 Tr. at 36, 38–40, 60–61, 72–96; Crapo 1/13/94 Dep. at 48, 56–59, 76–79, 186; Churg 3/3/94 Dep. at 35–36, 73–74; Roggli 3/9/94 Tr. at 28–30; see also Kilburn 2/2/94 Dep. at 64 (uses a fifteen-year latency period in his work); Oliver 3/14/94 Tr. at 75–76, 185–86 (uses B-readers in her work); Hammar 2/3/94 Dep. at 57 (rarely has seen cases where asbestos bodies were lacking and fibrosis was considered to be asbestos-related).

### D. *Compensation Procedures*

89. Parts VII, VIII and IX of the Stipulation set forth procedures for determining how, when, and how much will be paid for claims that qualify for compensation. Part VII establishes a (1) Compensation Schedule for the payment of qualifying claims; (2) Part VIII sets forth the Case Flow Maximums and payment procedures; (3) and Part IX discusses the payment of "extraordinary" claims. Exhibits SP–300, Parts VII–IX at 51–66 and SP–301 at 5–6.

### (1) Compensation Schedule

■ 90. The Compensation Schedule (described in Part VII and attached to the Stipulation as Exhibit B) [21] sets forth a maximum and a minimum value, as well as a middle range (a so-called "negotiated average value range"), for each of the four medical categories. These values will be used to determine compensation dollar payments for most of the qualifying claims under the Stipulation. Rooney 2/28/94 Tr. at 233; Exhibits SP–300 (Exhibit B) and SP–509 at 6. The Compensation Schedule also includes a "negotiated average value" for "extraordinary" claims, which will be used to determine the funds available for the payment of such "extraordinary" claims. Rooney 2/28/94 Tr. at 235–36;

Exhibits SP–300 (Exhibit B) and SP–509 at 6.

91. A claimant who qualifies for compensation under the Stipulation has several options for obtaining compensation: (1) the "simplified" payment procedure, whereby he or she will receive the "minimum value" in the appropriate medical category in a short period of time (Exhibit SP–300, Part VIII.B at 55–56; Rooney 2/28/94 Tr. at 245); (2) the "individualized" payment procedure, whereby he or she will receive compensation in some amount between the "minimum" and "maximum" values for the appropriate medical category, and where the average of all compensation amounts offered to claimants in that medical category in a six-month interval will fall within the "negotiated average value range" for that medical category (Exhibit SP–300, Part VIII.B at 58; Rooney 2/28/94 Tr. at 233–34; Murray 3/11/94 Tr. at 105–06); and (3) the "extraordinary" claim procedure, whereby the claimant will be awarded an amount due to extraordinary damages by an independent three-person panel [22] from a fund of money calculated using the "negotiated average value" for "extraordinary" claims on the Compensation Schedule (Exhibit SP–300, Part IX at 61–66; Rooney 2/28/94 Tr. at 235). *See also* Rooney 2/28/94 Tr. at 235, 245–46.

92. For those qualifying claimants that elect the individualized payment procedures, Part VIII.B.2 provides that the CCR will make offers to such claimants based on all the factors that it has used historically to evaluate claims for settlement. These factors include:

> type of claim, nature and extent of asbestos disease or injury, questions of medical causation, disability, age, number and age of dependents, special damages, pain and suffering, likelihood and amount of exposure to products manufactured or supplied by the CCR defendants ... job history, location of the forum in which a lawsuit for asbestos-related injury or damage could

---

**21.** The Compensation Schedule is also attached to this memorandum opinion.

**22.** One member of this three-person panel will be selected by counsel for the CCR defendants, and one member will be selected by Class Coun-

sel, with input from the AFL–CIO. These two panel members will jointly select the third member of the panel. Exhibits SP–300, Part IX.D at 62–63 and SP–301 at 8–9; Rooney 2/28/94 Tr. at 238–41.

properly be maintained by the Claimant, information concerning historical settlement values, jury verdicts, and judgments in comparable cases involving various plaintiffs' counsel in that forum and in other jurisdictions, type of release to be provided by the Claimant, and any other relevant criteria generally utilized in the settlement of litigated tort cases. Exhibits SP–301 at 5–6, SP–300, Part VIII. B.2.a at 57 and SP–509 at 9; Rooney 2/28/94 Tr. at 234–35, 246–47. These factors will be weighed by the CCR in accord with its historical practices. Exhibit SP–301 at 6; Rooney 2/28/94 Tr. at 247. Generally, claims will be paid in the order in which they are submitted; however, this principle may change in any year where the maximum number of qualifying claims in a medical category exceeds the number that may be paid. Exhibit SP–300, Part VIII.B.3 at 59; *see for explanation* Rooney 3/1/94 Tr. at 132–33, 144.

93. Part VII.B of the Stipulation further provides that, after the first ten years that the settlement operates, Class Counsel and the CCR defendants will renegotiate the Compensation Schedule. Part VII.B provides a dispute resolution procedure for deciding this issue if Class Counsel and the CCR defendants cannot agree. The values in the Compensation Schedule may not be adjusted at that time by greater than 20%. Exhibit SP–300, Part VII at 52.

94. The values in the Compensation Schedule, including those set for the payment of extraordinary claims, were negotiated based on the CCR defendants' historical settlement averages and several other factors. These other factors included reasons for increasing the compensation payments over the CCR's historical averages, such as that the historical averages include payments made to claimants without demonstrable breathing problems due to asbestos whose claims will be deferred under the Stipulation. Rooney 2/28/94 Tr. at 241–43; Exhibit SP–

509 at 8. They also included reasons for decreasing the compensation payments from the CCR's historical averages, such as the fact that the Stipulation involves a waiver of defenses to qualifying claimants by the CCR defendants; that payments under the Stipulation should, in most cases, be made faster than under the tort system at lower transaction costs, including attorneys' fees; and finally, that qualifying claimants with non-malignant conditions will be able to receive additional compensation if and when they contract cancer.[23] Rooney 2/28/94 Tr. at 243–45; Exhibit SP–509 at 8.

95. Having reviewed the underlying documents provided to Class Counsel during the negotiations and accepted into evidence at the fairness hearing, and having found these documents to be accurate and valid, this Court finds that the values in the Compensation Schedule are indeed a reasonable reflection of the CCR defendants' historical settlement averages from the tort system. Exhibits SP–502, SP–504 and SP–601(B)–(D); Rooney 2/28/94 Tr. at 182–85; Rooney 3/1/94 Tr. at 115–28; Murray 3/11/94 Tr. at 94–101, 109–11, 112–15, 128–30 (analyzing the CCR defendants' historical data). This Court further finds that it was reasonable and logical for the CCR defendants and Class Counsel to negotiate the values in the Compensation Schedule based on the CCR defendants' historical averages and the other factors described above. This Court finds that the Objectors have offered no persuasive evidence that the method for setting these values or the values themselves are manifestly flawed.

96. The Objectors raised several concerns regarding the Compensation Schedule. First, the Objectors question why the information provided to Class Counsel regarding the CCR defendants' historical averages did not break down the claims in the non-malignant medical category into "asbestosis," "disputed asbestosis," and "pleural." There was

---

**23.** As set forth in ¶¶ 105, 130 and 137, this Court finds based on the evidence at the fairness hearing that, on average, claims against the CCR defendants in the tort system take almost three years to resolve, and that delays in certain jurisdictions are much longer; that 33–40% contingency fee contracts are the norm in the asbestos litigation (compared to the 20–25% contingency fee maximum for claims under the Stipulation); and that 90% of the claims settled by the CCR defendants in the tort system have been settled for "full" releases, with the claimant thereby waiving all rights to additional compensation if cancer later develops.

testimony at the fairness hearing that the CCR defendants had data with the non-malignant category broken down as the Objectors described. Rooney 3/1/94 Tr. at 171–75. However, this Court infers from the testimony that such data would not have been a reliable basis for negotiation of the values in the Compensation Schedule because there were in place no standards for the CCR claims personnel to follow in placing non-malignant claims in the three categories and the data collected was thus flawed. Rooney 3/3/94 Tr. at 41–44; Rooney 3/1/94 Tr. at 177–80; Fitzpatrick 2/24/94 Tr. at 15–22. Having credited the above-mentioned testimony, this Court finds that it was not reasonable for Class Counsel to demand such data for purposes of negotiating the values in the Compensation Schedule.

97. The Objectors argued that because the CCR defendants' averages increased during 1992, the use of four-year historical averages as a primary component of the compensation amounts under the Stipulation is unfair. *See* Fitzpatrick 2/23/94 Tr. at 225. However, there was testimony, which this Court credits, that the increase was caused primarily by the settlement in 1992 of large consolidated trials in Maryland and New York. Rooney 2/28/94 Tr. at 185–86. Furthermore, the 1992 increase was fully disclosed during the negotiations. *Id.* Accordingly, this Court finds that the four-year settlement averages for the CCR defendants constitute a reasonable basis for determining the compensation values under the Stipulation.

98. The Objectors' also argue that the Compensation Schedule is unfair because they claim that the loss of consortium claims are thereby settled for no compensation. Based on the evidence at the fairness hearing, however, this Court finds that the CCR defendants' historical averages, upon which the compensation values are based, include payments for loss of consortium claims, and, accordingly, the Compensation Schedule is not unfair for this ascribed reason. Rooney 2/28/94 Tr. at 186–87.

99. Finally, the Objectors argue that the Compensation Schedule is unfair because it contains no adjustment for inflation. This Court has taken judicial notice of the general Consumer Price Index statistics, see Order, Dkt. No. 1005 (April 8, 1994), and the CCR defendants presented no evidence at the fairness hearing to rebut the Objectors' argument that a settlement agreement that settles future cases over the course of ten years should indeed contain an adjustment for inflation. *See* Hatten 3/17/94 Tr. at 13.[24] Having reviewed and considered the arguments on this issue, the Court finds that a picture perfect negotiator for the class members might have insisted on and achieved an adjustment for inflation. However, the Court also finds that the absence of such an adjustment does not render the Stipulation unreasonable or unfair when viewed as a whole in light of the significant advantages presented to the class members.

100. In sum, this Court finds that the compensation values under the Stipulation are fully justified by the CCR defendants' historical settlement averages and other factors, and, accordingly, that the compensation values are fair and reasonable to the class. The objectors' arguments concerning the inadequacy of these compensation amounts do not persuade this Court that they are unfair to the class.

### (2) Case Flow Maximums

■ 101. The Stipulation also contains, as Exhibit A and A*, annual Case Flow Maximums for the payment of qualifying claims during the first ten years of the Stipulation. These Case Flow Maximums govern only the timing of when claims may be paid; the CCR defendants remain obligated to pay all qualifying claims. Moreover, the Case Flow Maximums may be adjusted one time during the first ten years of the Stipulation, and are subject to renegotiation without limitations after ten years. Exhibit SP–300, Part VIII.A at 53–54 (and Exhibit A*); Rooney 3/1/94 Tr. at 14–15. If after ten years, Class Counsel and the CCR defendants cannot agree on new Case Flow Maximums, Part

---

24. Mr. Hatten testified that in his almost twenty years of experience, inflation has generally not been taken into account in settlement negotiations. This Court finds that Mr. Hatten was not discussing the type of settlement negotiations at issue in this class action.

VIII.A.3 provides a dispute resolution procedure. Exhibit SP–300, Part VIII.A.3 at 54; Rooney 3/1/94 Tr. at 19–20.

102. There are various provisions of the Stipulation that allow the Case Flow Maximums in a given medical category to be exceeded in a given year if less than the maximum number of claims or settlement dollars have been paid in another category. Exhibit SP–300, Part VIII at 60; Rooney 3/1/94 Tr. at 5–7; Murray 3/11/94 Tr. at 116–17. To the extent there are such "saved" dollars, qualifying claims in the mesothelioma category will be the first additional claims paid. Exhibit SP–300, Part VIII.C at 60; Rooney 3/1/94 Tr. at 5–6. Further, Part VIII.A provides that if the number of qualifying claims in any medical category exceeds these Case Flow Maximums in a given year, then such excess claims shall have priority for payment in the next year. Exhibit SP–300, Part VIII.A at 53; Rooney 3/1/94 Tr. at 4; Murray 3/11/94 Tr. at 116.

103. The Case Flow Maximums were negotiated based on the number of claims settled by the CCR defendants in each of the four disease categories in each of the four years preceding the settlement. Taken into account was CCR's commitment to settling all present claims filed against the CCR defendants in the tort system in addition to settling future claims through the Stipulation. Exhibit SP–502; Rooney 2/28/94 Tr. at 187–89; Rooney 3/1/94 Tr. at 9–11.

104. At the fairness hearing, the Settling Parties presented additional evidence, which this Court credits, to substantiate the point that the Case Flow Maximums, if reached, would result in the CCR defendants paying more claims, at a faster rate, than they have ever paid in the past. Exhibit SP–601(G) shows that, from October 1988 through the date that the Stipulation was filed (January 15, 1993), the CCR defendants settled (calculated on a paid basis) approximately 60,000 claims in the tort system during this four-and-one-quarter year period. Murray 3/11/94 Tr. at 102–03. *See also* Exhibit SP–504 at Bates Stamp No. CCR 2000313. Taking into account payment of settlements for the remainder of the pending tort claims (either under previously agreed-to or new settlements), and payment of "future" claims at the Case Flow Maximums in the Stipulation, SP–601(G) shows that the CCR defendants would pay settlements in approximately 225,000 claims from January 15, 1993 through the end of 2003. Murray 3/11/94 Tr. at 118–126. Exhibit SP–601(H) contains this data to set forth the calculation of the average number of claims paid per year by medical category both before (October 1988—January 15, 1993) and after (January 15, 1993—December 31, 2003). Murray 3/11/94 Tr. at 120–24, 127. Exhibits SP–601(G) and SP–601(H) together show that, in the mesothelioma, other cancer, and non-malignant medical categories, the CCR defendants would pay more claims each year after the instant Settlement Stipulation was filed than they did during the four years prior to this filing; in the lung cancer category, the CCR defendants would pay claims at approximately the same rate that they have historically paid such claims. Murray 3/11/94 Tr. at 127.[25]

105. This Court also finds based on the evidence at the fairness hearing that the average asbestos case takes almost thirty-one (31) months to resolve in the tort system, Exhibit SP–208 at 10–11, and that claims against the CCR defendants have, on average, taken almost three years to resolve. Rooney 3/1/94 Tr. at 129–30, 155, 67–68.

106. The Objectors argued that the Case Flow Maximums in the Stipulation are set unfairly low. The CCR defendants settled 128,000 claims in the last five years (1989–93). *See* Fitzpatrick 2/23/94 Tr. at 131–32. However, there was explanatory testimony, which this Court credits, that more claims were settled in the tort system by the CCR defendants in 1993 than ever before (approximately 53,000) because after this class action was settled, the CCR defendants undertook to settle all present tort claims over the next five years. Fitzpatrick 2/23/94 Tr. at 136;

---

25. In a March 18, 1994 Order, this Court ruled that both Exhibits SP–601(G) and SP–601(H), along with certain other of the Settling Parties' exhibits, are to be treated as confidential in accord with the Court's December 3, 1993 Confidentiality Order, and that such exhibits are to be maintained under seal.

Exhibit SP–300 at 3. Prior to 1993, the most claims that the CCR defendants had ever settled in one year was approximately 25,000 (1992), and the most claims they had ever paid in one year was approximately 19,000 (1990). Murray 3/11/94 Tr. at 102–03; SP–504 at Bates Stamp No. CCR 2000313. In other years, the number of claims settled or paid has been much lower. Exhibit SP–504 at Bates Stamp No. CCR 2000313.

107. The Objectors also argued that the Case Flow Maximums are inadequate for the following reasons: (1) the Case Flow Maximums are less than the annual new case filings against the CCR defendants; (2) the maximum number of lung cancer claims is slightly less than the maximum number of mesothelioma claims even though the CCR defendants have traditionally settled more lung cancer claims than mesothelioma claims; (3) the decrease from year-to-year in the mesothelioma and lung cancer categories is too great (Nicholson 3/31/94 Dep. at 64–66).[26] None of these arguments, however, refutes the central fact which this Court finds is supported by the evidence at the fairness hearing: the Case Flow Maximums, if reached, would result in the CCR defendants paying claims at a faster rate, than they have ever paid before, in the mesothelioma, other cancer, and non-malignant medical categories, and paying lung cancer claims at approximately the same rate that they have paid such claims historically. Murray 3/11/94 Tr. at 127; Exhibit SP–601(H). Further, with respect to lung cancer claims, the medical testimony, which this Court credits, was that claims for asbestos-related lung cancer should be on the decline due to the diminished levels of asbestos exposure to the class members in the past few decades. *See* Roggli 3/9/94 Tr. at 59.

108. Based on the foregoing findings of fact, this Court finds that the Case Flow Maximums will result in less delay for asbestos claimants than that experienced in the present tort system, and in the payment of the same amount of or more claims each year than CCR paid during the four years prior to this filing. Accordingly, this Court finds that the Case Flow Maximums are reasonable, adequate and fully justified by the evidence at the fairness hearing. The Objectors' arguments to the contrary are rejected as unpersuasive.

### (3) Extraordinary Claim Procedure

109. For those qualifying claimants that elect the extraordinary claim procedure, Part IX.C of the Stipulation provides that the Extraordinary Claims Panel will select extraordinary claims at annual intervals. Exhibit SP–300, Part IX.E.1 at 63. Criteria for selection as an "extraordinary" claim will include:

> a combination of age, number and age of dependents, relevant economic factors, an unusually high percentage of exposure to the asbestos or asbestos-containing products of the CCR Defendant(s) ... or other similar factors that would demonstrate a truly extraordinary claim for compensatory damages against the CCR Defendant(s) if litigated as a tort case in an appropriate forum.

Exhibits SP–300, Part IX.C at 62–63 and SP–509 at 10. The number of extraordinary claims able to be selected will be capped at a certain percentage of total qualifying claims for each medical category. Exhibit SP–300, Part IX.E.1 at 63–64; Rooney 2/28/94 Tr. at 235–37.

110. The "negotiated average value" figures for extraordinary claims set forth in the Compensation Schedule (Exhibit B) will be used to determine the fund of money that the Extraordinary Claims Panel has available to award every year. There is no fixed limit on the amount that may be awarded by the panel to any claim that it selects as extraordinary, but the total amount of money avail-

26. As to the third argument, the Objectors presented the expert testimony of Dr. William Nicholson, a Ph.D. scientist and professor from the Mount Sinai School of Medicine in New York City. Nicholson 3/31/94 Dep. at 10–13. In 1982, Dr. Nicholson published his opinion as to some general projections of future asbestos-related disease. *Id.* at 41–49. However, Dr. Nicholson admitted that the general projections in the 1982 paper could not be extrapolated to project the experience of a particular company or group of companies without more information. *Id.* at 84–86. In view of this concession, the Court does not consider the 1982 paper relevant or persuasive to the issue of whether the Case Flow Maximums here are adequate.

able for such extraordinary claimants is capped, as indicated above. Exhibit SP–300, Part IX.E.2 at 64–65; Rooney 2/28/94 Tr. at 235–38.

111. Based on the foregoing findings of fact, and after reviewing the evidence on the record on this issue, the Court finds that the Extraordinary Claims Procedure, including the cap on the amount available for all extraordinary claims, is reasonable and fair to the class. There were no substantive objections to the Extraordinary Claims Procedure which the Court credits.

#### (4) Other Issue

■ 112. The Objectors raised one final argument regarding the procedures for evaluating and paying claims under the Stipulation: that it is improper to include the identity of "plaintiffs' counsel" in the list of factors to be considered in settlement offers under the individualized payment procedures. Part VIII.B.2 describes this factor to include "historical settlement values, jury verdicts, and judgments in comparable cases involving various plaintiffs' counsel in that [appropriate] forum and in other jurisdictions." Exhibit SP–301 at 6. This Court infers from the record that the "identity of counsel" factor means that the claim evaluator for CCR will consider the demonstrated skill, ability, talent and experience of a claimant's counsel to assemble, understand and present the claim and the materials in support thereof and to fairly arrive at the settlement demand presented to CCR. This Court takes judicial notice of the fact that such considerations are endemic to all similar relations with attorneys making claims of any and all kinds.

113. Under Part VIII.B.2 of the Stipulation, however, this factor is only one of several factors to be weighed by the CCR in making settlement offers, and its importance will vary from claim to claim and over time. Fitzpatrick 2/24/94 Tr. at 86–87, 135–37. Furthermore, an individual claimant's lawyer's ability to litigate a claim before the Extraordinary Claims Panel under Part IX or in the alternative dispute resolution procedures under Part X of the Stipulation is relevant to the settlement offer that the claimant would receive from the CCR. Fitzpatrick 2/24/94 Tr. at 132–33, 126–27; Fitzpatrick 2/23/94 Tr. at 80–81. There is no suggestion that the "identity of counsel" factor will dominate substantive factors in the evaluation process.

114. In short, the Court finds that the reference to "plaintiffs' counsel" in the list factors in Part VIII.B.2 is of minor significance and is reasonable based upon historically considered factors.

### E. Alternative Compensation Procedures

■ 115. Part X of the Stipulation provides a procedure whereby claimants with qualifying claims, who are not satisfied with the settlement offers they receive under the other procedures of the Stipulation, may have their claims resolved in the tort system or through binding arbitration. Exhibits SP–300, Part X at 67 and SP–509 at 15. Under Part X.A, however, there is a limit on how many qualifying claimants may make this election each year, which is a set percentage by medical category,[27] of the qualifying claims that were paid in that medical category during the previous year. Those claimants that wish to proceed to the tort system or to binding arbitration but who exceed this numerical limitation will have the first priority to have their compensation amount determined in this fashion in the next year.[28] Exhibit SP–301 at 6–7; Rooney 3/10/94 Tr. at 31.

---

27. The maximum number of qualifying claimants who may make this election shall not exceed, in any one year, 1% of either the total number of claims that qualified for payment in each compensable medical category during the previous year or the maximum number of qualifying claims that may be paid in each compensable medical category during the previous year. Exhibit SP–300, Part X.A at 67–68.

28. Under Part X.A.3, qualifying claimants are generally to proceed to the tort system or to binding arbitration in the order in which they make an election to so proceed (so-called "FIFO" or "first in-first out" order). If the case flow limits are exceeded in a given year, however, this Court, upon application, will have authority to alter this principle of FIFO order so that a "disproportionate number" of claimants proceeding to the tort system or binding arbitration in that year in a given medical category are not represented by one attorney or firm. Exhibit SP–301 at 7–8.

116. Part X.C provides that the only issues to be resolved in claims that proceed to the tort system or binding arbitration under Part X will be (a) "whether the exposed person has/had an asbestos-related disease or condition"; (b) whether exposure to asbestos products of a CCR defendant "was a substantial contributing factor in causing the ... condition;" and (c) "the amount of compensatory damages, if any, to be awarded." Exhibit SP–300 Part X.C at 70. Thus, certain liability defenses may not be raised. In addition, Part X.C specifically provides that neither punitive damages nor damages for increased risk of cancer may be sought or recovered under this provision. Part X.C explains that the reason that damages for increased risk of cancer may not be recovered is that a claimant who recovers damages for a nonmalignant condition under this Part will have the right to present a claim for additional compensation for a malignant condition, if such a malignancy develops. Exhibit SP–300, Part X.C at 71–72.

117. Part X.D of the Stipulation explains that there is no limit on the amount of damages that may be awarded to a claimant who elects to have his or her compensation determined in this manner. To the extent, however, that the damages award exceeds 150% of the CCR's last settlement offer, the excess will be paid over five years. SP–300, Part X.D at 72–73; SP–509 at 15.

118. The evidence at the fairness hearing established that the annual percentage limitations for claimants that may make the election under Part X of the Stipulation each year far exceeds the percentage of claims that have historically proceeded to verdict against the CCR defendants in the tort system. Fitzpatrick 2/22/94 Tr. at 130–32; Exhibit SP–217; Fitzpatrick 2/23/94 Tr. at 132–34; Exhibit SP–509 at 15. Also, testimony at the fairness hearing established that no judgment for punitive damages in an asbestos personal injury case has ever been entered against any of the CCR members in the almost six years that the CCR has been in

existence. Fitzpatrick 2/22/94 Tr. at 130. This Court credits these documents and this testimony.

119. Based on the foregoing findings of fact, the Court finds that the Alternative Compensation Procedures in the Stipulation are factually reasonable and fair to the class and are fairly representative of the historical methods acceptable to claimants in the tort system.

### F. Releases; Deemed Releases; Contribution and Indemnity Claims

120. Parts II and XII.B of the Stipulation provides that the procedures for attaining compensation under the Stipulation shall be the "exclusive remedy" for class members who have not excluded themselves from the class, and who wish to pursue claims for asbestos-related personal injury or damage against one or more of the CCR defendants. Exhibit SP–300, Part II at 10, Part XII.B at 77; Exhibit SP–509 at 2. Parts XII and XIII, in turn, generally deal with the subject of releases by class members, and the procedures concerning contribution and indemnity against the CCR defendants by the co-defendants. Exhibit SP–300, Parts XII and XIII at 75–82.

121. Part XII.D and E of the Stipulation provide that, upon approval of the Stipulation, class members in certain states "shall be deemed to provide each of the twenty CCR defendants with a Deemed Release." Exhibits SP–300, Parts XII.D and E, at 78–79 and SP–509 at 16. The word "deemed" in the deemed release provision in the Stipulation is defined to mean simply that the Settling Parties have agreed that an order of this Court approving the settlement will have the effect of ordering or "deeming" releases to have been constructively given to the CCR defendants by the class members in enumerated states in exchange for the benefits provided to class members under the Stipulation.[29] Rooney 3/1/94 Tr. at 21–22; Exhibit SP–300, Part XII.A at 75.

---

29. Part XII of the Stipulation divides the fifty states, along with the District of Columbia, Puerto Rico, and the Virgin Islands, into four categories: (1) *pro tanto* jurisdictions"; (2) "per cap-ita-percentage share jurisdictions without contribution bar"; (3) "per capita or percentage share jurisdictions with contribution bar"; and (4) "no joint and several liability jurisdictions." Exhibit

122. Parts XIII.D, E and F of the Stipulation provide that when a class member receives a compensation payment under the Stipulation, that class member shall provide to the CCR defendants a release "containing all provisions included in the CCR Defendant(s)' customary release for the counsel representing the ... Class Member in the applicable jurisdiction." Where no history of a prior negotiated release exists, the CCR and the class member's counsel will negotiate the terms of the release or, if such negotiations fail, the CCR's standard release for the jurisdiction will be used. Exhibit SP–300, Part XII.D, E and F at 78–80.

123. The Stipulation provides that certain entities in addition to the twenty named CCR defendants, so-called "Additional Releasee(s)," will be entitled to the same benefits as the CCR defendants under the Stipulation. Exhibit SP–300, Part I.A at 5. This provision was intended to cover only those entities that the CCR defendants have traditionally settled for and obtained releases, such as distributors of asbestos or asbestos containing products. Rooney 3/1/94 Tr. at 135–36; Fitzpatrick 2/23/94 Tr. at 115.

124. Under Part XII of the Stipulation, a class member is required to take certain steps if, in a lawsuit for asbestos-related personal injury that class member brings against non-CCR defendants, the non-CCR defendants assert claims for contribution or indemnity against a CCR defendant, and that CCR defendant has received an actual or deemed release fully protecting it against such contribution or indemnity claims. Specifically, Part XIII.A.1 provides that, in this limited situation, the class member "will move jointly" with the CCR defendants "for severance and continuance of the trial of such

contribution or indemnity claims." Exhibit SP–300, Part XIII.A at 81.

125. Certain non-settling asbestos manufacturers or suppliers, as *Amici*, have argued that these release and contribution and indemnity provisions unfairly prejudice their rights to contribution and indemnity against the CCR defendants.

126. Having reviewed the memoranda and evidence presented by the *Amici*, this Court finds that no provision of the Stipulation is factually intended to or attempts to alter the rights of a non-settling asbestos manufacturer or supplier against the CCR defendants under applicable state law. It is clear that under the terms of the Stipulation, factually the parties intended that the rights of the other asbestos manufacturers or suppliers sued in the future that make claims against the CCR defendants will be determined under whatever state law may apply if and when claims for contribution or indemnity by the non-settling asbestos manufacturers or suppliers against the CCR defendants are asserted. Rooney 3/1/94 Tr. at 23; Fitzpatrick 2/24/94 Tr. at 103–04; Exhibit SP–509 at 16.

127. The credited evidence at the fairness hearing demonstrated to this Court that, in the tort system, third-party actions for contribution and indemnity are routinely severed from the plaintiff's main claim in the tort system. Rooney 3/9/94 Tr. at 240–41; Fitzpatrick 2/24/94 Tr. at 113. The credited evidence at the fairness hearing also demonstrated that the practical impact on the non-settling asbestos manufacturers or suppliers of the release and contribution and indemnity provisions of the Stipulation is likely to be

SP–300, Part XII.A at 75–77. *See* Parts XII.A at 75–77 (for description of each jurisdiction).

Whether a class member provides a deemed release shall depend on which of the descriptions in Part XII.A of the various jurisdictions "most accurately describes the law of the jurisdiction in which a claim for contribution or indemnity is asserted against the CCR Defendant(s)...." Exhibit SP–300, Part XII.C at 78. Thus, under Part XII.D and E, class members whose claims for asbestos-related personal injury would be brought in jurisdictions in three of the four types of jurisdictions will be deemed to have provided each of the CCR defendants with a "deemed

release" upon approval of the Stipulation. Exhibit SP–300, Part XII.D and E at 78–79.

Part XII.F of the Stipulation does not provide that a "deemed release" will be provided to the CCR defendants upon approval of the Stipulation by class members whose claims for asbestos-related personal injury would be brought in a "per capita or percentage share jurisdiction with a contribution bar." Exhibit SP–300, Part XIII.F at 79–80. The reason being that such releases might possibly disadvantage the class members in those jurisdictions as compared to most other class members. Fitzpatrick 2/24/94 Tr. at 114; Exhibit SP–509 at 16; Rooney 3/1/94 Tr. at 22.

small. In the almost six-year history of the CCR, there have been only one or two times when a non-settling co-defendant has pursued to judgment a contribution or indemnity claim against a CCR defendant, or when the CCR defendants have pursued to judgment a similar claim against a co-defendant. Rooney 3/1/94 Tr. at 23.

128. Based on the foregoing findings of fact, this Court finds that the release and contribution and indemnity provisions in the Stipulation do not unfairly prejudice the rights of non-settling asbestos manufacturers or suppliers to contribution and indemnity against the CCR defendants.

### G. Miscellaneous Provisions

#### (1) Right to Additional Compensation

129. Under Part XIV.B of the Stipulation, a class member who receives compensation for a non-malignant condition may submit a new claim, and receive additional compensation, if and when that class member develops a qualifying malignant condition. Exhibits SP–300, Part XIV.B at 83 and SP–509 at 17; Rooney 3/1/94 Tr. at 24.

130. Evidence was presented at the fairness hearing and credited by this Court supporting the Settling Parties' contention that this "re-entry" or "automatic limited release" provision is of great benefit to class members. This credible evidence showed that, of the claims paid by the CCR defendants through the end of 1992, just over 90% of the claims were settled for "full" releases, whereby the claimant releases all claims for any future asbestos-related injury, including cancer. In the tort system, therefore, less than 10% of the claimants whose claims the CCR settled received the benefit of "limited" releases approaching or similar to the benefits provided to all class members under Part XIV.B of the Stipulation. Fitzpatrick 2/22/94 Tr. at 127; Rooney 2/28/94 Tr. at 196–97; Rooney 3/1/94 Tr. at 114; Exhibit SP–508. Thus, this Court finds that this benefit has significant value to the class.

#### (2) No Joint and Several Liability Among the Settling Defendants for Unpaid Claims

[11] 131. Part XVI provides that compensation payments to class members will be funded in accordance with the CCR defendants' sharing agreement wherein each CCR defendant agrees to pay a fixed percentage share of the entire sum due on a settled claim, but recourse for each defendant's obligations if its share remains unpaid under the Stipulation will be limited to that defendant. Exhibits SP–300, Part XVI at 86 (Exhibit C) and SP–509 at 18; Fitzpatrick 2/23/94 Tr. at 202–04. If any CCR defendant should default under the Stipulation, its terms provide that that CCR defendant would have to give notice of the default to class members, and class members who have not received compensation under the Stipulation would have the option of enforcing the defaulting CCR member's obligations under the Stipulation, or asserting full rights in the tort system against the defaulting CCR member. Exhibits SP–300, Part XVI at 86–87 and SP–509 at 18.

132. Some Objectors and *Amici* have criticized the absence of joint and several liability in this provision on the ground that, in many states, *judgments* in the tort system are joint and several. But neither these Objectors or *Amici* offered any evidence that historically *settlement agreements* with multiple defendants provide for joint and several liability among the settling defendants. The clear implication is that each settling defendant is only responsible for its own share when a claim is settled in the tort system. In addition, several witnesses testified that, despite the principle of joint and several liability in many jurisdictions, most defendants have not picked up the share of a co-defendant who has become insolvent. Fitzpatrick 2/23/94 Tr. at 199; Rooney 1/10/94 Dep. at 182–83; Hatten 3/18/94 Tr. at 90–91. The Court credits this testimony.

133. Based on the foregoing and the healthy financial condition of the settling defendants (*see* FOF ¶¶ 142–70), this Court finds that the provision for no joint and several liability is reasonable and fair to the class, especially when there is de facto joint payment of the total sum agreed to be paid for all claims settled under the Stipulation.

#### (3) Withdrawal Rights

134. Although the Stipulation is a perpetual agreement, Part XXII of the Stipu-

lation gives each CCR defendant the right to withdraw from the settlement at the end of ten years. Exhibits SP–300, Part XXII at 95 and SP–509 at 19; Fitzpatrick 2/23/94 Tr. at 202, 204. Under Part XXII, any withdrawing member would be obliged to give notice of the withdrawal to class members, and class members who have not received compensation under the Stipulation would have one year or more to exercise their full rights in the tort system against the departing CCR defendant. If any CCR defendant elects to withdraw at the end of ten years, Part XXII of the Stipulation provides that the Compensation Schedule would be adjusted at that time by the share of the withdrawing CCR member. Exhibits SP–300, Part XXII at 95–96 and SP–509 at 19; Rooney 3/1/94 Tr. at 25.

135. This Court observes that class members would have the full benefits of the settlement for ten years and retain their rights in the tort system thereafter since any withdrawing CCR member will have authorized suit against it. Based on the foregoing, and having reviewed the objections to this provision raised at the fairness hearing, the Court finds that the CCR defendants' withdrawal rights are reasonable and fair to the class.

#### (4) Attorneys' Fees

■ 136. Under Part XIX, the CCR defendants will pay the attorneys' fees incurred by Class Counsel in their role as Class Counsel, with the amount to be approved by this Court. Exhibit SP–300, Part XIX at 92. Any claimant who submits a claim for compensation under the Stipulation may proceed without an attorney or may be represented by his or her own attorney, including Messrs. Motley, Locks and Rice, if they so choose; provided, however, that, under Part XX, the fee that may be charged by such attorney will be limited to 25% of the compensation award received by the claimant (and 20% of any amount received by the claimant above the maximum award under the individualized payment procedures for that claimant's medical category). Exhibits SP–300, Part XX at

93 and SP–509 at 20; Rooney 3/1/94 Tr. at 25–27.

137. Testimony at the fairness hearing demonstrated the benefit to claimants from the 20–25% limitation on attorneys' fees under Part XX for representing an individual claimant seeking compensation under the Stipulation. This testimony reliably proved that the fee arrangements used by most plaintiffs' attorneys in the asbestos litigation have provided for a 33–40% contingency. Hatten 3/18/94 Tr. at 33–34. Furthermore, the availability of counsel to class members, based upon traditional considerations, is improved when counsel are adequately compensated. This provision was negotiated by well-experienced lawyers who are obliged to consider the availability of counsel to the class members, and there were no persuasive objections to the stipulated rate of compensation.

138. Based on the foregoing, the Court finds that the provisions regarding attorneys' fees in the Stipulation are reasonable and fair to the class.

#### (5) Annual Audit

139. Under Part XXIII, Class Counsel and a representative of the AFL–CIO will annually audit the disposition of claims under the Stipulation to ensure that the Stipulation is being administered fairly and in accord with its terms. Class Counsel and the AFL–CIO will have full access to the CCR's records with respect to claims processed under the Stipulation for the purpose of that audit. Exhibits SP–301 at 8, SP–300, Part XXIII at 97 and SP–509 at 20; Rooney 3/1/94 Tr. at 27; Georgine 2/28/94 Tr. at 48–49, 103–04 (the AFL–CIO will be a "full participant" in monitoring implementation of the settlement).

140. Based on the foregoing, the Court finds that the provision for annual audits of the disposition of claims under the Stipulation, which includes the participation of Class Counsel and the AFL–CIO, is reasonable and fair to the class.[30]

---

**30.** See discussion below regarding the future appointment of additional class counsel to fulfill this role given this Court's finding that Messrs. Motley, Rice and Locks will be impermissibly conflicted if they both represent claimants who submit claims to CCR for compensation under the Stipulation, and participate in the auditing of

## (6) Operational Date

141. The CCR began operating to settle claims under the terms of the Stipulation on January 25, 1994—which marked the end of the opt-out period.[31] Exhibit SP–300, Part XXVII at 102–03; Rooney 3/1/94 Tr. at 136.

## H. *CCR Defendants' Ability to Meet The Financial Obligations Required by The Stipulation*

### (1) Overview

142. One issue related to fairness is whether the CCR defendants are likely to be able to meet their financial obligations under the Settlement. The Settling Parties presented two witnesses on this issue, Martha Wilke Murray and John H. Laeri, Jr., without objection as to qualification or the foundation for their opinions.[32]

143. Ms. Murray testified concerning the sums the CCR defendants are likely to be required to pay (1) to pay claims brought under the Stipulation during the initial ten year period of the Stipulation, (2) to pay other asbestos personal injury claims that had been filed against the CCR defendants as of the end of 1993 but either had not been resolved or had not been completely paid (hereinafter the claims in this category will be referred to as "present claims and claims filed through 1993"), and (3) to meet expenses involved in disposing of both types of claims. Ms. Murray also testified with respect to the insurance coverages which the CCR defendants have available to satisfy all or some of the above claims and expenses. Mr. Laeri gave his expert opinion as to whether each of the CCR defendants is likely to be able to meet its obligations under the Stipulation during the initial ten-year period of the Stipulation. Murray 3/11/94 Tr. at 141–296; Laeri 3/14/94 Tr. at 20–66; Laeri 3/15/94 Tr. at 3–93. This Court finds these factual subjects to be compellingly factually relevant to the determination of whether the Stipulation is fair to the class.

144. Objectors presented no testimony or other evidence indicating that the CCR defendants would not be able to pay the amounts required of them under the Stipulation. To the contrary, Frederick M. Baron, Esquire, on behalf of several Objectors, stated, with reference to the CCR defendants, that "these companies are not going bankrupt. They're not insolvent. They're in very good financial condition." Baron 2/22/94 Tr. at 55. Nonetheless, it is the obligation of the Court to review and analyze the financial condition of the settling defendants.

### (2) Mr. Laeri's Initial Involvement in Matters Relating to the Stipulation

145. In late July, 1992, and later in August and September, 1992, while the Stipulation was being negotiated, Mr. Laeri was

---

the disposition of claims under the Stipulation by CCR. *See* FOF ¶ 235–38.

**31.** As both the Stipulation and Amendment indicate (Exhibits SP–300 at 105–06 and n. * and SP–301 at 10–11 and n. *), the participation of the Asbestos Claims Management Corporation (formerly National Gypsum Company) in the Stipulation is subject to the approval of the bankruptcy court. It is anticipated that the Asbestos Claims Management Corporation will seek a ruling from the bankruptcy court on this issue shortly after this Court rules on the fairness of the settlement. Rooney 2/28/94 Tr. at 198–99.

**32.** Ms. Murray is a Vice–President of Peterson Consulting Limited Partnership ("Peterson"). Ms. Murray and Peterson have for many years worked for the CCR defendants and the CCR in compiling information and data concerning asbestos personal injury claims against the CCR defendants, the compensation and expenses paid in disposing of such claims, and the insurance coverages of the CCR defendants, including particularly the coverages that still remain available to the CCR defendants. Ms. Murray has testified as an expert on insurance matters in several other cases involving asbestos companies. Murray 3/11/94 Tr. at 90–93. Based on her curriculum vitae and her testimony, the Court finds that Ms. Murray is qualified to analyze the CCR defendants obligations and to present her opinions to the Court. *Id.;* Exhibit SP–600.

Mr. Laeri and his firm, Meadowcroft Associates ("Meadowcroft"), were retained by Class Counsel to advise Class Counsel whether each of the CCR defendants is likely to be able to make the payments required of it under the Stipulation during the initial ten-year period of the Stipulation. Mr. Laeri has extensive experience in financial matters, and based on his curriculum vitae and his testimony, the Court finds that Mr. Laeri is qualified to conduct the study and to present his opinions to the Court. Exhibit SP–400; Laeri 3/14/94 Tr. at 4–20 (for a description of Mr. Laeri's background).

approached by Gene Locks, one of the Class Counsel, and was asked to evaluate the ability of the CCR defendants to meet certain future obligations. Laeri 3/14/94 Tr. at 21–22. After various discussions with Mr. Locks and representatives of CCR, Mr. Laeri and Meadowcroft were ultimately retained on November 27, 1992. Laeri 3/14/94 Tr. at 22–27.

### (3) The CCR Defendants' Estimated Obligation to Compensate Claims Under the Stipulation

146. Ms. Murray developed a "worst case" scenario designed to estimate the maximum financial liability that the CCR defendants will have to meet under the Stipulation during the initial ten-year period of the Stipulation.[33] Ms. Murray generally assumed that the CCR defendants will have to pay the maximum amount possible on all claims brought under the Stipulation, and that compensation on all those claims will be due at the earliest date possible under the Stipulation. Murray 3/11/94 at 141–58; Exhibit SP–604(A).

147. Based on the above and footnoted "worst case" assumptions, Ms. Murray estimated that the total sum the CCR defendants will be obligated to pay in compensation to class members during the initial ten-year period of the Stipulation will be one billion two hundred and eighty-nine million dollars ($1.289 billion). Through the use of those assumptions, Ms. Murray also estimated the amount the CCR defendants will be obligated to pay in compensation in each year of that initial ten-year period. Murray 3/11/94 Tr. at 149; Exhibits SP–604(B) and SP–604(F).

148. Finally, Ms. Murray used the "Sharing Agreement" entered into by the CCR members to allocate among the members the compensation to be paid class members under the Stipulation (Exhibit C to the Stipulation) to determine the amount that each CCR defendant will have to pay of the $1.289 billion total and how much each CCR defendant will have to pay each year. Murray 3/11/94 Tr. at 147–48; Exhibit SP–604(F).

### (4) The CCR Defendants' Estimated Obligation to Compensate Present Claims and Claims Filed Through 1993

149. Ms. Murray also estimated the CCR defendants' liability with respect to present claims and claims filed through 1993 and, based on the applicable "sharing agreement", determined how that liability will be allocated among the different CCR defendants. Murray 3/11/93 Tr. at 150, 190–93; Exhibit SP–604(C).

150. With respect to claims as to which a settlement agreement has been entered into but full payment has not been paid, Ms. Murray valued the remaining liability on those claims based on the actual amounts that remained to be paid on them, and assumed that payments on these claims would be made at the agreed upon times. Murray 3/11/94 Tr. at 150, 154; SP–604(C).

151. With respect to claims as to which no settlement or other disposition had been reached, Ms. Murray, in conjunction with advice from CCR's claims staff, valued those claims based on the averages that were expected to be reached on settlements proposed as of July 1993 considering CCR's historical averages for settlements. Ms. Murray assumed that the amounts paid out in settlement of these currently unresolved claims will be paid in equal amounts over the next four years. Murray 3/11/94 Tr. at 150–51, 154; SP–604(C).

---

**33.** Ms. Murray made the following assumptions in her analysis of the "worst case" scenario: (1) that no qualifying claimant would choose the minimum payment through the "simplified payment" procedures (Murray 3/11/94 Tr. at 146–47; Exhibit SP–604(A)); (2) that the amount paid for all non-extraordinary claims in all medical categories will be at the top end of the "negotiated average value range" in the Compensation Schedule (Murray 3/11/94 Tr. at 147; Exhibit SP–604(A)); (3) that the total amount paid on all extraordinary claims during the initial ten-year period will be the maximum possible (Murray 3/11/94 Tr. at 147; Exhibit SP–604(A)); and (4) that the maximum number of qualifying claimants who could go to court or arbitration will do so, and that the amount paid to these claimants will on average be at the top end of the negotiated average value range (Murray 3/11/94 Tr. at 147; Exhibit SP–604(A)).

These hypotheses included all of the increases in the case flow maximums triggered by events adverse to CCR. Murray 3/11/94 Tr. at 115–16; Exhibits SP–601(F) and SP–604(A).

152. Based on these different assumptions, Ms. Murray estimated the total liability of all the CCR defendants for compensating all present claims and all claims filed through 1993 would be one billion six hundred and twenty-six million dollars ($1.626 billion). Murray 3/11/94 Tr. at 155.

153. Ms. Murray then allocated this $1.626 billion among the CCR defendants in accordance with the applicable "sharing agreement." She also estimated the amount that each CCR defendant would have to pay each year to meet its obligation to compensate present claims and claims filed through 1993. Murray 3/11/94 Tr. at 152–54; Exhibits SP–604(C) and SP–604(E).

#### (5) The CCR Defendants' Estimated Obligation to Pay Costs Involved in Disposing of All Claims

154. Ms. Murray also estimated the total costs of disposing of claims under the Stipulation during its initial ten-year period and present claims filed through 1993 to be three hundred and seventeen million dollars ($317 million), and determined what each CCR defendant's liability for costs would be in each year of the initial ten-year period of the Stipulation based on the applicable "sharing agreement." Murray 3/11/94 Tr. at 154–55, 157–58; Exhibit SP–604(C)–(F).

#### (6) The CCR Defendants' Estimated Total Obligation and the Ten–Year Estimates Concerning the Payment of this Obligation

155. In sum, Ms. Murray estimated that the total cost to all the CCR defendants of resolving all claims under the Stipulation for the initial ten-year period and all present claims and claims filed through 1993 would be three billion two hundred million dollars ($3.2 billion) ($1.289 billion plus $1.626 billion plus $317 million). Murray 3/11/94 Tr. at 155; Exhibit SP–604(F).

156. In January 1993, Ms. Murray and Peterson prepared schedules for each CCR defendant indicating the total estimated amounts that each CCR defendant will have to pay in each year of the initial ten-year period of the Stipulation. These schedules were updated in July 1993. Murray 3/11/94 Tr. 141–43, 158; Exhibit SP–604(H).

#### (7) The CCR Defendants' Insurance Coverages

157. Ms. Murray also determined and testified to her articulate reasoned analysis and conclusions regarding: (1) what insurance coverages will be available to each CCR defendant to meet that CCR defendant's obligation to pay claims under the Stipulation; (2) present claims and claims filed through 1993; and (3) the costs for disposing of those claims. She also estimated to what extent insurance coverages of each CCR defendant will be used up in each year of the initial ten-year period of the Stipulation. She made these latter estimates by dividing the CCR defendants' insurance coverages into certain categories [34] and applying the rules for the allocation of an asbestos producer's insurance coverages set forth in the Wellington Agreement, an agreement among certain asbestos producers, including all the CCR defendants, and certain insurance companies which among other things provides commitments for payment and agreements as to when insurance coverages will become payable. Murray 3/11/94 Tr. at 159–71; Exhibits SP–604(I) and SP–604(O).

158. Through the use of the Wellington rules and the different classifications, Ms. Murray was able to estimate not only what dollars of insurance coverages of each CCR defendant will be used in each year of the first ten years under the Stipulation, but also whether and to what extent excess coverages will be available to the CCR defendant in

34. Ms. Murray divided the CCR defendants' insurance coverage for the purposes of her analysis in the following ways: (1) she divided all insurance companies providing coverages to the CCR defendants into three categories based on whether issues involving the coverages provided by those companies had been resolved (Murray 3/11/94 Tr. at 161–62; Exhibit SP–604(I)); (2) she determined which insurance companies providing coverages to the CCR defendants, or which portions of a coverage, were insolvent and assumed that none of those coverages would be available (Murray 3/11/94 Tr. at 164–65); (3) she classified insurance policies according to whether and to what extent they covered expenses resolving asbestos claims as well as liability on the claims (Murray 3/11/94 Tr. at 165–66).

each year.[35] Murray 3/11/94 Tr. at 165–67, 173.

159. In total, Ms. Murray estimated that of the three billion two hundred million dollars ($3.2 billion) necessary to pay claims under the Stipulation, present claims and claims filed through 1993, and the costs for resolving those claims, slightly in excess of two billion dollars ($2 billion) in insurance coverage by non-bankrupt insurers is available to pay those claims and costs,[36] and the remaining one billion two hundred million dollars ($1.2) billion will have to be paid by the CCR defendants themselves. Murray 3/11/94 Tr. at 161–62, 168–70; Exhibits SP–604(I) and (L).

160. Ms. Murray and Peterson also prepared and presented at the fairness hearing, schedules showing the insurance coverages, allocated by the categories of insurance companies and by insurance company and amount, that will be available to fund each CCR defendant's obligation to pay claims under the Stipulation, present claims and claims filed through 1993, and the costs for disposing of such claims. Those schedules also indicate the amount that each CCR defendant will itself have to pay, which is referred to as the "Non–Insurance Allocation" or "NIA." These insurance schedules were also originally prepared in January 1993, and then were updated in over the course of 1993. Murray 3/11/94 Tr. at 141–43, 171–74; SP–604(O). The Court has studied these schedules during the fairness hearing and since.

## (8) The Likelihood That The CCR Defendants Can Meet Their Obligations Under the Stipulation

161. Before determining whether the CCR Defendants can meet their obligations under the Stipulation, Mr. Laeri or others at Meadowcroft: (1) received analyses and schedules from Peterson demonstrating the CCR defendants' obligations under the Stipulation (allocated by year), the CCR defendants' obligations to pay present claims and claims filed through 1993, the costs for resolving those claims, the insurance coverages available to the different CCR defendants (allocated by insurance company, amount, and the categories of "Signatory," "Resolved Non–Signatory," and "Other Non–Signatory") and each CCR defendants' "Non–Insurance Allocation" (Laeri 3/14/94 Tr. at 29–31, 33, 36–37; Murray 3/11/94 Tr. at 171–172; Exhibit SP–602); (2) met face-to-face with four of the five CCR defendants with the largest obligations, and spoke by phone with the fifth CCR defendant, to obtain information about those companies and their financial conditions [37] (Laeri 3/14/94 Tr. at 27, 34–35); (3) received letters from each CCR defendant in which the respective CCR defendant represented that it did not believe that claims against it other than asbestos personal injury claims would materially adversely affect the insurance coverages available to the CCR defendant to pay claims under the Stipulation during its initial ten-year period, that it did not believe that the Stipulation obli-

---

**35.** Ms. Murray also explained why estimates of excess coverage are relevant. Murray 3/11/94 Tr. at 165–67, 173.

**36.** Of the $2 billion in insurance coverages available to the CCR defendants, $840 million constitutes coverage by companies who have agreed to the coverages by signing the Wellington Agreement ("Signatory" companies), $409 million constitutes coverage by companies who did not sign the Wellington Agreement but have since resolved all their coverage issues with the CCR defendants ("Resolved Non–Signatory" companies), and $779 million constitutes coverage by those companies that still dispute coverage issues with the CCR defendants ("Other Non–Signatory" companies). Murray 3/11/94 Tr. at 161–62, 168–70; Exhibits SP–604(I) and (L).

**37.** Mr. Laeri and Meadowcroft determined that the five CCR defendants with the largest obligations under the Stipulation, including their insurance companies, were responsible for approximately 85% of the total obligation under the Stipulation.

One of these five companies, T & N plc, assumed the obligations of two of its subsidiaries who are also members of the CCR. In light of this and other arrangements, Mr. Laeri and Meadowcroft determined that there were seventeen "obligors" for the twenty CCR defendants, and it analyzed the ability to pay obligations under the Stipulation of each of these "obligors," not of each CCR defendant. Laeri 3/15/94 Tr. at 10. Of course, the net effect was still to analyze whether the obligations of each CCR defendant under the Stipulation will be met, and for the sake of simplicity, these findings of fact do not draw a distinction between the 20 CCR defendants and the 17 "obligors."

gations would render it insolvent as of the date of execution of the Stipulation, and that it also expected to have sufficient resources available to pay its Non–Insurance Allocation (Laeri 3/14/94 Tr. at 34, 36–37; Exhibit SP–603).

162. On January 14, 1993 (the date the settlement was finalized for presentation to the Court) based on a preliminary review of the information it had received and the research it had conducted to that date, Mr. Laeri informed Class Counsel that "it is Meadowcroft's present opinion that the CCR Members can be reasonably expected to meet" their obligations under the Stipulation during the initial ten-year period. Laeri 3/14/94 Tr. at 34, 40–41; Exhibit SP–401.

163. Throughout 1993, Mr. Laeri and Meadowcroft continued to receive extensive, updated information from Peterson concerning the CCR defendants' total obligations. In this connection, Peterson provided Meadowcroft revised and updated versions of the schedules Meadowcroft had relied upon for its preliminary opinion. *See* Exhibits SP–604(A) through SP–604(O). Mr. Laeri and Meadowcroft worked very closely with Peterson to understand the data that Peterson provided and constantly retested that data to confirm that it was reliable. Murray 3/11/94 Tr. at 143, 145, 174; Laeri 3/14/94 Tr. at 31.

164. Through much of 1993, Mr. Laeri and Meadowcroft also did very complex analyses to examine the possibility that one or more of the insurance carriers providing coverages to the CCR defendants might become insolvent during the initial ten-year period of the settlement by determining the ratings that Standard and Poor's and Moody's and A.M. Best gave the insurance companies and by determining how many defaults there were among insurance companies with those particular ratings. Laeri 3/14/94 Tr. at 33–34, 38–39, 42–44; Laeri 3/15/94 at 28–36; Exhibits SP–428 and SP–430. Based on the ratings and the projections, Mr. Laeri and Meadowcroft reduced to some extent the insurance coverages that were available to the CCR defendants and increased the estimated amount that the CCR defendants will have to pay themselves under the Stipulation. Laeri 3/14/94 Tr. at 38–39, 42–44; Laeri 3/15/94 at 26–36.

165. Through 1993, Mr. Laeri and Meadowcroft did a comprehensive due diligence analysis of those CCR defendants as to which they considered such an analysis necessary. Laeri 3/14/94 Tr. at 39, 64–65 (discussing what the analysis entailed). Mr. Laeri and Meadowcroft also did an extensive overview of each CCR defendant which included analyzing its business, reviewing its historical financial results, comparing it to a peer group of comparable companies to determine how it would be valued based on such a comparison, and using historical financial results and projections for the future to determine its value based on them. Laeri 3/14/94 Tr. at 65–66; Exhibits SP–403 through SP–419.

166. Mr. Laeri and Meadowcroft applied four separate tests to the information they obtained about each CCR defendant to determine whether it would be able to meet its obligation under the Stipulation during the initial ten-year period it was in effect. The tests compared, in different ways, the present value of each CCR defendant to its Non–Insurance Allocation, and examined whether, in each of the first ten years, the CCR defendant would generate enough cash from its business to meet both the amount of the Non–Insurance Allocation estimated to be due from it that year and its other obligations. These tests were relevant because if a CCR defendant could not in a given year meet its NIA for the year and its other obligations from the cash generated by its business but its value was several times greater than its total NIA, it could reasonably be assumed that it could borrow against value, sell an asset, or sell part of the equity in the company to meet the shortfall in a particular year. In applying these tests, Mr. Laeri and Meadowcroft made a point of being conservative in making estimates and projections. Laeri 3/15/94 Tr. at 14–23; Exhibits SP–403 through SP–419 (explaining the application of the four tests).

167. With respect to each of the CCR defendants, Mr. Laeri and Meadowcroft prepared an extensive report setting forth much of the relevant information they had obtained

about that CCR defendant and explaining the results of their research and analysis concerning that CCR defendant. These reports were submitted and received into evidence as Exhibits SP–403 through SP–419, and considered by the Court in the fairness analysis. Laeri 3/14/94 Tr. 49–50.[38]

168. In these reports, Mr. Laeri and Meadowcroft rated each of the CCR defendants in terms of the likelihood that it will meet its obligations under the Stipulation during the initial ten-year period. Eleven of the CCR defendants, with a combined Non–Insurance Allocation of three hundred twenty-five million one hundred thousand dollars ($325.1 million), were rated "highly probable" in terms of the likelihood of their meeting those obligations. Eleven CCR defendants, with a combined Non–Insurance Obligation of one million ninety-eight thousand six hundred dollars ($1.0986 million), were rated as "very probable" to meet those obligations. And the remaining two CCR defendants, with a combined Non–Insurance Allocation of only four hundred thousand dollars ($400,-000), were rated "probable" in terms of the likelihood that they would meet the obligation. The "highly probable" rating was assigned when there was only a two percent (2%) chance that the CCR defendant involved would default on its obligations under the Stipulation, the "very probable" rating was assigned when there was only a five percent (5%) chance of default, and the "probable" rating was assigned when there was a twenty-five percent (25%) chance of default. Laeri 3/15/94 Tr. at 42–43; Exhibits SP–403 through SP–419.

169. It is also Mr. Laeri's opinion that the Stipulation itself will, if approved, significantly enhance the financial condition and prospects of those CCR defendants with large

Non–Insurance Allocations because it will remove "uncertainty which adversely affects these companies' ability to access the capital markets, to raise debt in equity, or to attract people, or to compete in the marketplace. . . ." Laeri 3/15/94 Tr. at 44–46. Mr. Laeri believes that the resulting improvement in these CCR defendants' financial condition and prospects will benefit "everyone," specifically including "claimants who are hoping to be paid in the future." *Id.* In a February 18, 1994 letter to Class Counsel, Mr. Laeri gave his final opinion concerning the likelihood that the CCR defendants will be able to meet their obligations under the settlement during the initial ten-year period of the Stipulation. In that letter, he stated that to the best of his and Meadowcroft's "knowledge and belief," all of the CCR defendants "should reasonably be expected" to meet their obligations under the Stipulation during that ten-year period. Laeri 3/14/94 Tr. at 51–52; Exhibit SP–420. This Court credits the uncontradicted testimony of Mr. Laeri.[39]

170. Based on the foregoing findings of fact and the compelling evidence presented by the Settling Parties, this Court finds that all the CCR defendants will be likely to meet their obligations under the Stipulation during the initial ten-year period.[40]

## I. Benefits to Non–Impaired Claimants

171. The Objectors claim that the settlement is unfair because under the Stipulation, non-impaired class members, *i.e.,* those who do not presently meet the medical criteria for compensation, will not receive any cash compensation unless and until they meet the medical criteria. These class members in the tort system have traditionally received

38. By Order, Dkt. No. 958 (March 18, 1994), this Court ruled that these reports and certain other exhibits of the Settling Parties containing non-public informational projections specific to certain CCR defendants are to be treated as confidential in accord with the Court's December 3, 1993 Confidentiality Order, and are to be maintained under seal.

39. As mentioned earlier, FOF ¶ 17, many asbestos producers have gone into bankruptcy because of the overwhelming costs of defending thousands of asbestos lawsuits in the tort system.

This Court finds that the ability of the CCR defendants to pay all claimants under the Stipulation is important. Along this line, the Court finds that all the class members benefit from a system of compensation which works to avoid the bankruptcies of these companies.

40. The Objectors presented no evidence to the contrary, and have indeed conceded at the fairness hearing that it is their belief that the CCR defendants are "in very good financial condition" and "are not going bankrupt." Baron 2/22/94 Tr. at 55.

modest cash settlements, often having to give up all future rights by general releases. Under the Stipulation, however, the non-impaired class members will receive the following benefits:

a. The statute of limitations and timeliness defenses for all class members whose claims were not time-barred as of January 15, 1993 will be waived. Rooney 3/1/94 Tr. at 63; Fitzpatrick 2/23/94 Tr. at 113; SP–300, Part VI.A at 49.

b. If and when non-impaired class members file qualifying claims, the claims will, in most cases, be resolved faster than they have been in the tort system. Rooney 3/1/94 Tr. at 66–68, 70–71; Hatten 3/18/94 Tr. at 25–25.

c. Transaction costs (including attorneys' fees) will be lower than in the tort system. Hatten 3/18/94 Tr. at 23–24.

d. The defenses to liability will be waived, and the CCR defendant have agreed to pay all claims that qualify for compensation. Rooney 3/1/94 Tr. at 68, 70–71; Fitzpatrick 2/23/94 Tr. at 116–17; Hatten 3/18/94 Tr. at 22–25.

e. Non-impaired class members will have some assurance that there will be funds available if and when they get sick as this Court has found that each CCR defendant has shown an ability to fund the payment of all qualifying claims under the Stipulation. Fitzpatrick 2/23/94 Tr. at 116; Hatten 3/18/94 Tr. at 23, 39; Rooney 3/1/94 Tr. at 70–71; see FOF ¶¶ 142–170.

f. If and when a class members develops a qualifying *non-malignant* condition, they may file a claim under the Stipulation without forfeiting their right to file a subsequent claim if they develop a qualifying *malignant* condition. Exhibit SP–300, Part XIV.B; Fitzpatrick 2/23/94 Tr. at 26, 116; Rooney 3/1/94 Tr. at 70. In other words, class members are not required to give the CCR defendant a full release if they receive compensation for a qualifying non-malignant condition. Fitzpatrick 2/23/94 Tr. at 90; Fitzpatrick 2/22/94 Tr. at 127; Hatten 3/18/94 Tr. at 21–22.

172. This Court finds that the group of benefits offered to non-impaired class members has significant value. Non-impaired class members will no longer be forced to file premature lawsuits or risk their claims being time-barred. Fitzpatrick 2/23/94 at 90; Hatten 3/18/94 Tr. at 21–22, 113–14. Second, if and when class members do become sick, they will not have to suffer the uncertainties, long delays and high transaction costs of the tort system. Third, the waiver of the defenses under the Stipulation is a significant benefit because there are approximately a dozen CCR defendants who have, to date, been held not liable under negligence or strict liability principles in an asbestos case. Fitzpatrick 2/22/94 Tr. at 130; Hatten 3/18/94 Tr. at 22–24. Fourth, while many companies that have appeared financially healthy have filed for bankruptcy protection in the face of many asbestos lawsuits, this Court has found that the CCR defendants are able to fund the payment of claims under Stipulation. Hatten 3/17/94 Tr. at 39; see FOF ¶¶ 142–170. Finally, under the Stipulation, qualifying claimants with a non-malignant condition do not have to chose between filing now or waiting to see if they develop a more serious malignant condition. This is in marked contrast to the current tort system, where non-impaired claimants usually settle their claims for small amounts and a full release of all claims for any future asbestos-related injury, including cancer. Fitzpatrick 2/23/94 Tr. at 90; Fitzpatrick 2/22/94 Tr. at 127; Hatten 3/18/94 Tr. at 21–22. *See also* Wages 3/16/94 Tr. at 260. This is especially important given the uncontradicted testimony of two medical experts that currently non-impaired class members are likely to develop more serious asbestos-related medical conditions, such as lung cancer or mesothelioma. Roggli 3/9/94 Tr. at 62–63; Oliver 3/14/94 Tr. at 205–06. *See also* Vogt 2/24/94 Tr. at 147, 155–57; Vogt 1/12/94 Dep. at 18–19, 28–29; Annas 2/24/94 Tr. at 237–39, 245–46, 262, 271–73; Annas 1/14/94 Dep. at 53; Georgine 2/28/94 Tr. at 51, 52, 58, 90–91, 165–66; Georgine 1/27/94 Dep. at 94–95; Baumgartner 1/6/94 Dep. at 32–34, 50, 53, 69–70, 85–86, 93–94; Murphy 1/6/94 Dep. at 108–09, 112, 117–18; Raver 1/11/94 Dep. at 83, 115 (these representative plaintiffs testified, and the Court credits their testimony, that, in their view, the Stipulation offers sig-

nificant non-monetary value to non-impaired class members).

173. The Objectors argue that the Stipulation offers claimants with non-impairing asbestos-related conditions the same benefits that such claimants would receive under "green card" settlements with the CCR defendants, and that the CCR defendants have offered such "green card" settlements to any claimant who wanted one for several years. *E.g.,* Fitzpatrick 2/23/94 Tr. at 87–89. Thus, the Objectors' argument runs, the Stipulation offers no advantages to non-impaired claimants that were not already available to such claimants from the CCR defendants under the existing tort system. *Id.*

174. Although both "green card" settlements and the Stipulation provide for the deferral of claims of non-impaired individuals until certain objective medical criteria are satisfied, this Court finds that the benefits offered to non-impaired class members by the Stipulation are far more than those offered by "green card" settlements. Unlike "green cards", the Stipulation provides for a waiver of the statute of limitations, and guaranteed payment through an administrative procedure if and when a claimant develops a qualifying condition. Furthermore, once a claimant develops a qualifying condition, the Stipulation offers faster compensation, lower transaction costs, and a limited release if a claimant were to subsequently develop a qualifying malignant condition. Rooney 3/1/94 Tr. at 54–55, 58, 63–64, 66, 68, 70–72, 129–30, 155; Fitzpatrick 2/22/94 Tr. at 121; Fitzpatrick 2/23/94 Tr. at 26, 113, 116–17; Hatten 3/18/94 Tr. at 24. *See also* Exhibits SP–300, Part VI at 49 and SP–510(B) at 2–3.

175. The Objectors have also argued that the benefits offered non-impaired claimants under the Stipulation are not meaningful because few, if any, of these claimants will become sick and qualify for cash compensation. The Court credits the uncontradicted testimony of two medical experts in finding that currently non-impaired claimants are likely to develop more serious asbestos-related medical conditions, such as lung cancer or mesothelioma. Roggli 3/9/94 Tr. at 62–63; Oliver 3/14/94 Tr. at 205–06.

176. In sum, this Court finds that the group of benefits offered to non-impaired class members has significant value in that it gives each such class member the security of knowing that if and when they become impaired due to asbestos exposure, they will receive payment without having to suffer the delays, expense and uncertainty of the current tort system and will retain the right to re-enter the claims process a second time if he or she contracts cancer or mesothelioma. The Objectors' arguments to the contrary are unpersuasive.

## IV. ADEQUACY OF CLASS COUNSEL

177. In considering whether it is appropriate to enter a final class certification order under Rule 23 and whether to approve the settlement negotiated on behalf of the class, this Court must evaluate the conduct and adequacy of Class Counsel. The following constitute the Court's findings of fact as to this issue.

### A. *Selection, Qualifications, and Conduct of Class Counsel*

178. In or around November 1991, it became clear to the CCR defendants and Class Counsel that settlement negotiations in the MDL proceeding would not produce a global agreement among all plaintiffs and all asbestos defendants nationwide. *See* FOF ¶ 33–35. Thus, CCR concluded that it wanted to pursue individual global settlement negotiations on its own behalf. *See* FOF ¶ 35. To that end, CCR approached Mr. Motley and Mr. Locks in late 1991. Fitzpatrick 2/22/94 Tr. at 117.

179. At the time, CCR was aware that Mr. Motley and Mr. Locks had been appointed by Judge Weiner in the MDL proceedings as the co-chairpersons of the Plaintiffs' Steering Committee. Fitzpatrick 2/22/94 Tr. at 99. By this time, Mr. Fitzpatrick had been discussing possible solutions to the asbestos crisis with Mr. Motley for many years. *See* FOF ¶¶ 22, 31; Fitzpatrick 2/22/94 Tr. at 78, 86–87, 99–100, 114. And CCR was aware that the law firms of Ness, Motley and Greitzer and Locks had played prominent roles in representing thousands of asbestos victims in various national proceedings. Fitzpatrick 2/22/94 Tr. at 117. Indeed, the experience of

Messrs. Motley, Locks and Rice was recognized by the Honorable Robert M. Parker in the United States District Court for the Eastern District of Texas. Order Provisionally Certifying Class for Settlement Purposes at 3 in *Ahern v. Fibreboard Corp.*, No. 93–526, (E.D.Tex. Sept. 9, 1993).

180. Messrs. Motley and Rice's law firm, Ness, Motley, was widely known by those involved in asbestos litigation, including CCR, to represent more asbestos victims either directly or through co-counsel networks than any other law firm in the country. They had been involved in all the major events in the asbestos litigation, including consolidated trials, the *Linscomb* class action, and the major bankruptcies. Mr. Motley had served for the past 20 years as Chair of the Asbestos Litigation Group, a national organization of plaintiffs' counsel involved in asbestos litigation. Hatten 3/17/94 Tr. at 26–27.

181. It was known to CCR that Mr. Motley had played a significant role in the Manville bankruptcy proceeding and in other bankruptcy proceedings involving former asbestos manufacturing companies. He had been active in congressional efforts to enact legislation to remedy the problems posed by the asbestos litigation. He was very active in representing unions whose members were occupationally exposed to asbestos and asbestos-containing products over the years. Fitzpatrick 2/22/94 Tr. at 117–18.

182. It was known to CCR that Mr. Locks also had played a prominent role in various national matters for asbestos victims. Fitzpatrick 2/22/94 Tr. at 117. In addition, Mr. Locks was actively involved in the Manville bankruptcy proceeding, as well as the Unarco bankruptcy proceeding. Further, Mr. Locks served as Chairman of the Board of UNR. Fitzpatrick 2/22/94 Tr. at 118.

183. Mr. Rice's prominence, competence and skill was also recognized when he was appointed Class Counsel by Judge Parker in the recent settlement class action involving pending asbestos claims against one asbestos defendant, Fibreboard. *Ahern v. Fibreboard Corp.*, No. 93–526, Order Provisionally Certi-

fying Class for Settlement Purposes at 3 (E.D.Tex. Sept. 9, 1993).

184. This Court finds that Messrs. Motley, Locks and Rice are highly respected for their skills and experience in the asbestos litigation and had and have the knowledge and credibility necessary to negotiate on behalf of future asbestos victims in any global settlement effort. This Court also finds that CCR commenced negotiations with Class Counsel based on their reputation and experience in the asbestos litigation. There is no suggestion in the exhaustive discovery and litigated record that CCR executives or attorneys met and decided to "choose" plaintiffs' counsel with the largest inventory of unsettled claims in order to facilitate a global settlement by creating an atmosphere of collusion. That never happened.

### B. *Conflict of Interest*

#### (1) Settlement of Present Cases and Future Claims

185. During the first two years of CCR's existence, in 1989–90, CCR entered into a number of block or "inventory" settlements. Fitzpatrick 2/23/94 Tr. at 64–65. The CCR settlement philosophy at that time was to work ambitiously to settle large numbers of pending claims. *Id.* at 144, 148–49. CCR, however, determined that it would no longer pursue this ambitious settlement effort, after finding that the settlement strategy was not diminishing the number of pending claims. Fitzpatrick 2/23/94 Tr. at 144.

186. In 1991, CCR continued to make some settlements that were not trial driven. Fitzpatrick 2/23/94 Tr. at 148–49. In general, however, CCR determined to continue to make inventory settlements only if it could obtain some kind of protection for the future. *Id.* at 144, 148–49.

187. During the period of the MDL global settlement negotiations in 1991, CCR's position was that it was not prepared to agree to "inventory settlements," unless the plaintiffs' bar was willing to work with CCR and the courts for the establishment of pleural registries.[41] Fitzpatrick 2/23/94 Tr. at 146,

---

41. Pleural registries are deferral docket mecha- nisms, created by court order, under the terms of

161, 191–92. In August 1992, for example, a regional settlement of the asbestos cases pending in New England was reached and, as part of that settlement, the plaintiffs' counsel agreed to support the entry of mandatory pleural registries in the applicable jurisdictions. Fitzpatrick 2/22/94 Tr. at 128.

188. CCR, however, reached the conclusion that its concerns about the filing of pleural claims, by persons with little or no impairment, could not be successfully addressed by pursuing pleural registries. First, there was opposition in many quarters from the plaintiffs attorneys to such pleural registries. Fitzpatrick 2/22/94 Tr. at 123. The opposition was based in part on the desire to receive immediate cash compensation and in part on the lack of funding for the registries to ensure that companies would still be viable if and when a pleural claimant became impaired and moved off the registry. *Id.* at 123–24. In addition, this Court finds that CCR reasonably concluded that pleural registries were unsatisfactory unless a national pleural registry could be established, because it would be difficult for plaintiffs in one state to defer their claims if plaintiffs in other states would not be subject to deferral. *Id.* at 124.

189. Sometime in or around May or June of 1992, CCR negotiators came to believe that the class action settlement negotiations, which ultimately led to the filing of this lawsuit, were likely to result in an agreement. This belief was based upon the progress of the negotiations with Greitzer and Locks, although major components of the settlement including negotiation of the medical criteria and examination of the CCR defendants' financial ability to pay had not been completed. Rooney 2/28/94 Tr. at 202–03, 211; Laeri 3/14/94 Tr. at 21–24.

190. CCR had, for some time, been looking for a rational way of dealing with the

entire asbestos problem, both pending and future cases. CCR communicated to Mr. Motley, Mr. Rice, and Mr. Locks that once the CCR defendants "believed that there was some rational way of dealing with the futures [claims], that [they] were prepared to address the settlement of pending cases." Rooney 2/28/94 Tr. at 202. This Court finds that, indeed, once it was probable to the CCR negotiators that the negotiations would be successfully concluded for a class action settlement, CCR began to negotiate inventory settlements without a pleural registry. *Id.* at 202, 225; Fitzpatrick 2/23/94 Tr. at 66.

191. During the summer of 1992, CCR and Greitzer and Locks began negotiations for the settlement of currently pending claims. Included in the Greitzer and Locks inventory settlements were 3922 claims representing cases then pending in New York, Pennsylvania, Kentucky, New Jersey, Virginia, Indiana, Ohio, Illinois, North Carolina, Tennessee, and Maryland.[42] The settlements included those cases that were filed, and a few cases that had not been filed but were sufficiently prepared such that filing was imminent. Rooney 2/28/94 Tr. at 201, 207; Exhibit SP–302C.

192. During the period May–June 1992 when CCR commenced negotiating the Greitzer and Locks inventory settlements, Ness, Motley was otherwise engaged trying a large consolidated trial, where CCR defendants were involved, in state court in Baltimore, Maryland. Rooney 2/28/94 Tr. at 177–78; Rooney 3/1/94 Tr. at 76. Ness, Motley did not re-enter the global negotiations which resulted in this class action until late summer or fall of 1992. Rooney 2/28/94 Tr. at 178.

193. Sometime in late September or early October 1992, CCR began negotiating with Ness, Motley to settle their pending inventory of cases. Rooney 2/28/94 Tr. at 203. In November 1992, these negotiations resulted

---

which the resolution of claims of persons with pleural conditions resulting from asbestos exposure, but who do not meet certain medical criteria and/or impairment criteria, are deferred as to all asbestos defendants in the jurisdiction, with the statute of limitations being tolled, until such time as the medical condition progresses so as to satisfy the medical/impairment criteria. Fitzpatrick 2/22/94 Tr. at 123.

**42.** These Greitzer and Locks inventory settlements were concluded on August 3, 1992 in Kentucky, August 20, 1992 in New Jersey, Virginia, Maryland, Indiana, North Carolina, Illinois, Ohio and Tennessee, October 26, 1992 in Pennsylvania, and December 10, 1992 in New York. Exhibit SP–302C.

in an agreement in principle to settle 450 Ness, Motley cases pending in South Carolina and 9834 cases with Ness, Motley affiliated counsel located primarily in the states of West Virginia, Illinois, and Georgia. *Id.* at 204; Exhibit SP–302A.

194. These Ness, Motley inventory settlements, similar to the Greitzer and Locks settlements, included all cases pending in the jurisdictions as of November 1992, and a few unfiled cases that were ready to be filed as of that date. Rooney 2/28/94 Tr. at 207–08.

195. The inventory settlement agreements with Class Counsel did not provide for immediate compensation to all claimants. Rather, these agreements provided for a schedule of payments over a number of up to five years. Rooney 2/28/94 Tr. 205; Exhibits SP–302A and SP–302C.

196. In addition to inventory settlements with Greitzer and Locks and Ness, Motley, CCR settled approximately 9,000–10,000 cases prior to the filing of this class action, with other law firms, not affiliated with Class Counsel, under the same or similar provisions. Rooney 2/28/94 Tr. at 204.

197. The evidence in the record reflects, and this Court finds, that, in 1992, it was the CCR's policy not to settle pending cases without some protection for the future. With the negotiation of the settlement in this class action, CCR was exploring a different way to resolve the burgeoning number of asbestos claims, that is a different way of providing some protection for the future. The asbestos bar and the MDL Court were well aware of the CCR settlement policy. Fitzpatrick 2/23/94 Tr. at 161; Mem.Op. and Order, Dkt. No. 292 (Apr. 15, 1993) (Weiner, J.) at 6. The evidence in the record also reflects, and this Court finds, that Class Counsel did not enter into the *Georgine* negotiations for the purpose of settling their pending cases.

198. Moreover, the evidence reflects, and this Court finds, that the settlement of the inventory cases was not conditioned upon an agreement being finally reached in *Georgine*. It is clear on the face of the inventory settlement agreements, that if the Stipulation of Settlement had not been concluded after the negotiation of the inventory settlements, the inventory settlements nevertheless remained in full effect. Rooney 3/1/94 Tr. at 102–03.

199. This Court finds that in negotiating the inventory settlements for their present clients and the *Georgine* Stipulation for the futures class, Class Counsel and CCR bargained vigorously and at arms-length. The settlements reached for both groups of claimants were not negotiated against each other, and Class Counsel worked diligently to negotiate what they considered to be the best possible settlements achievable for each group of claimants. *See, inter alia,* Rooney 2/28/94 Tr. at 177–200, Fitzpatrick 2/23/94 Tr. at 184–85; Exhibit SP–300 (the fairness of the medical criteria and the compensation procedures is evidence of the adequacy of Class Counsel).

200. The Objectors argue that the simultaneous representation of present and future claimants by Class Counsel constituted an impermissible conflict of interest. They offered Professor Roger Cramton as an expert witness on this issue. Professor Cramton is the Robert Stevens Professor of Law at Cornell University and former Dean of the Law School. He is a co-author with Professor Geoffrey Hazard, one of the Settling Parties' ethics experts, of the textbook *The Law and Ethics of Lawyers.* He has published numerous articles on the legal profession and legal education and has experience teaching legal ethics. Cramton 3/15/94 Tr. at 94–102; O–67. Professor Cramton, however, has no asbestos litigation experience, or any litigation experience, and has had no experience as a lawyer or expert in mass tort cases. Cramton 3/15/94 Tr. at 189–90; Cramton 3/16/94 Tr. at 78.

201. Professor Cramton testified that, in his opinion, the concurrent representation of a very large number of present clients, whose asbestos cases Class Counsel wanted to settle, while negotiating on behalf of what became the *Georgine* class presented an impermissible conflict of interest under Model Rule 1.7(b) of the ABA Model Rules of Professional Responsibility. Cramton 3/15/94 Tr. at 108, 112–15, 213, 216. The Court rejects Professor Cramton's conclusion as to the existence of an impermissible conflict of interest because: (1) he lacks of expe-

rience in mass tort cases, class actions and asbestos litigation; and (2) because, as described below, the credible evidence in the record does not support his factual predicate.

202. Professor Cramton testified that, as he understood the facts, CCR demanded that "a large portion of the future claimants ... get no or little monetary recovery" under the class action and that CCR wouldn't talk to Class Counsel "unless [they] agree[d] to that." Cramton 3/15/94 Tr. at 206. Professor Cramton's factual assumption that a large portion of future claimants who suffer from an asbestos-related disease will receive little or no monetary benefit under the Stipulation is contradicted by the evidence in the record. Rather, this Court has found that the eligibility criteria for cash compensation are fair and reasonable to the class as a whole and that, while non-impaired pleural claimants will not receive *immediate* cash compensation unless and until they meet certain medical criteria, these claimants receive a group of valuable benefits in lieu of immediate cash, including the right to claim future money benefits. *See* FOF ¶¶ 171–176. A significant percentage of these claimants will ultimately develop a compensable injury and receive compensation under the settlement. *See* FOF ¶ 172; Roggli 3/9/94 Tr. at 62–63; Oliver 3/14/93 Tr. at 205–08. Further, this Court finds that Professor Cramton's conclusion was outweighed by the opinions of the experts offered by the Settling Parties.

 203. The Settling Parties presented the expert testimony of Professor Geoffrey Hazard on this issue. Professor Hazard is Professor of Law at Yale University (recently at the University of Pennsylvania Law School) and Director of the American Law Institute. Professor Hazard teaches in the fields of legal ethics and professional responsibility and civil procedure, including class actions. He is the lead author of *The Legal Profession: Responsibility and Regulation,* and the lead author of the textbook *The Law and Ethics of Lawyering.* He was the Reporter to the Kutak Commission which was responsible for reconsideration of the Rules of Professional Responsibility. He was a member of the advisory board for studies concerning the asbestos litigation undertaken

by the Rand Institute of Civil Justice. He has extensive experience as a consultant in the field of legal ethics. Exhibit SP–900A; Hazard 2/25/94 Tr. at 5–18. Professor Hazard is a competent expert because he has the knowledge, skill, experience, training and education to form an opinion on issues relating to his field of expertise.

204. Professor Hazard testified that, in his expert opinion, which this Court credits and accepts, Class Counsel did not have "a conflict of interest that impaired their ability or in any way disqualified them from performing the functions that they performed." Hazard 2/25/94 Tr. at 31. The Court accepts Professor Hazard's conclusions: (1) that it was not a conflict for a lawyer to represent two groups of clients with similar claims against a common defendant, in this case, clients with pending claims and future claimants; (2) that this kind of concurrent representation was common practice and not a violation of Model Rule 1.7(b); and (3) that such representation "requires the lawyer to exercise proper judgment and fair mindedness in working out the negotiations concerning allocation of any settlement, but that's part of the job. It doesn't mean you are out of the job." *Id.* at 31–35.

205. This Court accepts Professor Hazard's testimony that in reaching his conclusion that there was no impermissible conflict of interest in this case, he took account of the settlement policy of the CCR defendants, which called for some assurances as to the resolution of future claims before the CCR defendants were willing to embark on a program to settle inventories of present cases. Hazard 2/25/94 Tr. at 47–48. This Court finds persuasive Professor Hazard's explanation that CCR's interest in resolving the litigation, including both present and future claims, was not unlike a typical case where "defendants do not settle cases against the same lawyer involving similar or the same transactions unless they will settle them all, except under extraordinary circumstances." *Id.* at 47.

206. Professor Hazard was aware that some of the inventory settlements included a few cases that were as yet unfiled, but were ready to be filed. Hazard 2/25/94 Tr. at 48–

50. This Court accepts his opinion that this fact does not change the ultimate conclusion that Class Counsel did not have an impermissible conflict in settling their present cases at the same time that they negotiated the *Georgine* settlement. *Id.* at 50, 198–201.

207. Professor Hazard also took into account the contention made by Objectors that since the terms of the proposed *Georgine* settlement were not identical to the settlement terms for the inventory claims, then Class Counsel had an impermissible conflict of interest in their concurrent representation of their present clients and the futures class. Hazard 2/25/94 Tr. at 38. This Court finds Professor Hazard's rejection of that contention persuasive when he explained that pending claimants are not identically situated to future claimants in that they have already incurred at least some of the transaction costs, delays and burdens of the tort system and that present claimants are in certain respects different than future clients. *Id.* at 38–39. Based on this testimony, this Court finds that it was neither inappropriate nor evidence of a conflict to treat these two groups of claimants differently.

208. The Settling Parties also presented the testimony of Professor John P. Freeman on this issue. Professor Freeman is a Professor of Law at the University of South Carolina Law School, holding the chair of the John Campbell Professor of Business and Professional Ethics. He serves on the Professional Responsibility Committee, the Ethics Advisory Committee, and the Corporate and Securities Law Committee for the South Carolina Bar. Professor Freeman has extensive experience in the teaching of legal ethics and in consulting with lawyers in connection with legal ethics issues. He has published extensively in the area. In addition, Professor Freeman has significant experience in the litigation of class actions. Freeman 3/10/94 Tr. at 51–59; Exhibit SP–1075. Professor Freeman is a competent expert because he has the knowledge, skill, experience, training and education to form an opinion on issues relating to his field of expertise.

209. Professor Freeman also testified, and this Court credits and accepts his testimony, that Class Counsel did not have an impermissible conflict of interest in proceeding to negotiate the *Georgine* settlement at the same time that they continued to represent their present clients. Freeman 3/10/94 Tr. at 117. The Court accepts Professor Freeman's conclusion that (1) it would have been irresponsible for Class Counsel to dismiss their present clients in order to explore the possibility of a futures class, *id.* at 117–18, and (2) a lawyer can represent multiple clients against a common defendant in multiple forums. *Id.* at 119.

210. Professor Freeman testified, and this Court credits his testimony, that Class Counsel did not have an impermissible conflict of interest in settling their present cases while proceeding with the *Georgine* negotiations. Freeman 3/10/94 Tr. at 121. Professor Freeman explained that fiduciary obligations to two sets of clients does not create an impermissible conflict. *Id.* at 121–22. As with all of their clients, Class counsel was obligated to obtain what they considered was the optimum recovery for both their present clients and for the class in this action. *Id.*

211. This Court accepts Professor Freeman's testimony that the fact that non-impaired pleural claimants in the inventory settlements received immediate cash compensation, where similarly situated claimants under *Georgine* would receive a different bundle of rights, with no immediate cash payment, was not evidence that Class Counsel were burdened by an impermissible conflict of interest. This is so, Professor Freeman explained, because the present claimants had gone to Class Counsel in the tort system and "had a realistic expectation that their cases were going to be resolved in the tort system" by means of judgment or settlement. Freeman 3/10/94 Tr. at 126–27. Future claimants would have different expectations, and were receiving a "bundle or basket" of rights under *Georgine. Id.* at 128. Professor Freeman observed and this Court credits his view that while pleural non-impaired claimants who were paid in the tort system became "self-insured" upon signing a release to the settling defendant, under the *Georgine* settlement, "you've got ... CCR in essence being the insurer, with CCR standing ready with the money to pay these people, when, as

and if they get ill, and qualify under the *Georgine* standard." *Id.* at 129.

212. Based upon the testimony of Professors Hazard and Freeman, and the foregoing findings of fact, this Court finds that Class Counsel were not conflicted, and indeed acted responsibly, diligently, and ethically in representing their present clients while negotiating on behalf of the *Georgine* class.

**(2) Futures Provisions in the Inventory Settlement Agreements**

213. Objectors argued at the fairness hearing that the language of provisions in the inventory settlement agreements known as the "futures provisions" also created a conflict of interest for Class Counsel.

214. Before entering into the inventory settlement agreements, Class Counsel had consulted with and had been advised by Professor John Freeman, an ethics expert, in connection with these futures provisions and the class action settlement generally. Freeman 3/10/94 Tr. at 67. Professor Freeman advised Class Counsel that ethical propriety on the part of class counsel should be a keystone of any class action settlement. *Id.* at 67–68. Specifically, as it relates to the issue of the futures provisions, Professor Freeman advised them that it was impermissible to enter into an agreement, known as a "lockout agreement," which would amount to an agreement to restrict their right to practice law in exchange for the settlement of pending cases in violation of Model Rule 5.6(b). Exhibit O–35. Based upon Professor Freeman's testimony, this Court finds that before the original futures provisions in the inventory settlement agreements were drafted, it was the expressed intention of Class Counsel to act in accordance with the ethical rules governing the conduct of attorneys. Specifically, this Court finds that it was not the intention of Class Counsel to impermissibly restrict their right to practice law in exchange for the settlement of their pending cases.

215. The original futures provisions entered into by Class Counsel and CCR took two forms: the first was memorialized in letters from Mr. Locks to a representative of CCR (*see* Exhibit SP–302C) (hereinafter "the Greitzer and Locks inventory settlement agreements"), and the second was contained in inventory settlement agreements between Ness, Motley or their affiliate counsel and CCR (*see* Exhibits SP–302A and 302B) (hereinafter "the Ness, Motley inventory settlement agreements").

216. The language of the futures provision in the Greitzer and Locks inventory settlement agreements was as follows:

> It is further understood that in the future, Greitzer and Locks will not handle or process claims against the CCR defendants unless they meet certain mutually agreeable disease criteria.

Exhibit SP–302C.

217. At the time these letter agreements were written and the inventory settlements concluded, CCR and Greitzer and Locks had reached agreement on the concept of deferral of claims that would not meet certain medical criteria, but the actual medical criteria had not yet been determined. Rooney 2/28/94 Tr. at 208–09. The parties intended the medical criteria from the *Georgine* Stipulation, when they were finally agreed upon,[43] to constitute the "mutually agreeable disease criteria" in the futures provision. Rooney 2/28/94 Tr. at 211–12.

218. The futures provision in the Ness, Motley inventory settlement agreements was as follows:

> Ness, Motley agrees further that his law firm will not file any future asbestos personal injury claims in any court in the State of South Carolina or in any other state for a case which would be properly venued in South Carolina against the CCR or any of its current members, so long as the current member remains a member of the CCR, unless the medical evidence support one of the following asbestos-related diagnoses. . . .

**43.** These medical criteria were not finally agreed upon until January 1993. Rooney 2/28/94 Tr. at 211–12.

*See* Exhibit SP–302A (¶ 5 of January 14, 1993 South Carolina agreement).[44] The "asbestos-related diagnoses" in the agreements are substantially comparable to the medical criteria for qualifying for cash compensation under the *Georgine* Stipulation. *See* Exhibit SP–300 at 25–32.

219. There was testimony at the fairness hearing, which this Court credits, that these futures provisions were understood by CCR to confirm Class Counsel's commitment to the concept of the deferral of claims that did not meet the medical criteria in the Stipulation. Rooney 2/28/94 Tr. at 211. CCR understood that Class Counsel would recommend to clients that they defer their claims if they did not satisfy the medical criteria, and that, in CCR's experience, clients in the normal course followed the advice of counsel. Rooney 3/1/94 Tr. at 102. CCR was also under the impression that if a client did not accept their counsel's recommendation, Class Counsel was free to file a lawsuit on the client's behalf. *Id.*

220. On July 9, 1993, the Greitzer and Locks inventory settlement agreements were revised and superseded. The clarifying language provided:

> This letter is to *confirm and memorialize our prior understanding* concerning the agreement between Greitzer and Locks and CCR companies concerning future claimants.

> At the time we negotiated the settlements for our present clients, we agreed that if ever mutually acceptable medical disease criteria were to be agreed to in a class action, we would adopt those criteria for each of our settlements for future claimants. We, of course, never intended that Greitzer and Locks nor CCR would enter into any settlement which would be a violation of any canon of ethics or the model code of professional responsibility.

> To clarify what we always agreed to and what was always our understanding, we stated that our firm would use its best

efforts to encourage and would recommend that our future clients defer litigation against the CCR defendants until that claimant's medical condition satisfied the mutually acceptable medical criteria set forth in [*Georgine*]. We will make this recommendation in exchange for a tolling of the statute of limitations and in exchange for future nonmalignant and malignant "insurance policies" because this is advisable and in the best interests of our future clients, unless in the exercise of our independent professional judgment, given some unforeseen circumstance, we conclude otherwise for a particular client.

> As you also know, we made this agreement because we believe this alternative procedure is better than and more valuable than the existing system for any of our future clients who do not meet the medical criteria. Most important, it protects them from being compelled to prematurely litigate, settle, or release their claims against the CCR defendants.

> Despite our recommendation that we believe our future clients should accept the fair and reasonable medical criteria we agreed to in [*Georgine*], and as we always indicated and agreed, *in the event a potential future client of our firm should not wish to accept our recommendation, we would notify the CCR. In addition, it was always understood and agreed that we could and would, if we chose, represent that client against the CCR as well as all other defendants.*

Exhibit SP–302C (emphasis added).

221. On June 11, 1993, the January 14, 1993 Ness, Motley inventory settlement agreement was revised and superseded. The amended agreement provided:

> Plaintiff Counsel believes that the criteria set forth in paragraph 5 is fair and reasonable criteria and acceptance of CCR's offer will be in the interest of its future clients who do not have a medical condition described in paragraph 5, in that it protects

---

44. Subsequent to the January 14, 1993 South Carolina agreement, Ness, Motley or their affiliated counsel and CCR entered into 10 settlement agreements for pending inventories in Georgia, Illinois, West Virginia. These settlements in-volved 10 separate law firms within the three states. Each such agreement contained a provision identical or substantially the same as Paragraph 5. *See* Exhibit SP–302B.

such clients from being forced prematurely to litigate, or settle and release their claims for asbestos injury. *Plaintiff Counsel therefore agrees, unless in the exercise of its independent professional judgment, given some unforeseen circumstances, it determines otherwise, to recommend that its clients seriously consider, and accordingly will use its best efforts to encourage, each client to accept this alternative dispute resolution procedure. With respect to all clients who accept this alternative dispute resolution procedure, Plaintiff Counsel agrees to defer filing any asbestos-related personal injury claims against CCR or any of its current members until such time, if ever, as the claimant develops one of the asbestos-related diseases described in paragraph 5.*

. . . . .

Subject to paragraph 11 below, this agreement shall remain in full force and effect unless and until the Stipulation of Settlement in [*Georgine v. Amchem Products, Inc.*], C.A. No. 93–0215 (E.D.Pa.) is finally approved by the Court, with all appeals, if any, exhausted. Upon final approval of the [*Georgine*] settlement, which includes medical criteria substantially comparable to the criteria of paragraph 5, this Agreement shall be superseded by [*Georgine*], except for those who have chosen to opt out in accordance with the orders of the Court.

Exhibit SP–302B (emphasis added).

222. In the interim, between the time when the futures provisions were originally drafted by the parties and subsequently revised, the American Bar Association Committee on Professional Responsibility issued a Formal Opinion, No. 93–371. This opinion raised a question as to the propriety under ABA Model Rule 5.6(b) of these futures provisions in the inventory settlements. Accordingly, CCR and Class Counsel determined to and did clarify the meaning of the futures provisions as set forth in the original inventory settlement agreements as quoted above.

223. The Settling Parties presented the testimony of Professor Freeman, Professor Hazard, and Professor Sam Dash on the issue of the ethical propriety of the futures provisions. The Court has previously found that Professors Freeman and Hazard are competent experts. *See* FOF ¶¶ 203, 208. Professor Samuel Dash is currently Professor of Law and Director of the Institute of Criminal Law and Procedure at Georgetown University Law Center. He has been employed by Georgetown since 1965 where his primary teaching responsibilities include Professional Responsibility, criminal procedure, criminal law, and a seminar on Congressional investigations. He is a former District Attorney in Philadelphia, partner in private practice, and Director of the Philadelphia Council for Community Advancement. He has served as a consultant to a number of Congressional and other governmental committees to consult on various issues involving ethics and legislative procedure. In January 1973 he was asked to serve as Chief Counsel and Staff Director of the Senate Watergate Committee. In 1983 he was asked by the President of the Senate of Puerto Rico to supervise and train their staff to conduct a major Senate investigation of a political murder in Puerto Rico. He is a member of the Board of the International League for Human Rights which is frequently called upon to investigate human rights abuses and corruption in government. He has served as Chair of the Criminal Law Section of the American Bar Association and served for six years on the Standing Committee of Ethics and Professional Responsibility of the ABA. He continues to consult actively in the field of professional ethics. Dash 3/30/94 Tr. at 172–90; Exhibit SP–902. The Court finds that Professor Dash is a competent expert because he has the knowledge, skill, experience, training and education to form an opinion on issues relating to his field of expertise.

224. Professor Freeman testified that it was his opinion that Class Counsel had not entered into an unethical, improper, lock-out agreement with CCR in settling their pending inventory cases, and further did not constitute in any respect an ethical impropriety. Freeman 3/10/94 Tr. at 108.

225. In providing this opinion, Professor Freeman relied for the most part on: (1) the terms of the Stipulation which focus on the recognition that Class Counsel must proceed

in a manner consistent with their ethical obligations; (2) the fact that the earlier agreements were superseded by language making clear that Class Counsel was not restricted in the cases it could file, but was only reaffirming their professional judgment with respect to the application of the medical criteria to future clients; and (3) the testimony of Mr. Rooney and Mr. Fitzpatrick in the fairness hearing about what CCR understood the futures provisions to mean. Freeman 3/10/94 Tr. at 99–104.

226. Professor Hazard also testified that these futures provisions did not violate Model Rule 5.6. Hazard 2/25/94 Tr. at 63. The question, as analyzed by Professor Hazard, was whether it was inappropriate for lawyers who were handling a substantial number of asbestos cases, and who expect to handle a continuing flow of these cases, to state that in their professional judgment pleural cases should not be filed and agree to handle the pleural cases differently in the future. Professor Hazard concluded that the net effect of this statement is not a restriction; rather it is an affirmation about the standards that the lawyers will apply in screening the cases they handle in the future and an affirmation to the defendants that they should not be confronted with certain claims until the claimants are impaired. Hazard 2/25/94 Tr. at 64–65.

227. Professor Hazard further opined that, even if there were a violation of 5.6(b), it would be neither significant nor material, and that the futures provisions would not have undercut or impaired the loyalty with which Class Counsel acted on behalf of the class members. Rather, the futures provisions represent sober, sensible, humane professional judgment by the lawyers, reflecting experience in this kind of case, that will redound to the benefit of the lawyers' clients. Hazard 2/25/94 Tr. at 66, 232–34. *See also* Hatten 3/18/94 Tr. at 9–10, 49–50, 67–70; Hatten 3/17/94 at 88 (explaining that he made his own decision not to file pleural cases in the mid–1980s because of his belief that "the plaintiffs' bar needed to file their claims with more discretion and better judgment.").

228. Professor Dash credibly testified, based on his service on the ABA Standing Committee on Ethics and Professional Responsibility, that the policy of this committee "is that if the request [for an ethical opinion] sets forth facts that [are] clearly answered by the rules themselves or by decisional law or prior ethical opinions, they will not write a new opinion.... Only in situations where the fact situation as interpreted by the Standing Committee ... make[s] it unlikely that a lawyer trying to act ethically would be able ... to correctly apply the Rules of Professional Conduct do they make the decision that an opinion is necessary to clarify the ethical rule in that factual situation." Dash 3/30/94 Tr. at 199–200. Thus, the Court accepts Professor Dash's statement that the fact that the ABA Standing Committee issued Formal Opinion 93–371, which addressed a different but related futures agreement under Model Rule 5.6(b), indicates that the Standing Committee reached the conclusion that "the factual situation upon which they're opining is not clearly answered by the professional rule and it needs their guidance to lawyers on how to act in the future." Dash 3/30/94 Tr. at 200.

229. In support of their contention that Class Counsel acted unethically when it entered into the inventory settlements agreements with the futures provisions, the Objectors presented the testimony of Professor Cramton (*see* FOF ¶ 200) and Professor Susan P. Koniak. Professor Koniak is a Professor of Law at Boston University School of Law, where she teaches legal ethics. Koniak 3/17/94 Tr. at 105. She formerly was assistant to the President of the American Bar Association, Director of Governance Management for Greater Boston Legal Services, and Director of the Continuing Legal Education Program of the District of Columbia Bar. *Id.* at 106–08. She has taught legal ethics in the past at Catholic University and Georgetown University. *Id.* at 108–09. She is co-author of *The Law and Ethics of Lawyering* with Professors Hazard and Cramton, and has lectured on the subject of legal ethics. *Id.* at 110–11. Professor Koniak has no litigation or practice experience, is not a class action expert, and was generally unfamiliar with the asbestos litigation prior to the end

of December 1993 when she agreed to be an expert witness in this case. *Id.* at 251–53.

230. Professor Cramton testified that the January 14, 1993 Ness, Motley agreement violated Model Rule 5.6 because "the document on its face is a restriction on future practice." Cramton 3/15/94 Tr. at 158–60.[45]

231. Professor Koniak testified that even the amended Ness, Motley inventory settlement agreement of June 11, 1993 violates Model Rule 5.6 because Class Counsel are agreeing to restrict their advice to their future clients. Koniak 3/17/94 Tr. at 152, 155.

232. This Court rejects Professor Cramton's and Professor Koniak's conclusion as to the ethical propriety of the futures provisions because: (1) both lack experience in mass tort cases, class actions and asbestos litigation, *see* FOF ¶¶ 200, 229, such that neither understood how such a good faith commitment could reflect sensible professional judgment of lawyers with extensive experience in asbestos litigation; and (2) neither considered the intent of the lawyers and the parties when entering into the inventory settlement agreements.

233. This Court finds that the revised agreements more clearly reflect the parties' intent when entering into the original inventory settlement agreements, that is the parties originally intended that the futures provisions be a good faith commitment on the part of Class Counsel to recommend the *Georgine* medical criteria to their own clients. By "good faith commitment", the Court finds that the parties did not intend that the futures provisions create for Class Counsel a binding obligation not to represent clients who wished to sue CCR but who did not yet meet the *Georgine* medical criteria. Rooney 2/28/94 Tr. at 220, Fitzpatrick 2/16/94 Dep. at 341–42; *see also* Dash 3/30/94 Tr. at 259 (intent is required to find a violation of Model Rule 5.6(b)). Indeed, the revised agreements made clear that Class Counsel had simply reached their own independent professional judgment that the terms of the

agreement were in the best interest of their future clients. Dash 3/30/94 Tr. at 256–57.

### (3) Other Issues Relating to Conflict of Interest

234. Other than the issues discussed above, the objectors pointed to certain terms in the Stipulation and certain other issues which they claim supported their argument that Class Counsel was burdened by an impermissible conflict of interest when they negotiated the settlement. The terms in the Stipulation include (a) the provision that results in Class Counsel having continuing supervisory and oversight responsibilities with respect to the administration of the settlement (Cramton 3/15/94 Tr. at 147–48); (b) the provisions that result in Class Counsel having their own significant economic interests in the class in that they will receive a fee, approved by the Court, for their services as counsel for the class (*id.* at 119–21); (c) the provision that permits the AFL–CIO to monitor the administration of the settlement (*Id.* at 151; Koniak 3/17/94 Tr. at 169–70); (d) the provision that permits a deviation from the general rule that payment of claims is based on a first in time priority ("fair allocation of resources provision") (Koniak 3/17/94 Tr. at 166–68); (e) the Preamble to the Stipulation which provides that CCR will undertake to settle the present cases over the next four to five years (*id.* at 170); (f) the definition of the class which provides that class members are those persons who qualify for membership and who had not filed a lawsuit on or before January 15, 1993 (*id.* at 174–75); (g) the fact that there is no provision in the settlement to modify the medical criteria in the future based upon changed beliefs in the scientific community (*id.* at 176–79); and beyond the terms of the Stipulation itself, the Objectors argued that Class Counsel were burdened by an impermissible conflict of interest because (h) Class Counsel delegated the preparation and dissemination of the notice to CCR counsel (*id.* at 196–97); and (i) class representatives were prepared for their depositions in the presence of CCR counsel (*id.* at 197–98).

---

**45.** Professor Cramton also opined that the futures provisions violate Model Rules 1.2(c) and 1.7(b). Cramton 3/15/94 Tr. at 158. Having found that the futures provisions did not consti-

tute binding obligations on Class Counsel, *see* FOF ¶ 233, this Court finds that they could not have been a violation of Model Rules 1.2(c) and 1.7(b).

**304**

### (a) Class Counsel's Supervisory and Oversight Duties

■ 235. Under the terms of the Stipulation, Class Counsel has various continuing supervisory and oversight responsibilities. They must audit, on an annual basis, the processing and disposition of claims submitted to the CCR. Exhibit SP–300, Part XXIII.A at 97. In connection with these audits, Class Counsel will have the right to examine all books and records maintained by the CCR related to the processing of all claims under the Stipulation.[46] *Id.* Class Counsel also have the right to participate in the selection of: (a) the five Board–Certified pathologists who will resolve disputes concerning pathological issues (Part V.C.1.a.i), (b) the five physicians who will resolve disputes concerning the clinical diagnosis of non-malignant conditions (Part V.C.2.a.i), (c) the members of the Exceptional Medical Panel (Part V.D.1), (d) the members of the Extraordinary Claims Panel (Part IX.D), and (e) the list of arbitrators who will resolve disputes under Parts IV.B, VI.B, and XXVI (Part XXVI.B).[47]

236. The Court concludes that the role of Class Counsel in monitoring and supervising the activities of CCR in carrying out its obligations under the Stipulation is neither unusual nor inappropriate.

237. The Objectors, however, argue that this class action settlement is unique because Class Counsel will have the opportunity to represent individual class members who submit claims to the CCR for compensation under the Stipulation. *See* Exhibit SP–300, Part I.F. The Objectors argue that this "dual role" creates an impermissible conflict of interest. The Objectors point out that in fulfilling their monitoring and supervisory duties, Class Counsel will acquire information about the workings of the claim procedure, including the settlement offers made by CCR to qualifying claimants and CCR's willingness to accept offers made by claimants. Such inside information will not be available to other claimants. In addition, the Objectors argue that Class Counsel's role in selecting arbitrators, physicians and pathologists before whom Class Counsel will represent individual claimants creates an impermissible conflict of interest. *See* Post–Hearing Brief of the White Lung Association of New Jersey, et al., at 46–51.

238. The Court finds that because of the "dual role" of Class Counsel under the terms of the Stipulation, there exists a potential for conflict. The Court also finds, however, that this conflict does not render the Stipulation unfair to the members of the class because the Court can and no doubt will exercise its power to appoint additional class counsel who can fulfill the vital monitoring and supervisory responsibilities of class counsel under Parts V.C.1.a.i, V.C.2.a.i, V.D.1, IX.D, XXIII.A, and XXVI.B of the Stipulation, and who would not represent individual class members who submit claims for compensation under the Stipulation.[48]

### (b) Class Counsel's Economic Interest in the Class

■ 239. This Court finds that the fact that Class Counsel will receive a fee for their services for representing the class in this class action, which is to be paid by CCR and approved by the Court, does not create an impermissible conflict of interest. Dash 3/30/94 Tr. at 209–10.

### (c) The AFL–CIO's Monitoring Role

■ 240. This Court finds that providing the AFL–CIO with a monitoring role under the Stipulation was consistent with Class

---

**46.** Under the amendment to the Stipulation, the AFL–CIO will have the right to participate in such audits. Exhibit SP–301, Part XXIII.C.

**47.** Under the amendment to the Stipulation, the AFL–CIO will participate in the selection all arbitrators and medical panel members. Exhibit SP–301, Part XXIII.D.

**48.** *See* Order, Dkt. No. 11 (Jan. 29, 1993) at 3 (Judge Weiner appointed Messrs. Motley, Rice and Locks as class counsel but held that *"[t]he Court may in the future appoint additional counsel if it is deemed necessary and advisable."*) (emphasis added); *see also* Manual for Complex Litigation (2d Ed.) § 30.15 at 215 ("[I]f necessary to assure adequacy of representation, [the Court] may appoint another attorney as class counsel or may condition class certification on the employment of additional counsel.").

Counsel's fiduciary obligations to the class. Dash 3/30/94 Tr. at 205–07. Indeed, this Court finds that inclusion of the AFL–CIO in the Stipulation in this capacity only increases the protection for members of the class.

### (d) Fair Allocation of Resources Provision

241. This Court finds that the basis for the "fair allocation of resources provision," was to accommodate the concerns of plaintiffs' counsel with fewer cases such that the largest plaintiffs' firms not be able to control the case flow. Exhibit SP–300, Part VIII.B.3. Thus, the provision was intended to protect class members who are represented by small law firms. Rooney 3/1/94 Tr. at 144; see Koniak 3/17/94 Tr. at 211 (did not know the basis for the provision or what impact it would have on the settlement of claims when she testified that it was troublesome). This provision is fair and salutary in that it will benefit an otherwise potentially disadvantaged group of class members. Furthermore, the provision will only come into play if the number of qualifying claims in a given medical category exceeds the maximum number that may be paid in that category.

### (e) CCR's Stated Intention to Settle Present Cases

242. In the Preamble to the Stipulation, CCR states that it is its goal and intent to resolve all the approximately 77,000 claims currently pending against the CCR defendants in the tort system. Exhibit SP–300 at 3. This Court finds that CCR's undertaking to settle all present claims did not negatively affect the class members financially or otherwise and does not evidence an inadequacy of Class Counsel.

### (f) Definition of the Class

243. This Court finds that the definition of the class, with a cut-off date of January 15, 1993 for inclusion in the class, did not create a conflict of interest between future and present claimants. Any class for future claimants must necessarily be defined with a cut-off date which is a logical method of identifying a class in mass tort litigation.

*Ahern v. Fibreboard Corp.*, Order Provisionally Certifying Class for Settlement Purposes, No. 93–526, (E.D.Tex. Sept. 9, 1993).

### (g) Lack of Provision to Modify Medical Criteria

244. The Objectors argue that Class Counsel was inadequate in that they failed to negotiate a settlement that provided for additional compensation to the class if scientific opinion were to change as to the reasonableness of the existing medical criteria. Koniak 3/17/94 Tr. at 223. This Court finds this argument unpersuasive because the medical criteria are mature, being defined over many decades, and because there was no evidence presented by the Objectors regarding the likelihood of any significant changes in the applicable medical opinions.

### (h) Class Counsel's Role in the Notice Plan

245. This Court finds that Class Counsel were actively concerned with the development of the notice plan; sought the advise of counsel with respect to notice; participated in the filing of all notice materials with the Court; and did not abrogate their responsibilities by permitting CCR's counsel to work with the notice expert retained by the Settling Parties. Dash 3/30/94 Tr. at 213–16; Kinsella 2/16/94 Dep. at 69, 126 (testifying that she reported to CCR's counsel in the development of the notice plan).

### (i) Class Representatives Preparation for Depositions

246. This Court finds that the fact that Class Counsel permitted CCR counsel to assist in the preparation of class representatives for deposition suggests understandable cooperation concerning the details of the settlement in order to benefit the class as a whole and is not evidence of the inadequacy of Class Counsel. *See* Koniak 3/17/94 Tr. at 235–36.

### C. Collusion

#### (1) Overview

247. The Objectors final argument as to adequacy of counsel is that the settlement in

this class action was the product of collusion, *i.e.,* that Class Counsel "sold out" the interests of the class members to benefit themselves and their present clients. This Court already found, without the benefit of the testimony presented at the fairness hearing, that the settlement appeared to be the product of non-collusive negotiations. *Carlough v. Amchem Products, Inc.,* 834 F.Supp. at 1466. The following findings of fact are based on the evidence presented at the fairness hearing.

248. As this Court has already found, in the summer and fall of 1992, after it was confident about the settlement negotiations which led to the Stipulation in this case, CCR undertook to settle present cases. To this end, CCR entered into inventory settlements with Greitzer and Locks and Ness, Motley, and settled approximately 9,000–10,000 cases with other law firms, unaffiliated with Class Counsel, before the filing of this class action. Rooney 2/28/94 Tr. at 204. *See* FOF ¶ 196.

249. The Court has already found that the simultaneous representation of their present clients and the members of the *Georgine* class did not create an impermissible conflict of interest for Class Counsel. FOF ¶¶ 185–212. The Objectors also argue, through the testimony of Professor John C. Coffee, Jr., that the inventory settlements are evidence that the settlement of this class action is collusive because they argue that: (1) Class Counsel were paid a premium for the settlement of their inventory cases in exchange for an agreement in this class action; (2) class members would have received more of a benefit in the tort system than they do under the Stipulation; and (3) claimants in the inventory settlements received more than they would have under the Stipulation.

250. Professor Coffee is the Adolf A. Berle Professor of Law at Columbia University, where he has been teaching for 14 years. Coffee 3/29/94 Tr. at 4. He has taught courses primarily in the areas of corporations; corporate finance, and securities regulation. *Id.* at 11. Prior to teaching at Columbia, Professor Coffee taught at Georgetown University Law Center and, before that, practiced law from 1970–76 at Cra-

vath, Swaine and Moore. *Id.* at 4. He served as a reporter for the American Law Institute on "Principles of Corporate Governance" and is currently doing a study concerning modern class actions for the Institute for Judicial Administration. *Id.* at 5–6. He has appeared as an expert witness regarding class action issues, particularly at the settlement stage. *Id.* at 7. He has published primarily in the area of securities and antitrust class actions, focusing on economic incentives affecting plaintiffs' attorneys; conflicts of interest within the plaintiffs' camp; and the impact of various attorneys' fee formulas. *Id.* at 8–11. Professor Coffee is a competent expert because he has the knowledge, skill, experience, training and education to form an opinion on issues relating to his field of expertise.

251. Professor Hazard testified that Professor Coffee's view was not soundly based, and that there is no persuasive evidence that the settlement was a product of collusion. Hazard 2/25/94 Tr. at 36–37; 80. Professor Hazard testified that:

> [Collusion is] a charge that the lawyers sold out the class, that they were not faithful to the interests, that—it's not just that they were—failed in energy, failed in diligence, failed in attention to specifics and details, it is that they wanted to gain for themselves something at the price of their client, that they essentially cheated their clients.

Hazard 2/25/94 Tr. at 67–68.

252. This Court finds that when counsel represent a class they certainly can be in a position to sell out the class. For this and other reasons, courts are called upon to approve settlements of class actions to ensure that they are fair to the class. The opportunity to collude is not enough for a finding of collusion, however, especially given this Court's thorough analysis of the fairness of the terms of the class action settlement pursuant to Fed.R.Civ.P. 23. For this Court to find collusion in this case, the Court must find that there are some indications that Class Counsel did indeed negotiate the class action settlement for their own benefit. That is, this Court must find that Class Counsel would not have settled *Georgine* but for the

opportunity to settle their inventory of unresolved cases for historical settlement values.

253. Having found the foregoing, the Court will address each of Professor Coffee's bases for his opinion that the settlement was a product of collusion.

### (2) The Value of the Inventory Settlements

254. On January 29, 1993, Judge Weiner granted the Settling Parties' joint motion to appoint Professor Stephen Burbank as Special Master in this case pursuant to Fed. R.Civ.P. 53 and the Court's inherent powers, to assist the Court in its consideration of the proposed Stipulation of Settlement. Order, Dkt. No. 13 (Jan. 29, 1993). Specifically, Professor Burbank was asked to analyze confidential information provided to him by the Settling Parties in order to evaluate the inventory settlements reached between Class Counsel and the CCR defendants in contemplation of the *Georgine* settlement. *Id.* Professor Burbank compared the value of those inventory settlements with the settlements reached historically between Class Counsel and CCR defendants during the period 1988–92.

255. As a representative sample of the inventory settlements, Professor Burbank determined to analyze the settlement agreements in South Carolina, Ness, Motley's home state, and Pennsylvania, the home state of Greitzer and Locks. Professor Burbank then asked the Objectors' counsel to designate an additional two jurisdictions. The Objectors' chose Illinois for Ness, Motley and New Jersey[49] for Greitzer and Locks. *See* Reports of the Special Master, Dkt. No. 707 (South Carolina and Pennsylvania, Feb. 1, 1994); Dkt. No. 751 (Illinois, Feb. 11, 1994); Dkt. No. 781 (New Jersey, Feb. 15, 1994).

256. With respect to all four states, Professor Burbank received historical data on settlements between either Ness, Motley or Greitzer and Locks and the CCR defendants in each state during the period 1988–92. The

data included lists of cases, broken down into four disease categories (mesothelioma, lung cancer, other cancer, and non-malignant).[50] The lists allocated settlement amounts attributed to each category of case. Professor Burbank received lists from CCR and from either Ness, Motley or Greitzer and Locks.

257. Professor Burbank reconciled the lists provided and compared the amounts allocated for each disease category by Class Counsel and CCR. Where there were differences between the amounts allocated for a particular disease category by Class Counsel as compared to CCR, Professor Burbank used an amount for the disease category which reflected one-half the difference in the total amounts allocated by Class Counsel (or their affiliate) on the one hand and CCR on the other. Professor Burbank concluded that differences in settlement dollars attributed to the same cases are due primarily to varying practices in the allocation of group settlements.

258. Professor Burbank then calculated the dollar and percentage differences between the Class Counsel/CCR historical averages for each of the four states and the averages reflected in each state's inventory settlement agreement.

259. Based upon this analysis, Professor Burbank concluded that in South Carolina "the inventory settlement averages were lower than the Ness, Motley/CCR historical settlement averages in three categories (Mesothelioma (living), Lung Cancer, and Non-Malignant [between 3.4 and 3.6% lower]) and higher in one category (Mesothelioma (deceased) [6.1% higher])." Report of Special Master, Dkt. No. 707 (South Carolina, Feb. 1, 1994) at 1–2, 5. Since there was only one "other cancer" case in the historical settlement data, no valid comparison could be made with the "other cancer" category of the inventory settlements. *Id.* at 5.

260. With respect to Pennsylvania, based upon the above-described analysis, Professor Burbank concluded that "the inventory set-

---

**49.** With respect to the New Jersey analysis, Professor Burbank also received data related to settlements in Kentucky which provided a broader historical context for purposes of comparison.

**50.** For South Carolina, Professor Burbank broke the mesothelioma category into "mesothelioma-living" and "mesothelioma-deceased."

tlement averages were lower than the Greitzer and Locks/CCR historical settlement averages in all four disease categories [between 12–14.2%]." Report of the Special Master, Dkt. No. 707 (Pennsylvania, Feb. 1, 1994) at 2, 5.

261. With respect to Illinois, Professor Burbank received historical data on settlements between Ness, Motley and their affiliated counsel, The Lakin Law Firm, P.C. and Bono, Goldenberg, Hopkins & Bilbrey, P.C., and the CCR defendants, during the period 1988–92. And, based upon the above-described analysis, Professor Burbank concluded that, with respect to the Lakin agreement "the inventory settlement averages were lower than the Ness, Motley/CCR historical settlement averages in three categories (Lung Cancer, Other Cancer, and Non–Malignant) and higher in one category (Mesothelioma) [3.3% higher]." Report of the Special Master, Dkt. No. 751 (Lakin Agmt., Feb. 11, 1994) at 1–2, 5. With respect to the Bono agreement, "the inventory settlement averages were higher than the Ness, Motley/CCR historical settlement averages in two categories (Mesothelioma [8% higher] and Non–Malignant [18.3% higher] ) and lower in one category (Cancer [5.3% lower] )." Report of the Special Master, Dkt. No. 751 (Bono Agmt., Feb. 14, 1994) at 2, 5. Professor Burbank also compared the Bono inventory agreement with historical averages, including historical averages for one CCR defendant, GAF, which were not included in the historical averages because the cases were settled before it became a CCR member. Under this analysis, the mesothelioma category for the inventory settlement was 7.4% higher than the historical average and the non-malignant category was 10.9% higher. *Id.* at 5.

262. With respect to New Jersey, based upon the above-described analysis, Professor Burbank concluded that "the inventory settlement averages were lower than the Greitzer and Locks/CCR historical settlement averages in three categories (Lung Cancer, Other Cancer, and Non–Malignant) and higher in one category (Mesothelioma) [30% higher, but 32.3% lower than Kentucky]." Report of the Special Master, Dkt. No. 781 (New Jersey, Feb. 15, 1994) at 1–2, 5.

263. Based upon Professor Burbank's reports and the testimony of Mr. Rooney, the Court finds that the inventory settlements were generally based upon historical settlement value averages with Class Counsel in the applicable jurisdictions, with certain upward and downward adjustments made to take account of the particular circumstances of the claims settled. Rooney 2/28/94 Tr. at 204–05. Professor Burbank's analysis supports that contention, and the Court finds no credible evidence in the record to the contrary.

264. The Objectors' contention that Class Counsel received a "premium" for the settlement of their inventory cases, that is, that the inventory settlement amounts were in excess of current fair market value, was based on the testimony of Professor Coffee. Coffee 3/29/94 Tr. at 34, 52, 54.

265. Professor Coffee's analysis of the value of the inventory settlement relied on four factors. *First,* Professor Coffee testified that the payment of historic settlement values constituted a premium for the inventory settlements because the value of the inventory claims had been devalued in the current market as a result of the stay order applicable to federal cases issued in the Multidistrict Litigation. Coffee 3/29/94 Tr. at 55. *Second,* Professor Coffee testified that the fact that the inventory cases did not have trial dates reduced their value. *Id.* at 57. *Third,* Professor Coffee testified that the fact that the inventory settlements included "a great number" of cases—or at least a "certain number" of cases that were unfiled is further evidence that a premium was paid. *Id.* at 58. *Fourth,* Professor Coffee testified that the fact that Class Counsel did not reduce their fee, giving the CCR defendants a "volume discount," was an indication that a premium was paid. *Id.* at 59.

266. With respect to the first factor, this Court finds that the CCR defendants never had a policy to seek a discount for the settlement of federal cases based upon the MDL stay order, and never offered less than historical averages for the settlement of pending federal cases as a result of the MDL. Rooney 2/28/94 Tr. at 226; Fitzpatrick 2/23/94 Tr. at 24. A portion of the evidence

upon which Professor Coffee relied was excluded as inadmissible hearsay (Coffee 3/29/94 Tr. at 79, 80–81). The rest of the evidence upon which Professor Coffee relied either did not implicate the settlement policy of CCR or was not credible to the Court. *See* Exhibit O–15 and Rooney 3/1/94 Tr. at 107–08 (in letter, Mr. Motley referred to the settlement policy of an asbestos defendant that was not one of the CCR defendants); Iola 3/30/94 Tr. at 25, 75 (plaintiff attorney's testimony that cases are "stuck" in MDL not credible because has historically settled only thirty cases with CCR). *See also* Hatten 3/18/94 Tr. at 55 (values in federal court cases were not depressed in 1992 because of the MDL).

267. Thus, this Court finds that there is no credible evidence in the record to support a finding of collusion based upon the theory that Class Counsel were paid a premium for their inventory settlements by receiving undiscounted historical settlement averages for their cases pending in federal court. *See* Coffee 3/29/94 Tr. at 176–78.

268. Professor Coffee's second factor upon which he relied to support his opinion that Class Counsel received a premium for the settlement of the inventory cases was that the lack of federal trial dates reduced the settlement value of the inventory cases. Professor Coffee provided no settlement data at all to support this theory. This Court finds Professor Coffee's analysis on this point unpersuasive given the uncontested testimony that 90% of the Ness, Motley inventory cases, and 70% of the Greitzer and Locks inventory cases were pending in state court. Rooney 3/1/94 Tr. at 78, 80. State cases proceed to trial unaffected by the MDL. Because the CCR defendants had to resolve the state-listed cases, and because federal and state cases were settled together without differentiation, the fact that the federal cases did not have trial dates had no demonstrable impact on the settlement value of the inventory cases as a whole.

269. The third factor supporting Professor Coffee's opinion that a premium was paid to Class Counsel was that the inventory settlements included some number of unfiled cases. Professor Coffee conceded on cross-examination that he did not know how many unfiled cases were settled. Coffee 3/29/94 Tr. at 188. He was further not aware of CCR past practice with respect to the settlement of certain unfiled cases in group or inventory settlements. *Id.*

270. This Court finds that CCR historically has settled a modest number of claims before a lawsuit had actually been filed. Rooney 2/28/94 Tr. at 191. With respect to inventory settlements, CCR generally would settle all present cases and cases in the pipeline that had not yet been filed, where the cases were ready for filing, with the medical work completed and some product identification established. *Id.* at 201; Fitzpatrick 2/23/94 Tr. at 147; Fitzpatrick 2/16/94 Dep. at 312–13. Class Counsel's inventory settlements with CCR in 1992–93 included a small percentage of unfiled cases, in accordance with CCR's historical practice. Rooney 2/28/94 Tr. at 208. This Court finds that there is no credible evidence in this record reliably supporting Professor Coffee's opinion that the settlement of unfiled cases as part of the inventory settlements constituted a departure from normal behavior, resulted in a premium being paid to Class Counsel for the settlement of their inventory cases, or reflected any collusive conduct.

271. The final factor which Professor Coffee testified supported his opinion that a premium had been paid to Class Counsel with the inventory settlements was that Class Counsel charged their normal fee with the settlement of the inventory cases. Coffee 3/29/94 Tr. at 264. Professor Coffee had no evidence that the practice of reducing attorneys' fees with inventory settlements is typical in asbestos litigation, *id.* at 189, 191, and this Court finds no historical or otherwise compelling reason for expecting that Class Counsel would reduce their fee under the circumstances.

272. In sum, having considered the reports of Professor Burbank, the testimony of Professor Coffee, and the record evidence, this Court finds that the settlement amounts in the inventory settlements were generally consistent with historical settlement averages for comparable settlements with CCR, were not inflated, did not include a premium paid

to Class Counsel in exchange for the *Georgine* settlement, and were not the product of collusion.

### (3) Benefits to the Class under *Georgine* vs. the Tort System

273. The second value comparison articulated by Professor Coffee as a basis for his opinion on collusion was a comparison of the value of the benefits to class members under the Stipulation compared to what class members would have received under the tort system. Coffee 3/29/94 Tr. at 34. This Court finds that Professor Coffee's conclusion that class members would be treated better in the tort system than under the procedures and with the payments allowed under the terms of the Stipulation in this class action, is not supported by the record evidence.[51]

274. The evidence upon which Professor Coffee relied for his opinion on this point does not persuade this Court that class members would fare better in the tort system. Professor Coffee relied on the settlement averages of one law firm for the period of 1991–93 (Exhibit O–64), and the fact that eligibility criteria under the Stipulation for immediate cash compensation are somewhat more restrictive than in the tort system. Coffee 3/29/94 Tr. at 87–89, 97.

275. Professor Coffee testified that he did not know or consider settlement averages of this law firm during the period 1988–92 which is the period from which the CCR's historical settlement values were taken and upon which the *Georgine* compensation ranges were negotiated and based. Coffee 3/29/94 Tr. at 193–94. And, this Court finds that the settlement averages for 1991–93 for this law firm were not representative of settlements generally during either the narrow period 1991–92 or the relevant period 1988–92. The record shows that the averages of this law firm indeed exceeded the national average. *See* Exhibit SP–502 (Exhibit O–28) (Chart showing settlement averages by jurisdiction Bates Stamp No. 2000223).

276. Professor Coffee also relied on the more restrictive eligibility criteria of *Georgine* for immediate cash compensation. Cof-

fee 3/29/94 Tr. at 97, 109, 113. However, this Court has already held that those class members who do not qualify for immediate cash compensation will receive a group of benefits under the Stipulation that have significant value. Professor Coffee conceded, however, that he is not qualified, and is therefore unable to value the benefits provided to these class members. *Id.* at 128–29.

277. In sum, this Court finds that Professor Coffee's conclusion that *Georgine* class members would be treated better in the tort system than under the Stipulation and that this state of affairs is evidence of collusion is unpersuasive.

### (4) Comparison of Compensation Paid to Inventory Claimants to What They May Have Received Under *Georgine*

278. Professor Coffee's third comparative valuation as a basis for his opinion on collusion was a comparison of the value of the benefits to be received by the *Georgine* class members with the benefits received by similarly situated claimants in the inventory settlements. Coffee 3/29/94 Tr. at 34, 122–24. Professor Coffee argues that the claimants in the inventory settlements received more than they would have under the Stipulation. This valuation was based upon Exhibit O–170. *Id.* at 137–38.

279. Having reviewed Exhibit O–170, the Court finds that it does not provide sufficient information to support a finding that the claimants in the inventory settlement would not have fared as well under the Stipulation.

280. As to whether Class Counsel "sold out" the class, this Court has already found that the inventory settlements were generally based upon CCR's historical settlement averages with Class Counsel in the applicable jurisdictions, with certain upward and downward adjustments made to take account of the particular circumstances of the claims settled. *See* FOF ¶ 263. This would be so whether or not *Georgine* were approved by this Court.

281. This Court has also found that, during the course of the settlement negotiations in this class action, there were reasons for

---

**51.** This Court has already found that the terms of

the Stipulation are fair to the class.

decreasing the values in the compensation schedules in the Stipulation from CCR's historical averages. These reasons included the fact that the Stipulation involves a waiver of defenses to qualifying claimants by the CCR defendants; that payments under the Stipulation should, in most cases, be made faster than under the tort system at considerably lower transaction costs, including attorneys' fees; and finally, that qualifying claimants with non-malignant conditions will be able to receive additional compensation if and when they contract cancer. Professor Coffee's inquiry into how well the inventory claimants would have fared under the Stipulation ignored these reasons, and thus the Court finds his opinion on this issue unpersuasive.[52]

282. In sum, the Court finds that an objective review of the record evidence does not persuade the Court that the Stipulation was the product of collusion. This Court finds that the settlement was non-collusive. *See also* Dash 3/30/94 Tr. at 218–19 (testified that, in his opinion "there's no evidence that I have seen, and I've read all the testimony and the transcript, the depositions, and I have seen no evidence in the record before this Court that would lead me to conclude there's any evidence of collusion, fraud or deceit on the part of Class Counsel.").

### D. *Prior Conduct of Class Counsel*

283. As to the adequacy of Class Counsel, the Objectors finally contended that Mr. Locks should be disqualified as Class Counsel because of three prior incidents, unrelated to this class action. Cramton 3/15/94 Tr. at 174–83. This Court rejects the Objectors' accusations of inadequacy as to Mr. Locks as insubstantial, irrelevant and unpersuasive. *See* Hatten 3/17/94 Tr. at 17, 18–19; Freeman 3/10/94 Tr. at 139–41; Hazard 2/25/94 Tr. at 75–77. The Court finds that Mr. Locks' prior conduct did not raise any question as to Mr. Locks' competency, trustworthiness or integrity. Hazard 2/25/94 Tr. at 77.

### V. ADEQUACY OF NOTICE

284. The Settling Parties' proposed notice materials contained a comprehensive individual notice, a set of "Questions and Answers" designed to explain the notice in a more conversational manner, a one-half page newspaper ad, a television ad script, camera-ready "clip art" for use in publications by unions and others, and various other materials. The proposed dissemination plan called for a multi-million dollar television and print advertisement campaign, a special 800–number where class members could call to obtain notice materials, and numerous other proposals for disseminating the notice through national and local unions and other groups. Joint Motion of the Settling Parties for Approval of the Notice to the Class, Dkt. No. 445 (Aug. 16, 1993).

285. Various objections were made to the notice materials themselves and to the Settling Parties' proposal for dissemination of the notice. Some Objectors also argued that the twelve-week opt-out period did not allow class members sufficient time to decide whether to opt out of the class. Other Objectors argued that class members with presently unmanifested medical conditions cannot, by definition, receive notice and opt-out rights sufficient to satisfy the Due Process Clause. Finally, various *Amici* and third-party insurers urged this Court postpone any dissemination of the notice until the Third Circuit or the U.S. Supreme Court had resolved the subject matter jurisdiction and other preliminary jurisdictional issues.

286. At oral argument on October 5, 1993, the Court heard from all Objectors and *Amici* on these and other matters relating to the proposed notice plan. On October 27, the Court, in a 43–page opinion, addressed all the issues raised by the Objectors and *Amici*, and approved, with some changes, the notice materials and dissemination plan proposed by the Settling Parties. This Court ruled at that time "that the extensive plan for dissemination of notice designed by the settling parties, and the contents of the notice materials satisfy the requirements of

---

52. It is also important to note that in reaching his conclusion on this issue, Professor Coffee did not review or consider lower settlement averages in other jurisdictions. Coffee 3/29/94 Tr. at 235–38.

Rules 23(c)(2) and (2) and the due process clause of the Constitution." Mem., Dkt. No. 512 (Oct. 27, 1993) at 42–43. This Court also ordered that final notice materials be filed on November 1, and that the notice and opt-out period begin that day and continue until January 24, 1994.

287. In its October 27 decision, this Court ordered that the Settling Parties file, on December 6, a Mid–Term Report on implementation of the notice. The Court ordered that one of the main issues to be addressed in the Mid–Term Report was "precisely what efforts the various 'volunteer' organizations [such as labor unions] have made to notify potential class members." Mem., Dkt. No. 512 (Oct. 27, 1993) at 24–25.

288. The Mid–Term Report filed by the Settling Parties on December 6, showed that the notice plan had been implemented, through that date, fully in accord with the Court's notice decision, and that implementation was on or ahead of the schedule set in the October 27 decision. With respect to the efforts of labor unions and others to help in the dissemination of the notice, the Mid–Term Report explained that, on October 29, AFL–CIO President Lane Kirkland had sent a letter to 48 AFL–CIO unions with retirees or members potentially in the class to urge these unions to help in the notice effort. See Exhibit SP–305. The Mid–Term Report also stated that, as of December 6, over 30 national or international unions had agreed to run the court-approved "clip art" in union publications delivered individually through the mail to members and retirees, and that eight unions had agreed to mail or have mailed notice materials to their members. No Objector or *Amici* filed any pleading concerning the Settling Parties' Mid–Term Report.

289. During the twelve-week opt-out period, various motions were made to allow attorneys' signatures on exclusion request forms and to extend the opt-out period. After argument on the issues, the Court denied the motions.

290. On February 16, 1994, the Settling Parties filed a Final Report on implementation of the notice. The Final Report explained in detail how the notice program had been implemented fully in accord with the Court's October 27 decision. This Court incorporates here as credible and reliable the Final Report which stated that 35 national or international unions had run the court-approved "clip art" in the publications delivered individually to the homes of over 6 million union members and retirees, and that nine national or international unions had had notice materials mailed individually to almost 400,000 union members or retirees. The Final Report, adopted and credited here, also explained the multi-million dollar media campaign undertaken to publicize the class action and proposed settlement, and reported that over 320,000 individual notice packets and over 4,000 copies of the Stipulation had been mailed to potential class members in response to calls to the special 800–number listed in all notice materials. All in all, the Final Notice Report, adopted and credited here, stated, over 6.8 million individuals received individually delivered notice materials, and millions more were notified through media efforts. Settling Parties' Final Report on Implementation of the Notice, Dkt. No. 777 (Feb. 16, 1994). No Objector or *Amici* filed any pleading or factual rebuttal concerning the Settling Parties' Final Notice Report.

291. On May 9, the Settling Parties filed a Report on opt-out requests. The Report stated that approximately 201,654 exclusion requests had been received by the January 24 postmark deadline by or on behalf of exposed individuals, and that approximately 34,669 additional forms had been filed by affiliated family members. Settling Parties' Final Report on Implementation of the Notice, Dkt. No. 777 (Feb. 16, 1994); Supplement to Final Notice Report, Dkt. No. 1128 (Aug. 4, 1994). The Report also stated that approximately 13,773 opt-out forms (11,955 on behalf of exposed individuals and 1,818 by affiliated family members) had been received with postmarks after January 24, 1994, and discussed various issues raised by such late opt-outs. A total of 14,219 opt outs were received on behalf of exposed individuals and 660 by affiliated family members, but were signed by attorneys. *Id.*

292. For the most part, objections that have been raised concerning the notice at this stage of this proceeding reiterate argu-

ments about the notice materials and dissemination plan that were made, or that could have been made, when the notice issues were litigated before this Court in August and September of 1993. The following three objections, however, raise new issues not addressed by this Court's October 27, 1993 opinion approving the Settling Parties' notice plan.

293. *First*, the Director, Office of Workers' Compensation Programs, United States Department of Labor, asserts that the notice of settlement is "materially defective and incorrect". Mem. of the Director, Office of Workers' Compensation Programs' ("OWCP") in Support of the Motion For Leave To File Objections to Settlement as *Amicus Curiae*, Dkt. No. 734 (Feb. 9, 1994) at 1. The Director argues that the notice does not warn class members covered by the Longshore and Harbor Workers' Act ("LHWCA") that the law interpreting § 33(g) of the LHWCA is unsettled and that there is at least a possibility that LHWCA rights could be forfeited. In the Director's view, this omission constitutes a "material misstatement of law regarding the settlement's affect on third-party tort suits." *Id.* at 11. *See also* Motion to Intervene of Roland Dearborn, Judith Dearborn and Kerwin Butcher and Written Objection, Dkt. No. 641 (Jan. 19, 1994) at 4. This Court addresses and resolves the substance of this objection in the Conclusions of Law below. *See* Conclusions of Law (hereinafter "COL") ¶¶ 94–100.

294. *Second*, the Objectors argue that the notice was inadequate because "[a]n unknown number of class members who called Class Counsel's 1–800 number were erroneously advised by Class Counsel's staff that if they wished not to be bound by the class settlement, they need take no further action," and also received inaccurate information about attorneys' fees in the class action. Wiese Objectors' Objections to Proposed Settlement, Dkt. No. 727 (Feb. 8, 1994) at 10; *see also* Statement of the Asbestos Victims of America and the Trial Lawyers' for Public Justice, as *Amicus Curiae*, in Opposition to the Proposed Class Action Settlement, Dkt. No. 732 (Feb. 7, 1994) at 4–7.

295. The Objectors first raised the issue concerning allegedly erroneous advice to class members given out by operators on Class Counsel's 1–800 number in a motion that they filed in January 1994 renewing their request for depositions of Class Counsel. Class Counsel filed affidavits concerning the calls at that time. After considering those affidavits and the other evidence in the record at that time, this Court found "that the plan for training and supervision of the telephone answering personnel of co-class counsel Ness, Motley et al. was reasonable," that "the [O]bjectors have shown only that the errors by telephone personnel were very few and were anecdotal and incidental," and hence that the recorded calls did not "breach[ ] or undermine[ ]" the notice plan approved by his Court. Order, Dkt. No. 750 (Feb. 14, 1994) at 1. The Objectors have shown no reason for this Court to change that finding at this time.

296. *Third*, the Objectors assert that implementation of the notice was flawed because "[t]he testimony of Robert Wages, Myles O'Malley, and other witnesses will establish that the various unions upon whom the Settling Parties relied to disseminate notice of this class action did not effectively notify class members", and because several of the representative plaintiffs did not see the notice ads on television or in the newspaper. Wiese Objectors' Objections to Proposed Settlement, Dkt. No. 727 (Feb. 8, 1994) at 10–11.

297. The Objectors' assertion that the various unions did not effectively notify class members is not supported by the record evidence. As noted above, the Settling Parties' unchallenged Final Notice Report showed that 35 national or international unions ran some version of the Court-approved "clip art" in union publications delivered individually to approximately 6 million union members and retirees during the notice and opt out period, and that nine national or international unions agreed to mail or have mailed notice materials to almost 400,000 unions members and retirees. Kinsella 2/16/94 Dep. at 98–99 (the Settling Parties' notice expert explained that the level of union coop-

eration in the notice program was "quite extraordinary").

298. At the fairness hearing, the only witness that the Objectors presented concerning the notice efforts by unions was Robert Wages, who is president of the Oil, Chemical and Atomic Workers International Union ("OCAW"). Wages 3/16/94 Tr. at 200. Mr. Wages explained that his union opposes the proposed settlement on several grounds. *Id.* at 209, 234–37. Mr. Wages testified that he had received the October 29 letter from Lane Kirkland urging that unions participate in the notice effort (*id.* at 263–64), and that, in November, he received a notice packet and a follow-up phone call requesting that OCAW help in the notice campaign. *Id.* at 264–66. *Mr. Wages explained that his union refused to help in the notice effort in this class action at the national level, although he stated that some of the OCAW locals undertook efforts to notify their members and retirees. Id.* at 233–34, 270. This Court finds that Mr. Wages' refusal to cooperate with the notice plan does not support a finding that the level of union cooperation was not adequate.

299. While many of the representative plaintiffs did not see the official Court-approved notice ads on television or in newspapers, most received actual notice of the class action and proposed settlement either because they are class representatives or learned about the proposed settlement otherwise. Mr. Vogt testified that, in December, 1993, he received a six-page letter concerning the class action and proposed settlement from the business manager of his local union. Vogt 2/24/94 Tr. at 152; Exhibit SP–824. Mr. Vogt also received a letter concerning these issues from a local Baltimore lawyer in January 1994. *Id.* at 153. Mr. Murphy similarly received information on the class action and proposed settlement from his union, and a co-worker mentioned to Mr. Murphy that he had seen one of the newspaper ads. Murphy 1/6/94 Dep. at 137, 55–56. Mr. Annas testified that he saw an ad concerning the class action and proposed settlement from a local lawyer, as well as an article that counsel for the Wiese Objectors, Mr. Baron, publish-

ed in the *Wall Street Journal.* Annas 2/24/94 Tr. at 268. Mr. Georgine saw one of the television ads and reviewed an individual notice packet. Georgine 2/28/94 Tr. at 120–21. Finally, Mrs. Kekrides testified that her brother-in-law told her about one of the notice ads he had seen on television. Kekrides 1/12/94 Dep. at 41–42.

300. In sum, this Court finds that the notice materials and dissemination plan were more than sufficient to supply the factual predicate necessary to comply with Fed. R.Civ.P. 23 and the Due Process Clause under the applicable law discussed in this Court's October 27, 1993 memorandum opinion. *See Carlough v. Amchem Products, Inc.,* 1993 WL 472812, \*20, 1993 U.S.Dist. LEXIS 15280, \*66 (E.D.Pa. Oct. 27, 1993). The Final Notice Report filed with this Court, and other evidence in the record, shows that the notice plan was implemented fully in accord with this Court's October 27, 1993 decision, and that extensive and massive notice of this class action and proposed settlement was given to the class.

### CONCLUSIONS OF LAW [53]

Based in part on the foregoing findings of fact, the Court makes the following conclusions of law.

## I. CLASS CERTIFICATION

### A. *Standards for Final Class Certification*

1. Federal Rule of Civil Procedure 23 allows a district court conditionally to certify a class action for purposes of considering the fairness of a proposed class settlement, followed by final certification by the district court if the settlement is found to be fair, adequate and reasonable to the members of the class. *Girsh v. Jepson,* 521 F.2d 153, 155 n. 3 (3d Cir.1975) ("There is no impediment to determining a class action for the purpose of settlement only."); *Greenfield v. Villager Indus., Inc.,* 483 F.2d 824, 826 (3d Cir.1973) (suit may " 'proceed and be maintained as a class action' for settlement purposes only"); *Manual for Complex Litiga-*

---

**53.** To the extent that these conclusions of law include findings of fact or mixed findings of fact and conclusions of law, those findings and conclusions are hereby adopted by this Court.

tion *Second* § 30.45, at 242–44 (1985); 2 *Newberg on Class Actions* § 11.27 (3d ed. 1992).

2. Federal Rule of Civil Procedure 23(a) provides that a class action may be brought if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). Under Federal Rule of Civil Procedure 23(b)(3), final certification of an opt-out class to resolve claims for money damages is proper if the requirements of Rule 23(a) are satisfied and "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

■■ 3. The Rule 23 requirements for class certification apply to all federal class actions; however, they are often more readily satisfied in the settlement context because the issues for resolution by the Court are more limited than in the litigation context. *See In re A.H. Robins Co.*, 85 B.R. 373, 378 (E.D.Va.1988) ("[T]he requirements of Rule 23 may be more easily satisfied in the settlement context than in the more complex litigation context."), *aff'd*, 880 F.2d 709 (4th Cir.1989); *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F.Supp. 446, 450 (E.D.Pa.1985) (same). *See also Manual for Complex Litigation Second* § 30.45, at 243; 2 *Newberg on Class Actions* § 11.28, at 11–57. Indeed, courts have approved settlements and finally certified settlement classes while at the same time holding that class certification for litigation purposes might be improper. *See, e.g., In re Anthracite Coal Antitrust Litig.*, 79 F.R.D. 707, 713–14 (M.D.Pa.1978) (court approved class settlement while noting that certification for litigation purposes would be doubtful), *aff'd in part mem. and vacated in part mem. sub nom. Colonial Fuel Co. v. Blue Coal Corp.*, 612 F.2d 571, *Wilkes–Barre*

*Steam Heat Co. v. Blue Coal Corp.*, 612 F.2d 576 and *Appeal of Wilkes–Barre Steam Heat Co.*, 612 F.2d 576 (3d Cir.1979).

4. For the reasons set forth fully in the following paragraphs, this Court concludes that the prerequisites for final class certification under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure are satisfied in this case. The Court concludes that the plaintiff class is so numerous that joinder of all members would be impracticable, and that the claims of the representative plaintiffs are typical of the claims of other class members. *See* FOF ¶¶ 1–12; *see also* Complaint, Dkt. No. 1 (Jan. 15, 1993); Exhibits SP–300 and SP–301. The Court also concludes that questions of law and fact common to the members of the class predominate over questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient resolution of the controversy. Finally, the Court concludes that the representative plaintiffs, through qualified counsel, are, and have been, adequate representatives of the interests of the class throughout the pendency of this litigation. *See* FOF ¶¶ 3–12.

### B. *Numerosity*

■■ 5. The numerosity requirement of Rule 23(a) is satisfied. Given the size of the class, joinder of the class members' claims would be impracticable. FOF ¶ 2. *See also* 1 H. Newberg & A. Conte, *Newberg on Class Actions* § 3.05, at 3–23 to 3–24 (3d ed. 1992) (where class numbers in the "hundreds, or thousands, or even millions . . ., the impracticability of bringing all class members before the court has been obvious, and the Rule 23(a)(1) requirement has been easily met").

### C. *Commonality and Predominance of Common Questions*

■■ 6. The requirement that there be questions of law or fact common to the class (Fed.R.Civ.P. 23(a)), and that such common questions predominate over questions affecting only individual class members (Fed. R.Civ.P. 23(b)(3)), is more readily satisfied in the settlement context than in the litigation context. *See Manual for Complex Litigation Second* § 30.45, at 243 ("although 'common questions' may predominate and justify

a class if the case is *settled*, the standards of Rule 23(b)(3) may not be met if the case must be *tried*") (emphasis added). Among the predominant issues in the settlement context is whether a proposed settlement is fair, reasonable and adequate for the class. *See* 2 *Newberg on Class Actions* § 11.28, at 11–58 to 11–60.

7. In this case, there are questions of law and fact common to the class, and such questions predominate over questions affecting only individual members. The members of the class have all been exposed to asbestos products supplied by the defendants and all share an interest in receiving prompt and fair compensation for their claims, while minimizing the risks and transaction costs inherent in the asbestos litigation process as it occurs presently in the tort system. Whether the proposed settlement satisfies this interest and is otherwise a fair, reasonable and adequate compromise of the claims of the class is a predominant issue for purposes of Rule 23(b)(3). *See, e.g., Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 160 (S.D.Ohio 1992) (requirements of Rule 23(b)(3) satisfied because "[t]he settling of all class members' claims at once, in like fashion, will allow the class to receive maximum benefits without high attorneys' fees and costs, while at the same time avoiding the trauma of going through litigation").

### D. *Typicality*

8. "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." 1 *Newberg on Class Actions* § 3.13, at 3–76. The requirement that the claims or defenses of the representative parties be typical of the claims or defenses of the class does not require the representative plaintiffs to have the same particular injuries as all class members. "[T]he typicality requirement is usually met irrespective of varying fact patterns which underlie individual claims." *Id.* at 3–77; *Jenkins v. Raymark Indus., Inc.*, 109 F.R.D. 269, 272 (E.D.Tex. 1985) (in asbestos personal injury class action, "[t]he degree of harm may differ be-

tween the representatives and members of the class according to the degree of exposure (if any), the effects of the asbestos disease process, and the nature of the disease contracted by the individual"), *aff'd*, 782 F.2d 468 (5th Cir.1986).

9. Moreover, the typicality requirement is more readily satisfied in the settlement context than in the litigation context. *See Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 159 (S.D.Ohio 1992); 2 *Newberg on Class Actions* § 11.28, at 11–58 ("[T]ypicality of claims in a settlement class context requires proof that the interests of the class representative and the class are commonly held for purposes of receiving similar or overlapping benefits from a settlement.").

10. The Court concludes that the claims of the representative plaintiffs are typical of the claims of the class for purposes of Rule 23(a). *See* FOF ¶¶ 3–12; *see also* Complaint, Dkt. No. 1 (Jan. 15, 1993); Exhibits SP–300 and SP–301.

### E. *Superiority*

11. As set forth in the Court's findings of fact and conclusions of law addressing the fairness and adequacy of the proposed settlement, the proposed settlement will provide class members with fair compensation for their claims while reducing the delays and transaction costs endemic to the asbestos litigation process as it occurs presently in the tort system. *See generally* FOF ¶¶ 13–29, 37–176. Thus, for purposes of Rule 23(b)(3), the proposed class action settlement is superior to other available methods for the fair and efficient resolution of the asbestos-related personal injury claims of class members. *See, e.g., Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 473 (5th Cir.1986) (class action superior to case by case litigation of asbestos claims); *In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F.Supp. 415, 418–19 (J.P.M.L. 1991).

### F. *Adequacy of Representation*

12. The Court of Appeals for the Third Circuit has set forth the following two-part test for determining adequacy of representation under Rule 23(a):

"Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the [representative] plaintiff must not have interests antagonistic to those of the class."

*Weiss v. York Hosp.*, 745 F.2d 786, 811 (3d Cir.1984) (quoting *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975)).

■ 13. It is not a requirement that representative plaintiffs have specific knowledge of the claims and issues in the action, or that they play a personal role in the direction and management of the action. *See Lewis v. Curtis*, 671 F.2d 779, 789 (3d Cir.1982) ("The adequacy-of-representation test is not concerned whether plaintiff personally derived the information pleaded in the complaint or whether he will personally be able to assist his counsel.... [T]he requirements in *Wetzel* are sufficient to insure adequate representation....") (class representative in derivative suit found adequate even though he "displayed a complete ignorance of facts concerning the transaction that he was challenging"); *Snider v. Upjohn Co.*, 115 F.R.D. 536, 541 (E.D.Pa.1987) ("[t]he third circuit has recognized that class counsel, not the named plaintiff, directs and manages the class action," it is therefore irrelevant whether "plaintiff is a nominal plaintiff who has given unfettered discretion to her attorney and lacks knowledge about many of the most basic matters at stake").

■ 14. It is also well settled that adequacy of representation under Rule 23(a) does not require the representative plaintiffs to prove the elements of their individual cases, or even to demonstrate a likelihood of success on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 2153, 40 L.Ed.2d 732 (1974) (" '[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.' ") (citation omitted); 1 *Newberg on Class Actions* § 3.29, at 3–149 to 3–150. This is particularly true where certification is for purposes of settlement. *See,*

*e.g., Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981) (courts approving settlements "do not decide the merits of the case ...").

## G. *Consistency of Interests of Representative Plaintiffs and the Class*

■ 15. To the extent that there are factual differences in the claims and circumstances of the representative plaintiffs and of the class, such differences do not render the class representatives inadequate. "The key question is whether their interests are *antagonistic.*" *Steiner v. Equimark Corp.*, 96 F.R.D. 603, 610 (W.D.Pa.1983) (emphasis in original). *See also Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir.1975). "[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.*, 1980–1 Trade Cas. (CCH) ¶ 63,163, at 77,788 n. 10, 1979 WL 1751 (S.D.Tex. Dec. 21, 1979), *aff'd*, 643 F.2d 195 (5th Cir.1981).

16. The Court concludes that there is a consistency of interests between the representatives plaintiffs and the members of the class, and that their interests are not antagonistic. *See generally*, FOF ¶¶ 2–12; Complaint, Dkt. No. 1 (Jan. 15, 1993); Exhibits SP–300 and SP–301. It is clear that the class representatives and the members of the class are united in seeking the maximum possible recovery for their asbestos-related claims. *See Jenkins v. Raymark Indus., Inc.*, 109 F.R.D. 269, 274 (E.D.Tex.1985) (In class certified for litigation of asbestos personal injury claims, court held, "class representatives here present a spectrum of varying exposures to asbestos containing products and stages in the disease process. That cross-section of interests is substantially similar to the class as [a] whole so as to meet the requirements of 23(a)(4)."), *aff'd*, 782 F.2d 468 (5th Cir.1986).

17. Although class members may fall into different medical categories under the Stipulation and may be subject to various com-

pensability criteria and compensation schedules, there is no antagonism of interest between persons in various categories, or between persons with and without currently manifest asbestos conditions. First, the assets of the defendants do not constitute a limited fund, and so Class Counsel was able to negotiate compensation schedules for varying diseases without competition between medical categories for the same dollars. FOF ¶¶ 142–170. *See In re Asbestos School Litig.*, Master File No. 83–0268, slip op., 1986 WL 13882 (E.D.Pa. Dec. 3, 1986) (no conflict of interest and class counsel could represent both class members and opt-outs in asbestos property damage class action because defendants' assets not a limited fund); *see also In re Amatex Corp.*, 755 F.2d 1034, 1042–43 (3d Cir.1985). Further, representative plaintiffs with no currently manifest asbestos condition, or with only non-impairing pleural changes, may in the future develop a condition in any one or more of the compensable medical categories. *See* FOF ¶ 172. These representative plaintiffs, through Class Counsel, therefore have a strong interest that recovery for *all* of the medical categories be maximized because they may have claims in *any,* or several categories. *See Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 158–59 (S.D.Ohio 1992) (named plaintiffs adequate to represent recipients of allegedly defective heart valves who were subject to a variety of emotional and physical injuries); *In re Agent Orange Prod. Liab. Litig.*, 996 F.2d 1425, 1435–36 (2d Cir.1993) (interests of present and future claimants against settlement fund not antagonistic and no subclasses required).

18. Although the Court's conclusion as to adequacy of representation firmly rests on the factors discussed above, the representation of the class has been enhanced by the AFL–CIO's involvement in this litigation and its agreement to participate, along with Class Counsel, in auditing and supervising the compensation system established under the settlement. *See* FOF ¶¶ 38, 47, 52, 53, 91, 139–140, 240. *Cf. Alaniz v. California Processors, Inc.*, 73 F.R.D. 269, 276 (N.D.Cal. 1976) (interests of class members in Title VII class action brought by private plaintiffs' counsel received extra protection by virtue of the approval and participation of the EEOC in proposed settlement).

### H. *No Need for Subclasses*

■■■■■■ 19. Creation of subclasses is left to the discretion of the trial court and is appropriate "only when the court believes it will materially improve the litigation." *Clark Equip. Co. v. International Union, Allied Indus. Workers of America,* 803 F.2d 878, 880 (6th Cir.1986). Further, "[s]ubclassing is not encouraged," because of the potential to "compound confusion and cost." *County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1428, 1447 (E.D.N.Y.1989) (citing *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 407–08, 100 S.Ct. 1202, 1214–15, 63 L.Ed.2d 479 (1980)). The burden of persuasion lies with the proponent of subclassing. *Geraghty,* 445 U.S. at 407–08, 100 S.Ct. at 1214–15.

■■■■ 20. As outlined above, this Court has concluded that there is no antagonism of interest between class members with various medical conditions, or between persons with and without currently manifest asbestos impairment. Subclassing is therefore unnecessary in this action to protect antagonistic interests because there are only common interests. *See* FOF ¶¶ 2–12; Complaint, Dkt. No. 1 (Jan. 15, 1993); Exhibits SP–300 and SP–301.

21. Moreover, because asbestos conditions often have a long latency period and are in many cases progressive, subclasses based on asbestos conditions, as some Objectors suggest, would be illusory. Class members with no current asbestos-related condition may develop serious conditions in the future. *See* FOF ¶ 172. Similarly, a class member who claims to have an asbestos-related condition but who does not satisfy the medical criteria for compensation may in the future be compensated if the medical criteria become satisfied. *See* FOF ¶¶ 171–176. Class members share a common interest in receiving maximum compensation for whatever condition, or conditions, they may ultimately develop. There is no divergence of interest sufficient to warrant the creation of the subclasses urged by Objectors. *See In re Agent Orange Prod. Liab. Litig.*, 996 F.2d

1425, 1436 (2d Cir.1993) (Second Circuit affirmed district court's rejection of separate subclasses for present and future claimants).

22. Finally, although it is not dispositive, federal courts have also found subclasses to be less useful in Rule 23(b)(3) opt-out class actions because class members who are dissatisfied with the terms of a proposed settlement may exclude themselves from the class. *See, e.g., In re Joint E. & S. Dist. Asbestos Litig. (Findley v. Blinken),* 982 F.2d 721, 744 (2d Cir.1992), *modified,* 993 F.2d 7 (2d Cir. 1993).

23. This Court concludes that creating subclasses is unnecessary and would create unwarranted complication and expense while providing little, if any, benefit to the class. Thus, the Court concludes that it is proper to grant final certification to the following settlement class:

> (a) All persons (or their legal representatives) who have been exposed in the United States or its territories (or while working aboard U.S. military, merchant, or passenger ships), either occupationally or through the occupational exposure of a spouse or household member, to asbestos or to asbestos-containing products for which one or more of the defendants may bear legal liability and who, as of January 15, 1993, reside in the United States or its territories, and who have not, as of January 15, 1993, filed a lawsuit for asbestos-related personal injury, or damage, or death in any state or federal court against the defendant(s) (or against entities for whose actions or omissions the defendant(s) bear legal liability).
>
> (b) All spouses, parents, children, and other relatives (or their legal representatives) of the class members described in paragraph (a) above who have not, as of January 15, 1993, filed a lawsuit for the asbestos-related personal injury, or damage, or death of a class member described in paragraph (a) above in any state or federal court against the defendant(s) (or against entities for whose actions or omissions the defendant(s) bear legal liability).

24. Excluded from the settlement class are those persons who have submitted valid and timely requests for exclusion.

## II. FAIRNESS OF THE SETTLEMENT

### A. *Introduction*

25. Federal Rule of Civil Procedure 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court. . . ." Fed.R.Civ.P. 23(e). As numerous courts have recognized, Rule 23(e) thus requires a determination by this Court concerning whether the proposed settlement here is "fair, adequate and reasonable." *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975).

■ 26. In making this fairness determination, the district court has broad discretion. *See Girsh v. Jepson,* 521 F.2d 153, 156 & n. 7 (3d Cir.1975). However, the Court's choice is simply whether or not to approve the settlement; it may not alter the proposed settlement in any way. *See Harris v. Pernsley,* 654 F.Supp. 1042, 1049 (E.D.Pa.) ("The court may either approve or disapprove the settlement; it may not rewrite it."), *aff'd,* 820 F.2d 592 (3d Cir.1987).

■ 27. In deciding the fairness issue, the court must primarily balance the strength of the claims of the class against the benefits to be provided under the settlement. In other words, "[t]he court must be assured that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants." 2 *Newberg on Class Actions* § 11.46, at 11–105 to 11–106 (footnote omitted). In this regard, "[c]ash as well as noncash consideration is appropriate, as long as the total consideration is sufficient." 2 *Newberg on Class Actions* § 11.46, at 11–106. *See also Bogosian v. Gulf Oil Corp.,* 621 F.Supp. 27, 1985–1 Trade Cas. (CCH) ¶ 66,510, at 65,547 (E.D.Pa.1985) (district court rejected Objectors' argument that certain non-cash consideration given by defendant as part of a class settlement was "purely illusory").

28. In *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975), the Court of Appeals listed several factors that may be considered by a district court in deciding whether to approve

a settlement as fair.[54] While the list of factors in *Girsh* is a long one, most of the factors listed point to the same issue: an evaluation of the benefits received by the class in exchange for the settlement. *See also Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir.1978) ("principal factor" in fairness determination is "extent of the benefit to be derived from the proposed settlement"). *Girsh* also lists two other subsidiary factors that a court should consider in deciding fairness—the maturity of the underlying litigation (*i.e.*, "the stage of the proceedings and the amount of discovery completed"), and the "reaction of the class" to the proposed settlement. 521 F.2d at 157.

29. Other courts have identified another subsidiary factor that should go into a court's calculation concerning fairness: who negotiated the settlement and how the negotiations proceeded. Thus, in *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir.1982), the court noted that it would look at the "negotiating process by which the settlement was reached" in deciding whether to approve a proposed settlement as fair. Similarly, in *Kusner v. First Pa. Corp.*, 74 F.R.D. 606, 608 (E.D.Pa.1977), *aff'd mem.*, 577 F.2d 726 (3d Cir.1978), the court noted that, in evaluating a class settlement, " '[t]he opinion and judgment of experienced counsel, whose labors produced the settlement, should . . . receive due consideration.' " (Citation omitted.) Thus, this Court may have more confidence in the fairness of a settlement that it finds was negotiated by experienced counsel in a long, deliberative process.

■ 30. In sum, in evaluating the fairness of the settlement proposed here, this Court has looked primarily at the benefits received by class members in exchange for the settlement of their rights against the CCR defendants. This Court has looked and will look, however, at the subsidiary issues identified in *Girsh* and by other courts—namely, 1) the maturity of the underlying litigation; 2) how and by whom the settlement was negotiated; and 3) the reaction of the class to the settlement.

■ 31. In addition to these general considerations regarding the evaluation of the fairness of a class settlement, three other important principles apply. First, a class settlement is not required to "achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in contested litigation." *United States v. Allegheny–Ludlum Indus., Inc.*, 517 F.2d 826, 850 (5th Cir.1975). *See also Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977) ("compromise is the essence of a settlement"). Rather, as the Court of Appeals for the Second Circuit has noted:

[I]n any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion—and the judge will not be reversed if the appellate court concludes that the settlement lies within that range.

*Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.1972). *See also Alaniz v. California Processors, Inc.*, 73 F.R.D. 269, 278 (N.D.Cal. 1976) ("Nor should a court attempt to determine whether the proposed settlement is the best possible or even whether a better agreement might have been negotiated.").

■ 32. Second, and closely related, a class settlement must be evaluated *as a whole*, and not term-by-term or plaintiff-by-plaintiff. As one court has explained:

---

**54.** The factors listed in *Girsh* are as follows:

" '(1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . . .; (3) the stage of the proceedings and the amount of discovery completed . . .; (4) the risks of establishing liability . . .; (5) the risks of establishing damages . . .; (6) the risks of maintaining the class action through the trial . . .; (7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery . . .; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. . . .' " 521 F.2d at 157 (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974)). A similar list of factors is found in other cases. *E.g., Malchman v. Davis*, 706 F.2d 426, 433–34 (2d Cir.1983); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312 (N.D.Ga.1993).

The Court's primary concern is whether a settlement, taken as a whole, is fundamentally fair, adequate and reasonable to all concerned.... [T]he essence of settlement is compromise. Compromise involves the moderation of lofty and idealized hopes and the relinquishment of unyielding and absolute positions.

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F.Supp. 1379, 1387 (D.Ariz.1989), *aff'd sub nom. Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir.1992).

■ 33. Finally, the fairness of any settlement cannot be measured in a vacuum. Instead, the settlement must be evaluated in light of the practical realities of the litigation from which the settlement arose:

In conducting its analysis and making its determinations, the Court must take into consideration any unique facts and circumstances. [The court must] ... contemplate the particular circumstances that surrounded [the] settlement[ ].

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F.Supp. 1379, 1387–88 (D.Ariz. 1989), *aff'd sub nom. Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir.1992) (citation omitted). *Accord In re Armored Car Antitrust Litig.*, 472 F.Supp. 1357, 1369 (N.D.Ga.1979) (where full scale litigation might outlive many of the persons involved, its costs might consume any final recovery, and individual or statewide actions would burden the judiciary and the parties, settlement was favored).

34. The legal conclusions concerning fairness of the settlement are divided into several parts: (1) the context or background in which this settlement arose; (2) how and by whom this settlement was negotiated; (3) specific provisions of the settlement itself; and (4) the reaction of this class to the proposed settlement.

**B. *Background of the Settlement***

**(1) Maturity of the Litigation**

■ 35. In evaluating a proposed settlement of a class action, courts have emphasized that " 'the stage of the proceedings and the amount of discovery completed' " should be considered. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975) (quoting *City of De-troit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974)). Thus, this Court must consider whether there has been sufficient discovery and development of the claims and defenses so that the Court is confident that the parties and the Court could have intelligently evaluated the proposed settlement. The courts and commentators have made clear that this assessment may be undertaken by looking either at the proceedings in the class action at issue, or in related proceedings. *See* 2 *Newberg on Class Actions* § 11.45, at 11–102 n. 247 (citing *West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710 (S.D.N.Y.1970) (relying upon discovery taken in prior Patent Commission proceeding in approving class settlement)); *In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 180 (5th Cir.1979) (in evaluating fairness, district court properly considered discovery in certain long-pending companion cases); *City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1380, 1386 (S.D.N.Y.1972), *settlement aff'd, rev'd on other grounds*, 495 F.2d 448 (2d Cir.1974) (relying upon discovery taken in prior government action).

■ 36. This Court concludes that the discovery in this case was extensive, especially when compared to other reported class action cases. *See* Mem. Op., *supra*, at 9 & n. 9. *See, e.g., In re General Tire & Rubber Co. Securities Litigation*, 726 F.2d 1075, 1084 n. 6 (6th Cir.1984) (Objectors "are not automatically entitled to discovery or 'to question and debate every provision of the proposed compromise.' "); *Cotton v. Hinton*, 559 F.2d 1326, 1332–33 (5th Cir.1977) (district judge had discretion to limit scope of discovery where lack of formal discovery into merits of underlying class action did not hinder his evaluation of fairness of settlement); *Robertson v. National Basketball Ass'n*, 72 F.R.D. 64, 70–71 (S.D.N.Y.1976) ("There is no requirement that every objector be allowed to have discovery concerning the settlement itself so that he can personally assure its reasonableness."), *aff'd*, 556 F.2d 682 (2d Cir. 1977).

37. Furthermore, as this Court has already found, the asbestos litigation is probably the most "mature" mass tort litigation in this country. *See* FOF ¶ 36. As a result, an

enormous amount of discovery has taken place with the liability issues involving the defendant companies and the medical issues concerning asbestos related disease having been explored in great detail. *Id.* The CCR defendants have all been involved in asbestos claims for at least the past decade, and some of the CCR members have been involved since the early 1970s. *Id.* at ¶¶ 15, 21. Because of the maturity of the asbestos litigation, this Court concludes that the underlying facts and law are plainly at a stage where the proposed settlement to this class action may be intelligently evaluated even though there was no merits discovery in this action seeking certification of a settlement class.

### (2) Asbestos Litigation in the Present Tort System

38. As explained above, this Court should not consider the proposed settlement in a vacuum. Its fairness is to be evaluated in light of the alternatives available to class members in the tort system.

■ 39. This Court has also made findings concerning how asbestos victims presently fare in the tort system. *See* FOF ¶¶ 13–14, 18–20, 94. New filings continue unchecked, there is much uncertainty as to liability and verdict results, claims are often resolved only after long delays, transaction costs are high, and victims receive only a fraction of the funds expended. *Id.* In the face of this crisis, many companies have gone bankrupt. *Id.* at 17.

40. This Court has also found that the litigants and others have been searching for solutions to the asbestos crisis since at least the mid–1980s. FOF ¶¶ 21–34. This Court concludes that it is against this backdrop, including the maturity of the litigation and the prior efforts to find a resolution to the asbestos litigation crisis, that the proposed settlement must be evaluated.

### (3) Negotiation of the Settlement

41. As set forth above, several courts have explained that how and by whom a settlement was negotiated is important to the evaluation of fairness. A court will and should have more confidence in the reasonableness and adequacy of a settlement if the evidence shows it was negotiated by experienced counsel in an extensive and deliberative negotiation.

42. This Court has found all three Class Counsel are highly experienced in the asbestos litigation, and in the issues raised by this proposed settlement, and were well qualified to represent the class and negotiate the proposed settlement on their behalf. *See* FOF ¶¶ 177–283; COL ¶¶ 58–91. This Court has also found that the negotiations leading to the proposed settlement were long in duration, extensive in scope, and deliberative in nature. FOF ¶¶ 40–45.

### C. *Specific Terms of the Stipulation*

### (1) Compensation Schedule and Procedures, Eligibility and Overview

43. This Court has extensively recited and evaluated the key provisions of the proposed settlement and has made factual findings as to whether these provisions are fair and reasonable to the class. *See* FOF ¶¶ 37–176. Based on the foregoing analysis and these factual findings, the Court concludes that the Stipulation as a whole is fair to the class and clearly falls within the zone of reasonableness required for approval of the settlement under Fed.R.Civ.P. 23(e). Specifically, the Court concludes that the following provisions of the Stipulation are fair and reasonable to the class:

(1) the asbestos exposure requirements and waiver of all other liability defenses by the CCR defendants, FOF ¶¶ 46, 47–48;

(2) the medical criteria, FOF ¶¶ 49–88, including:

 (a) the quality control aspects, FOF ¶¶ 62, 83–84, 87–88; and

 (b) the line drawn between those claimants who qualify for immediate cash compensation because they are impaired and those who do not qualify for immediate cash compensation because they are non-impaired, FOF ¶¶ 64–70, 87–88;

(3) the compensation procedures, FOF ¶¶ 89–119, including:

 (a) the compensation schedule, FOF ¶¶ 90–100;

 (b) the Case Flow Maximums, FOF ¶¶ 101–108; and

(c) the alternative compensation procedures, FOF ¶¶ 109–111, 115–119;

(4) the agreement to share responsibility for the payment of claims in the absence of joint and several liability among the CCR defendants, FOF ¶¶ 131–133;

(5) the CCR defendants' withdrawal rights, FOF ¶¶ 134–135; and

(6) the release and contribution and indemnity provisions, FOF ¶¶ 120–128.

### (2) Releases, Contribution and Indemnity Provisions

#### (a) General Principles

44. This Court has found that release and contribution and indemnity provisions in the Stipulation factually do not unfairly prejudice the rights of non-settling asbestos manufacturers or suppliers to contribution and indemnity against the CCR defendants. FOF ¶¶ 120–128. As this Court found, the Stipulation leaves the rights of non-settling manufacturers to be determined, if and when they may arise, under whatever law applies to them in the fora in which they may be asserted.

45. A proposed settlement that does not cognizably prejudice the formal legal rights of non-settling defendants vis-a-vis the Settling Parties is not unfair as to those non-settling defendants. *In re School Asbestos Litig.*, 921 F.2d 1330, 1332 (3d Cir.1990) (non-settling manufacturer must show "cognizable prejudice to a legal relationship between it and the settling parties").[55]

46. Claims that a proposed settlement will merely make it factually more difficult for non-settling defendants to litigate, *i.e.*, that they will incur additional expense, expend additional effort, or suffer a tactical disadvantage, allege nothing more than "factual injury." Such factual injury does not

rise to the level of "cognizable prejudice to a legal relationship." *See Quad/Graphics, Inc. v. Fass*, 724 F.2d 1230, 1233 (7th Cir.1983) (disadvantage or injury in fact to non-settling defendants is "bound to occur" as result of partial settlement but only plain legal prejudice justifies judicial interference); *Waller v. Financial Corp. of America*, 828 F.2d 579, 583–84 (9th Cir.1987) (partial settlement placing non-settling defendant at a "tactical disadvantage" does not amount to "plain legal prejudice"). Thus, the *Amici* in this case at this time are left to litigate what the CCR defendants have chosen to settle. They must then accept the consequences of their decision.[56]

#### (b) Severance of Contribution Claims

47. As this Court has found, Part XIII.A provides that, in limited situations, class members are required to "move jointly" with the CCR defendants "for severance and continuance of the trial of such contribution or indemnity claims." Exhibit SP–300, Part XIII.A at 81; FOF ¶ 124. The *Amici* contend that this provision will prejudice them if the joint severance motion is granted by a court in which it is made. This Court has found, however, that courts routinely sever third-party contribution actions. FOF ¶ 127. Moreover, it is within a trial court's discretion to order severance of such claims. *See Didio v. Philadelphia Asbestos Corp.*, 434 Pa.Super. 191, 642 A.2d 1088 (1994); *Noecker v. Johns–Manville Corp.*, 355 Pa.Super. 463, 513 A.2d 1014, 1017–18 (1986). The severance provision itself is no guarantee that any court would grant such a joint motion by class members and CCR defendants. Thus, this Court concludes that the *Amici* assert, nothing more than speculative, factual injury which does not rise to the level of "cognizably prejudice" to their formal legal rights under any applicable law.

---

55. The case law addresses fairness to non-settling defendants in terms of their standing to object rather than in substantive terms. In other words, if they cannot show "cognizable prejudice" to their formal legal rights vis-a-vis the Settling Parties, the *Amici* have no standing to object to any aspect of the Stipulation. The underlying principle remains the same, however, whether the issue is framed in jurisdictional or substantive terms.

56. In applying these principles to the *Amici*'s claims, it is helpful to remember what is *not* before this Court. The *Amici* are not parties to this litigation; the class members in this proceeding have asserted no claims against these *Amici*, and these *Amici* have not, and could not, assert contribution or indemnity claims against the CCR defendants at this time in this case.

### (c) Release Provisions

48. This Court has recited and reviewed the Stipulation's release provisions, under which the CCR defendants will receive "deemed releases" from the non-impaired claimants in certain types of jurisdictions but not in others. FOF ¶¶ 120–122. Based on this Court's finding that the non-impaired claimants will receive a valuable group of benefits, *see* FOF ¶¶ 171–176, this Court concludes that these releases given by these class members are supported by valuable consideration.

49. The *Amici* contend that the release provisions strip the non-settling asbestos manufacturers or suppliers of their contribution and set-off rights under state law.[57]

50. This Court finds that the deemed releases, whether labeled as such or not, are not uncommon in class action settlements. *See, e.g., In re Granada Partnership Sec. Litig.*, 803 F.Supp. 1236, 1242, 1245 (S.D.Tex. 1992); *In re Silicone Gel Breast Implants Prods. Liab. Litig. (Lindsey v. Dow Corning Corp.)*, C.A. No. CV–94–P–11558–S, 1994 WL 114580 (N.D.Ala. Mar. 22, 1994), Breast Implant Litigation Settlement Agreement, Part VIII, at 42. Furthermore, as this Court has found, the *Amici* fail to show that the Stipulation's release provisions conclusively and adversely resolve their formal legal rights under the law of a single jurisdiction. FOF ¶ 126. This is so because the rights of the non-settling asbestos manufacturers or suppliers will be determined under whatever state law may apply if and when claims for contribution or indemnity are made by these companies against the CCR defendants.[58] If anything, these releases may only place the non-settling asbestos manufacturers at some sort of tactical disadvantage. Thus, the Court concludes that the release and contribution and indemnity provisions are fair and reasonable and that any factual injury or inconvenience to the non-settling asbestos manufacturers does not rise to the level of legal prejudice which requires judicial interference.[59]

### D. Reaction of the Class

51. One final legal consideration in the fairness assessment is the "reaction of the class" to the proposed settlement. This consideration is somewhat less important than the others this Court has already discussed. Thus, courts have approved settlements involving significant opposition within the class. *E.g., Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir.1974) (confirming approval of a class action settlement despite objections to the settlement from some 20% of the class); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir.1987) (approving class action settlement where between 36% to 48% of class objected to settlement, and citing cases where settlements were approved despite objections ranging from 15% to 56% of the class).

---

57. These *Amici* do not complain that the Stipulation's release provisions strip them of any rights in those jurisdictions that have abolished joint and several liability. At the time the Stipulation was signed, examples of jurisdictions that had abolished joint and several liability included Alaska, Arizona, Colorado, Idaho, Kansas, Kentucky, North Dakota, Utah, and Vermont. *See* Exhibit SP–300, Part XII.A at 77.

58. The Stipulation thus differs significantly from the Manville settlement that the Second Circuit declined to approve in *In re Joint E. & S. Dist. Asbestos Litig. (Findley v. Blinken)*, 982 F.2d 721 (2d Cir.1992), *modified*, 993 F.2d 7 (2d Cir.1993). The Manville settlement attempted to "establish national rules of joint and several liability and pro tanto (*i.e.*, dollar for dollar) setoff for the Manville liability share ...," even where state or other applicable law provided differently. *Id.* at 731. By contrast, the Stipulation leaves all matters of joint and several liability, contribution bars, and calculation of set-offs to be resolved pursuant to state or other applicable law.

59. The co-defendant Amici have also asserted that various provisions of the Stipulation will leave them responsible for a substantial number of cases in the tort system, and that the value of these claims will be significant. Provisions challenged by the *Amici* on this ground include the provision for no joint and several liability among the settling defendants, the case flow maximums, and certain other features of the Stipulation. *Id.* This Court discusses the overall reasonableness of virtually all of these provisions in this memorandum opinion. In any event, the co-defendant *Amici's* contention that each of these provisions will prejudice them is purely speculative, and does not rise to the level of "cognizable prejudice" to their rights sufficient to render the Stipulation unfair. *In re School Asbestos Litig.*, 921 F.2d 1330, 1332 (3d Cir.1990).

52. This class action is highly unusual, in that a combined notice was given under Rule 23(c) and (e) and class members were given information about the settlement at the same time that they had to decide whether or not to exclude themselves from the class. Thus, unlike many class actions, the opponents of the settlement here had the option of removing themselves from the class entirely. Hence, this Court places less weight on the fact that class members excluded themselves from the class action because they will not be bound by its terms. None of the class members who opted out participated in the fairness hearing.

53. There were few actual objectors to the settlement compared to the size of the class. Objecting counsel at the fairness hearing represented less than a dozen individual objectors, and a few victims' organizations. Other than Mr. Wages, no Objectors testified at the fairness hearing. A very small number of additional objectors filed written objections.[60]

54. The national AFL–CIO, representing some 13 million union members and a "substantial percentage" of those with occupational exposure to asbestos, endorsed the settlement. Mem.Op., *supra*, at 8 n. 7.[61]

55. The Settling Parties' Supplemental Final Notice Report states that 201,654 exclusion requests were received on behalf of individuals claiming exposure to asbestos products (with 34,669 additional forms for affiliated family members) by the January 24, 1994 deadline. FOF ¶ 291. This number does not significantly impact this Court's assessment of fairness. *First*, as stated above, those class members who opted out of the class will not be bound by the Stipulation, of which presumably they either do not approve or in which they are disinterested, because they are no longer members of the settlement class.[62] *Second*, the Objectors have, at various times, estimated the size of the class at issue here as ranging from 20 to 30 million.[63] Baron, May 28, 1993 Hearing, Tr. at p. 51, line 15, p. 58, lines 19–20; Wiese Parties' Mem. of Law in Opposition to the Settling Parties' Joint Motion for Approval of the Notice to the Class, Dkt. No. 93–0215 (Sept. 16, 1993), at 1; Dec. 17, 1993 Hearing, Tr. at p. 153, lines 9–12. Even if the class is significantly smaller, and whatever the unknown basis for any individual decision to opt out, the number of opt-outs in question does not, in all likelihood, represent significant or material opposition to the settlement from the class. While not determinative, the CCR defendants have chosen not to exercise their right to withdraw from this settlement on the basis of excessive opt outs as permitted by Part XXI of the Stipulation. Exhibit SP–301, Part XXI.

56. This Court concludes that the reaction of the class to this settlement, on balance, further supports approval of the settlement under Rule 23(e).[64]

### E. Conclusion

57. In consideration of all the factors discussed above, this Court concludes that the proposed settlement is fair, adequate, and reasonable to the class within the meaning of Rule 23(e).

---

**60.** The docket shows that, in total, there were only approximately 500 purported class members who entered their appearance as objectors to the settlement. Of this total, 419 individuals were submitted as *one* group represented by *one* law firm.

**61.** Only one union member, Robert Wages, President of the Oil, Chemical and Atomic Workers, testified at the fairness hearing in opposition to the proposed settlement. Wages 3/16/94 Tr. at 209.

**62.** Also, there has been no evidence presented that the persons who filed opt-out forms were in fact members of the class; the exclusion request forms merely make that assertion.

**63.** This Court has found that the class in this action consists of many tens of thousands of class members. *See* FOF ¶ 2.

**64.** A motion to certify a California mesothelioma opt-out class has been filed by three objectors to this settlement based on perceived advantages mesothelioma victims have in California state courts. Motion, Dkt. No. 598 (Jan. 6, 1994). This Court concludes that the substance of the objectors' motion does not impact on this Court's evaluation of the fairness of the proposed settlement in that this Court has considered the differences in California law, and has concluded that the settlement is fair and reasonable to the class as a whole. Formal and final resolution of this motion is deferred.

## III. ADEQUACY OF COUNSEL

### A. *Legal Standard*

58. Fed.R.Civ.P. 23(a)(4) provides that a class action may be maintained only if "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This prerequisite to maintenance of a class action, and ultimately the entry of a final judgment, is essential to meet the due process standards that must be satisfied at all stages of a class action. 1 H. Newberg & A. Conte, *Newberg on Class Actions* § 3.21, at 3–125 (3d ed. 1992).

59. Adequacy of representation requires that "the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. Additionally, it is necessary to eliminate so far as possible the likelihood that the litigants are involved in a collusive suit or that [a representative] plaintiff has interests antagonistic to those of the remainder of the class." *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir.1968). *See also In re Fine Paper Antitrust Litigation*, 617 F.2d 22, 27 (3d Cir.1980).

60. In deciding whether Class Counsel adequately represented the class here, and accordingly whether the class settlement should be approved, this Court must determine whether Class Counsel were burdened by an impermissible conflict of interest as they negotiated the *Georgine* Stipulation of Settlement or whether the settlement itself was the product of collusion. *See e.g., In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207–09 (5th Cir.1981); *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677 (7th Cir. 1987).

61. "The ethical standards imposed upon attorneys in federal court are a matter of federal law." *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1316 (3d Cir.1993). In the Third Circuit, the courts look to the Model Rules of Professional Conduct to furnish the appropriate ethical standard. *Id.*

62. As many courts have recognized in a variety of different contexts, however, "courts cannot mechanically transpose to class actions the rules developed in the tradi-

tional lawyer-client setting context ..." *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 163 (3d Cir.1984) (Adams, J. concurring); *Rand v. Monsanto Co.*, 926 F.2d 596, 601 (7th Cir.1991) (vacating a district court ruling that plaintiff was an inadequate class representative because he refused to advance the costs of litigation in violation of the Model Code); *In re Agent Orange Prod. Liab. Litig.*, 800 F.2d 14, 18 (2d Cir.1986) (refusing to disqualify two appellate attorneys who had represented parties supporting the class settlement in the district court and then represented Objectors on appeal, on the ground that "[a]utomatic application of the traditional principles governing disqualification of attorneys on grounds of conflict of interest" would have a serious adverse effect on class actions.) *See also* 3 *Newberg on Class Actions*, § 15.01 at 15–3 ("The class action device was designed to serve unique purposes. Categorical application of ethical precepts developed for the individual action, without accommodation of the fundamental goals of the class action rule, dilutes both the ethical standards and the effectiveness of class litigation.")

63. Thus, it is appropriate for this Court to consider the Model Rules in determining the adequacy of representation, but ultimately it is this Court's task to determine whether, in the context of this litigation, Class Counsel were vigorous and diligent in negotiating the *Georgine* Stipulation, unburdened by any conflicts of interest or collusion. *See* FOF ¶¶ 177–283, 40–45.

### B. *Conflict of Interest*

64. In this case, Objectors contend that Class Counsel had an impermissible conflict of interest, in violation of Model Rule 1.7(b), which adversely affected the *Georgine* settlement. Model Rule 1.7(b) provides:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

65. Model Rule 1.7(b) proscribes any concurrent representation where that representation "may be materially limited by an" ongoing representation. As set forth in the comments to the Model Rule:

> A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. Consideration should be given to whether the client wishes to accommodate the other interest involved.

ABA Model Rules at 28. *See also* Hazard and Hodes, *The Law of Lawyering* § 1.7:301, at 246 (Supp.1993) ("[S]ince only 'material' limitations trigger operation of the bar, Rule 1.7(b) forces a case-specific inquiry into the precise effect that a particular combination of conflicting responsibilities might engender. It is for this reason that Rule 1.7(b) can be said to contemplate a balancing process, rather than a firm rule.")

66. As discussed in the above Findings of Fact, five expert witnesses have testified in this proceeding as to whether Class Counsel were burdened by any impermissible conflicts of interest in negotiating the *Georgine* settlement. Professors Hazard, Freeman, and Dash testified that there were none. Professors Cramton and Koniak testified to the contrary. *See generally* FOF ¶¶ 185–246. Because the issue is a mixed question of fact and law for the Court to decide, this Court may be guided by the expert testimony, but is not bound by it. *See e.g., In re Solerwitz,* 848 F.2d 1573, 1578 (Fed.Cir.1988) (in a disciplinary proceeding, court "reviewed the testimony of the three experts and their conclusions regarding the propriety of [the attorney's] conduct," but court made clear "it is this court and not [the attorney's] experts that must determine whether [the attorney's] conduct was improper.")

67. At the time that Class Counsel negotiated what became the *Georgine* settlement, there was no attorney-client relationship between Class Counsel and the unformed *Georgine* class. Class Counsel nevertheless had a fiduciary responsibility to this putative class, that is, a duty of loyalty and a duty of due care. *See* 2 *Newberg on Class Actions,* § 11.65, at 11–183 ("The general rule is that the named plaintiff and counsel bringing the action stand as fiduciaries for the entire class, commencing with the filing of a class complaint."). *See also Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 832 (3d Cir.1973) ("[C]lass action counsel possess, in a very real sense, fiduciary obligations to those not before the court."). Thus, whether or not Model Rule 1.7(b) technically applies to this Court's determination, this Court concludes that the general principles of loyalty and due care are applicable here.

68. Having carefully considered the testimony of Professors Hazard, Freeman, and Cramton, *see* FOF ¶¶ 185–212, and the record in this case as a whole, this Court concludes that Class Counsel's representation of the *Georgine* class was not materially limited by their representation of present clients with pending claims against the CCR defendants. Thus, the concurrent representation of present claimants, while negotiating the *Georgine* settlement, ultimately resulting in settlement terms for present clients that differed from the terms of *Georgine,* did not create an impermissible conflict of interest under Model Rule 1.7(b), or otherwise, and Class Counsel were not burdened with any such conflict throughout the negotiation of the *Georgine* settlement.

69. The settlement philosophy adopted by the CCR defendants in 1992 was an outgrowth of years of experience in the tort system and rational defense concerns about the growth and character of the litigation. There was nothing impermissible in the effort of CCR to reach a global solution of the asbestos litigation encompassing both present and future claims. In fact, CCR's settle-

ment position was consistent with the urging of the federal judiciary that private parties seek to find a global solution to the litigation.

70. The settlement position of CCR was not unlike that of the defendant railroad in *Holden v. Burlington Northern, Inc.,* 665 F.Supp. 1398 (D.Minn.1987). *Holden* was an employment discrimination class action lawsuit in which class counsel had been litigating against the defendant, in other employment litigation, for "approximately ten years." *Id.* at 1426–27. There the "objectors contend[ed] the resolution of matters other than *Holden,* along with *Holden,* evidences a conflict of interest." *Id.* at 1426. The *Holden* Court noted that there, as here, the fact that the defendant was interested in a global resolution of all the litigation was no secret to the parties, the Objectors, or to the Court. *Id.* The Court then held that it found "no necessary conflict in resolving matters other than *Holden* concurrently with *Holden.* Early on in the negotiation process the Court recognized that any settlement of *Holden,* if one could be attained, would have had to include a global settlement of all matters involving [class counsel and [the defendant railroad].... [A] proposed settlement consisting of anything less than a settlement of all matters ... could never have been accomplished." *Id.* at 1426–27.

71. In this case, as in *Holden,* the CCR defendants' settlement posture was well-known to the plaintiffs' and defense bars and the courts. Further, given the history of this litigation, as in *Holden,* CCR's settlement position was not unreasonable. *Id.* at 1427. Accordingly, Class Counsel did not have an inherent conflict of interest in seeking to negotiate a futures settlement while concurrently settling their present inventory of cases with CCR provided they, as experienced asbestos litigators, reasonably believed the settlements were fair, reasonable and in the best interests of both the putative class and their present clients. This Court concludes that Class Counsel did indeed make these reasoned judgments and reasonably decided in favor of settling.

72. Class Counsel were not required to withdraw from the representation of their current clients in order to undertake the *Georgine* negotiations, as suggested by Professor Cramton. Such a step was not only not feasible, but would have prejudiced the representation of the present clients. Moreover, it was the very fact that Class Counsel represented such a substantial number of present clients, as leaders of the asbestos bar, that made them credible and appropriate counsel to negotiate on behalf of an inchoate futures class. *Cf. Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 160 (S.D.Ohio 1992) (Objectors complained that class counsel had insufficient experience in litigating heart valve cases, and, as a result, additional counsel were named who had substantial experience in the litigation. On this basis the Court concluded that the interests of the class were adequately protected.).

73. The negotiations of the *Georgine* settlement and the present inventory settlements were both the product of arm's length, good faith bargaining. *See* FOF ¶¶ 40–45. In hindsight, those not participating in the negotiation process can always criticize specific settlement terms or assert that other terms should have been included in the settlement. The fact, however, that a settlement did not achieve all that others may have hoped for does not support the conclusion that the lawyers were burdened by an impermissible conflict of interest in negotiating that settlement. In the words of the Fifth Circuit:

> It is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting. If the terms themselves are fair, reasonable and adequate, the district court may fairly assume that they were negotiated by competent and adequate counsel; in such cases, whether another team of negotiators might have accomplished a better settlement is a matter equally comprised of conjecture and irrelevance.

*In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 212 (5th Cir.1981).[65]

---

65. *See also In re Chicken Antitrust Litig.,* 669 F.2d 228, 236 n. 15 (5th Cir.Unit B 1982) ("Although there may be the potential for a conflict of interest to arise, it is best to avoid second

74. Thus, for example, whether the settlement might have provided an adjustment for inflation over time or revision of medical criteria based upon changes in scientific thought are issues relating to the fairness of the settlement. *See, e.g.,* FOF ¶ 99. The fact that such provisions were not included in the Stipulation is not evidence that Class Counsel had a conflict which impaired their ability to represent the class.

75. Similarly, the fact that the *Georgine* class is defined as persons with occupational exposure who had not filed claims prior to January 15, 1993 does not create an impermissible conflict of interest by permitting class counsel to prefer certain claimants over others. *See* FOF ¶ 243. There is no evidence in this record that Class Counsel themselves actually used their knowledge of the forthcoming class action suit to file premature claims to avoid the class, or to refrain from filing and settling appropriate cases in order to ensure the viability of the class representatives.

76. The fact that the inventory settlements included terms that differed from the terms of the *Georgine* settlement also does not reveal an impermissible conflict of interest. Present clients in the tort system are not identically situated to future claimants. They already have engaged a lawyer, they already have made or committed to expenditures, have a place in the trial queue and have expectations of a certain course of proceedings. The relevant question is not whether the terms of the *Georgine* settlement are identical to the terms of settlements in the past, but whether, given all the circumstances, the terms of *Georgine* are fair and reasonable. *See, e.g., M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,* 671 F.Supp. 819, 824 (D.Mass.1987) (approving class action settlement that provided different terms for present tenants than for former tenants, and holding that "I find that the division of the plaintiff class set out in the agreement . . . was reasonable and appropriate, and fairly reflects the reality of the business situation presented by this lawsuit").

77. The Objectors cite to two cases in support of their contention that Class Counsel were burdened by an impermissible conflict of interest: *Fiandaca v. Cunningham,* 827 F.2d 825 (1st Cir.1987) and *Lewis v. National Football League,* 146 F.R.D. 5 (D.D.C.1992). These cases are distinguishable from this case. In *Fiandaca,* lawyers for a class of female prisoners were seeking a new facility for their incarceration. The state offered to provide a facility which was then housing another class of individuals also represented by the same counsel. It was not in the interest of the second class for the female inmates to inhabit their building, thus creating a direct conflict of interest for the class counsel. No such conflict is presented in this case where present and future claimants are both seeking compensation for their injuries from the defendants, but there is no limited fund from which this compensation is to be paid. Similarly, in *Lewis,* a law firm was found to have a conflict of interest where it sought to represent a putative class of football players while the law firm, at the same time, was representing the player's association in a lawsuit against at least 20 individual members of the plaintiff class. In *Lewis,* there was direct adversity creating the impermissible conflict. There is no such adversity here.

78. The fact that, in 1992, CCR approached Mr. Motley, Mr. Rice, and Mr. Locks to see whether they were willing to embark again on an effort to reach a global settlement, after the dissolution of the MDL negotiations, does not support the conclusion that Class Counsel had a conflict of interest. Given the history of the asbestos litigation and the prior settlement efforts, there was nothing about this procedure that created a conflict of interest here. Mr. Motley and Mr. Locks were the Co-chairs of the Plaintiffs' Steering Committee in the MDL. All three Class Counsel were unquestionably experienced, highly respected leaders of the plaintiffs' asbestos bar. FOF ¶¶ 178–84. Indeed, counsel for Objectors forthrightly stated that they were not challenging the qualifications or experience of Class Counsel. If CCR

guessing the judgment of counsel in settlement negotiations absent an actual conflict of interest

which renders effective representation impossible.").

wanted to succeed in reaching a global settlement that a Court would approve, they had no choice but to hope to negotiate with such counsel.

79. The procedure followed here was not unlike the settlement procedure reviewed by the Court of Appeals for the Third Circuit in *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir.1971). *Ace Heating* involved a settlement of a nationwide class of plumbing, mechanical and general contractor claimants in antitrust litigation. The defendants there attempted to negotiate a settlement with an ad-hoc plaintiffs' committee. After that effort reached an impasse, the defendants began settlement talks with another plaintiffs' attorney. The Court recognized that this procedure, where a lawyer "unofficially represents the class during settlement negotiations," can result in plaintiffs' counsel being "under strong pressure to conform to the defendants' wishes." *Id.* In these circumstances, where a settlement is not negotiated by a "court designated class representative the court must be doubly careful in evaluating the fairness of the settlement to plaintiff's class." *Id.* In *Ace Heating,* the Court, applying this heightened scrutiny, nevertheless concluded that the plaintiffs' negotiating counsel had effectively represented the class and that the settlement was fair. *Id.* at 35. Thus, applying the *Ace Heating* analysis to the *Georgine* settlement, this Court concludes that the fact that CCR chose to negotiate with Messrs. Locks, Motley and Rice, who had not yet been designated as class counsel but who were publicly known to be accountable as co-lead counsel in the MDL proceedings or in other high profile cases, does not support a claim of ineffective representation or conflict of interest. *See also Bowling v. Pfizer,* 143 F.R.D. 141, 157 (S.D.Ohio 1992) (a settlement was not "flawed because settlement preceded class certification").

### C. *The Futures Provisions in the Inventory Settlements*

80. Model Rule 5.6(b) provides:

A lawyer shall not participate in offering or making:

. . . . .

(b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties.

81. Objectors contend that the futures provisions in the inventory settlement agreements violate this Model Rule and that this violation is evidence that Class Counsel had an impermissible conflict of interest.

82. The January 14, 1993 agreement and the August, October, and December 1992 letter agreements were superseded by the June 11, 1993 agreement and the July 9, 1993 letter agreement, respectively. FOF ¶¶ 220–221. This Court has already found that counsel intended to act ethically and that these agreements do not violate Model Rule 5.6(b) in that they do not factually create a binding obligation on the part of Class Counsel not to represent clients who may wish to sue CCR but who did not yet meet the *Georgine* medical criteria. FOF ¶¶ 214, 219, 232–233. Rather, the provisions represent a good faith commitment on the part of Class Counsel to recommend the *Georgine* medical criteria to their clients while retaining their independence to conclude otherwise in an appropriate case. *Id.* at 233.

83. This Court need not decide, however, whether or not a state bar disciplinary board would conclude that these provisions technically violated Rule 5.6, since that issue is not before this Court in determining the adequacy of counsel. *See, e.g., Rand v. Monsanto Co.,* 926 F.2d 596, 600, 601 (7th Cir.1991); *Coles v. Marsh,* 560 F.2d 186, 189 (3d Cir. 1977) (both held that while various provisions of the Model Rules are useful as guides in assessing adequacy of counsel, they should not be so rigidly applied as to subvert the use of the class action device).

84. What is significant for this proceeding is that the futures provisions did not have any adverse or improper impact on the *Georgine* class. Based on the Findings of Fact, this Court concludes that the futures provisions did not restrict Class Counsel's negotiation of the *Georgine* Stipulation, they were superseded by subsequent provisions which did not restrict Class Counsel in their practice of law in any way, and they did not

create an impermissible conflict of interest for Class Counsel. *See* FOF ¶¶ 213–233.

### D. Collusion

85. Objectors here contend, based upon the testimony of Professor Coffee, that the *Georgine* settlement was the product of collusion. Professors Hazard and Dash testified to the contrary. FOF ¶¶ 251, 282.

86. Collusion is defined as follows:

An agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law. *It implies the existence of fraud of some kind, the employment of fraudulent means, or of lawful means for the accomplishment of an unlawful purpose.* A secret combination, conspiracy or concert of action between two or more persons for fraudulent or deceitful purpose.

*Point Pleasant Canoe Rental, Inc. v. Tinicum Township,* 110 F.R.D. 166, 169 (E.D.Pa. 1986) (emphasis added) (quoting *Black's Law Dictionary* 240 (5th ed. 1979).

■ 87. Thus, in order for this Court to conclude that the *Georgine* settlement was the product of collusion, it would have to find that Class Counsel and the CCR defendants "sought to accomplish an improper purpose, perpetrated a fraud," and acted "secretively." *Id.* Acting secretly, moreover, does not mean "out of the public eye." *Id.* at 170. Intense negotiations necessarily must proceed with a limited number of actors; that does not make the negotiations collusive. *Id.* *See also Bowling v. Pfizer,* 143 F.R.D. 141, 156 (S.D.Ohio 1992) (holding "[n]o requirement exists that either Class Counsel or the Defendants must inform other attorneys ... about their negotiations").

88. Having carefully considered the testimony of Professors Coffee, Hazard, and Dash, the Report of Special Master Burbank, *see* FOF ¶¶ 251, 254–263, 282, and the record as a whole, this Court concludes that the *Georgine* settlement was not the product of collusion. Class Counsel did not receive a premium in settling their inventory cases, nor did they "sell out" the *Georgine* class. Also, there is no evidence that Class Counsel or CCR attempted to keep the fact of their negotiations secret. The terms of the *Georgine* settlement, including the definition of the class, compensation ranges, medical criteria, case flow provisions, and eligibility criteria reflect neither "improper" nor "fraudulent" conduct on behalf of Class Counsel or CCR.

89. Further, the Court concludes that the fact that the lawsuit and settlement were filed simultaneously, or the fact that defendant CCR members were searching for a global solution to the asbestos litigation, including the settlement of present cases if a solution could be found for the future, does not support the conclusion that the *Georgine* settlement was the product of collusion. *See Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 154 n. 13 (S.D.Ohio 1992) (holding that it is not collusion for the defendants to have a "yen for peace from the numerous lawsuits that [the defendant] ha[d] coped with since the mid–1980's").

### E. Prior Conduct of Class Counsel

90. Objectors contend that Mr. Locks should be disqualified from serving as Class Counsel because of past conduct. Having considered the testimony of Professors Cramton, Hazard, and Freeman on this point, and the resulting findings of fact, *see* FOF ¶ 283, as well as the record as a whole, this Court concludes that the three instances referred to have no legal relevance to this proceeding. *See, e.g., Uniondale Beer Co. v. Anheuser–Busch, Inc.,* 117 F.R.D. 340, 343 (E.D.N.Y.1987) (rejecting defendants' attempts to challenge plaintiff representatives "adequacy based on allegations of misconduct in unrelated actions," finding such a challenge to be "grasping at straws.")

### F. Conclusion

91. This Court concludes that Class Counsel as highly competent, skilled and experienced members of the plaintiffs' asbestos bar, were exceedingly well qualified to serve as Class Counsel in this case and, based upon the foregoing findings of fact and conclusions of law, that they acted ethically and appropriately in negotiating the *Georgine* settlement, unburdened by any conflicting interests; that the *Georgine* settlement was not the product of fraud or deceit and, therefore,

was not the product of collusion; and that Class Counsel vigorously and diligently negotiated this class action settlement in the best interests of the *Georgine* class members.

## IV. ADEQUACY OF NOTICE

### A. *General Notice to Class*

92. In a decision issued on October 27, 1993, this Court has already held, after extensive briefing and argument, that the notice materials and dissemination plan approved in this case satisfy the requirements of Fed.R.Civ.P. 23(c)(2) and (e) and the Due Process Clause of the Constitution. *Carlough v. Amchem Products, Inc.*, 1993 WL 472812, *20, 1993 U.S.Dist. LEXIS 15280, *66 (E.D.Pa. Oct. 27, 1993). *See also* FOF ¶¶ 284, 287–291. Nothing has occurred since that time to change this Court's prior conclusion which is incorporated herein.

93. As this Court held when approving the notice plan:

> Fed.R.Civ.P. 23(c)(2) requires "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2).... Rule 23 does not require the parties to exhaust every *conceivable* method of identifying the individual class members. For those whose names and addresses cannot be determined by reasonable efforts, notice by publication will suffice under Rule 23(c)(2) and under the due process clause.

> · · · · ·

> Rule 23(c)(2) requires that the notice "advise each member that (a) the court will exclude the member from the class if the member so requires by a specified date; (b) the judgment, whether favorable or not, will include all members who do not request exclusion; and (c) any member who does not request exclusion may, if the member desires, enter an appearance through counsel."

> · · · · ·

> Rule 23(e) simply states that "notice of the proposed ... compromise shall be given to all members of the class in such manner as the court directs."

*Carlough*, 1993 WL 472812 at *7, *14–15, *15, 1993 U.S.Dist. LEXIS at *22–23, *48, *49 (citations omitted).

### B. *Notice to Longshoremen and Related Class Members*

94. The Court rejects the argument made by some Objectors or *Amici* that the notice materials respecting the impact of the Stipulation of Settlement on the rights of class members covered by the LHWCA were materially misleading. The LHWCA provides benefits to employees in shipbuilding, repair and shipbreaking industries and longshoring operations who become disabled as a result of occupational injury. *See* 33 U.S.C. § 903(a). The LHWCA does not constitute the exclusive remedy for the occupational injury. Rather, the LHWCA permits a covered employee, in addition to making a claim against his employer, to bring suit against a third party alleging that the third party is also liable for his occupational injury, § 933. The affected employer is entitled to set-off any monies received by its employee in the third-party action against the LHWCA benefits that the employee would otherwise receive, § 933(f). In this regard, this Court concludes that the LHWCA requires that a line of distinction be drawn between judgments of the court against third parties and settlements with third parties. A LHWCA-covered employer must merely be given notice of a third-party claim resolved by *judgment*, § 933(g). In contrast, the LHWCA requires an employee to notify his employer and to secure the employer's written approval prior to accepting a monetary *settlement*, § 933(g)(1); 20 C.F.R. § 702.281(b) (1993).

95. This Court has conducted an extensive fairness hearing to determine whether the Stipulation of Settlement is fair and adequate to the class. This Court concludes that an Order of this Court approving the Stipulation of Settlement, which represents its "independent finding of the value of the claim after full presentation of the evidence," *Morauer & Hartzell, Inc. v. E.D. Woodworth*, 439 F.2d 550, 553 (D.C.Cir.1970) (per curiam), *cert. dismissed*, 404 U.S. 16, 92 S.Ct. 170, 30 L.Ed.2d 136 (1971), constitutes a *judgment*. *See Grimes v. Vitalink Com-*

*munications Corp.,* 17 F.3d 1553, 1557–58 (3d Cir.1994) (where objecting class members have been provided with the "opportunity to address the court as to the reasons the proposed settlement is unfair or inadequate ... [and] [t]he court then rules as to the adequacy and fairness of the settlement," the settlement and release of claims "is not simply a contract entered into by private parties, but is one that has been given a stamp of approval by the court," and class members are bound by this judgment). This Court further concludes that the LHWCA requirement of employer notice of judgments is satisfied where the settling defendants provide notice of the Court's Final Order, within ninety (90) days, to all insurance carriers providing coverage for LHWCA covered employers who have registered with the United States Department of Labor for fiscal year 1994.

■■■■■ 96. Some Objectors argue that there is a possibility that a subsequent tribunal may, in the future, conclude that this Court's Order constitutes a "settlement" and that, in such an event, this Order may act to work a forfeiture of LHWCA benefits available to class members. This Court considers this possibility to be quite remote. The LHWCA provides for employer notice of and consent to private third-party settlements in order to protect employers against potentially collusive or imprudent private settlements that may unfairly increase the employers' burden in paying LHWCA benefits. *Cretan v. Bethlehem Steel Corp.,* 1 F.3d 843, 846 (9th Cir.1993). In accordance with this public policy, these concerns are not triggered here. Pursuant to Fed.R.Civ.P. 23(e), this Court has independently scrutinized this Stipulation of Settlement and has concluded that it is non-collusive and is fair and reasonable to the plaintiff class. That being so, the Stipulation does not constitute a privately negotiated release between two private parties. It is for this reason that the authority cited to this Court interpreting § 933(g) requiring employer consent to unilateral private party monetary settlements is not on point here.

97. The LHWCA settlement provision concerns the settlement of a claim covered by that Act for a sum certain. This Court concludes that the Stipulation of Settlement will not affect a settlement of any claim by any class member for an asbestos-related injury for a sum certain.

98. To the contrary, the Stipulation of Settlement establishes an alternative dispute mechanism under which class members with qualifying claims may, in the future, seek to receive monetary compensation in settlement from the settling defendants.

99. For these added reasons, this Court concludes that its approval of the Stipulation of Settlement does not constitute a "settlement" as contemplated by § 933(g) or 20 C.F.R. § 702.281(b).

100. This Court further concludes that the employer notice and consent requirements of the LHWCA shall be triggered only when a class member presents a qualifying claim to the CCR. This Court concludes that class members will be adequately informed and reminded of these notice and consent requirements because these requirements shall be set forth by the settling defendants on the claim form that must be used to present all claims to the CCR. In the unlikely event a subsequent tribunal rules that this Court's Order does constitute a settlement with the effect of working a forfeiture of LHWCA rights of a class member, well settled law establishes that a class member would have a right to relief in an appropriate forum at that time.

### C. Conclusion Regarding Notice to Class

101. The Final Notice Report filed with the Court in February 1994 showed that over 6.8 million persons, including individuals who were likely class members, received individually-delivered notice materials, and that millions more persons, including likely class members, were notified through media efforts. As this Court has found, FOF ¶ 300, the Final Notice Report and other evidence shows that the notice plan was implemented fully in accord with this Court's October 27, 1993 Order, and that extensive notice of the

**334**

class action and proposed settlement was given to the class. Accordingly, the requirements of Rule 23 and the Due Process Clause have been wholly satisfied.

## V. FINAL OMNIBUS CONCLUSIONS OF LAW REGARDING PROPOSED SETTLEMENT

102. In sum, this Court concludes that: (1) this Court has subject matter jurisdiction over this class action, *see* Memorandum Opinion, *supra*, at 1 & n. 2; (2) the prerequisites for final class certification of the class as defined in the findings of fact are satisfied, *see* COL ¶¶ 1–24; (3) the terms of the Stipulation of Settlement are fair to the class as a whole pursuant to Fed.R.Civ.P. 23(e), *see* COL ¶¶ 25–57; (4) Class Counsel were qualified to represent the class and acted without conflict of interest, without collusion, and appropriately in negotiating the Stipulation of Settlement, *see* COL ¶¶ 58–91; and (5) the notice materials, the plan for and the actual dissemination of the notice satisfied the requirements of Fed.R.Civ.P. 23(c)(2) and (e) and the Due Process Clause of the Constitution, *see* COL ¶¶ 92–101.

103. The provisions of the Stipulation of Settlement will hereafter be made a part of the record in this case and will have the full force and effect of an Order of this Court.

### *CLOSING DISCUSSION* [66]

No one disputes the notion that settlement is a preferred alternative to costly time-consuming litigation. This Court has been presented with an intricate comprehensive settlement plan on behalf of a nationwide opt-out class. The members of the class total conservatively in the tens of thousands and possibly as many as several hundred thousand or more. They are defined as workers or their family members who have been occupationally or secondarily exposed to asbestos products manufactured by at least one of the twenty settling defendants.

Unlike the tort system, the settlement provides certain and prompt cash compensation to all class members who have suffered im-

pairment or death as a result of their exposure to asbestos. The CCR defendants, in exchange, have waived all liability defenses except proof of exposure to one of their asbestos products. To all those class members who do not suffer an impairing asbestos-related disease, the settlement provides certain benefits, including the right to certain cash compensation if and when they become sick.

Also unlike the tort system, the claim procedures under the Stipulation are essentially non-adversarial; most qualifying claims of persons actually disabled from demonstrable asbestos disease will be settled for sums within a range of dollar values similar to the historical values paid by CCR over recent years. These settlements will include limitations on claimants' counsel fees and binding arbitration for most exceptional and extraordinary claims. A small number of unusually exceptional and difficult claims will be allowed to return to the tort system.

The CCR defendants have committed to the payment of a likely $1.289 billion (plus $317 million in costs) to settle anticipated claims under the Stipulation over the first ten years of its operation. And, because CCR was able to reach the settlement in this class action, it has further committed an additional $1.626 billion over the next four years to settle the inventory of cases presently pending in the tort system.

This case has received a great deal of attention from the press and from the asbestos bar and has been the subject of much debate. However, this Court has been determined to decide the fairness and jurisdictional issues assigned to it fairly and objectively and to stay removed from the fray. This Court has been constantly aware of whose interests are ultimately at stake in this lawsuit: the class members and the defendants. And, this Court has been deliberate in its case management, allowing unprecedented discovery and pre-hearing procedures to take place over many months in preparation for the fairness hearing and has been appropriately expansive in the receipt of evidence.

---

**66.** This closing discussion and its commentary does not amend or change any of the foregoing

Findings of Fact or Conclusions of Law. It is intended to supplement and support them.

The competent, comprehensive and hard-pressed advocacy of all of the objectors' counsel has indeed aided and improved this Court's analysis of the fairness of the settlement. The absence of such advocacy might have prevented this Court's thorough review of the objectors' concerns. This advocacy has been especially important because this settlement is not conventional but rather is innovative and seeks a partial solution to a crisis that has plagued and overextended the Courts.

The extensive analysis by prestigious scholars and quasi-judicial bodies of the problem with asbestos litigation in the tort system, as well as the research and writing all outlined in the findings of fact above, have convinced this Court that the usually adequate conventional tort system, state and federal, must adopt far from conventional methods to compensate victims of disease and death as a result of asbestos exposure. These methods, of course, must protect the rights of the parties concerned. The thoughtful distinguished authors, groups, panels, committees and the Judicial Panel on Multidistrict Litigation itself, have all encouraged the parties to proffer forms of all-encompassing settlement methods for present and future claims. This Court has concluded that the settlement plan presented to it in this case is fair and goes a long way toward meeting the goals sought to be achieved.

The inadequate tort system has demonstrated that the lawyers are well paid for their services but the victims are not receiving speedy and reasonably inexpensive resolution of their claims. Rather, the victims' recoveries are delayed, excessively reduced by transaction costs and relegated to the impersonal group trials and mass consolidations. The sickest of victims often go uncompensated for years while valuable funds go to others who remain unimpaired by their mild asbestos disease. Indeed, these unimpaired victims have, in many states, been forced to assert their claims prematurely or risk giving up all rights to future compensation for any future lung cancer or mesothelioma. The plan which this Court approves today will correct that unfair result for the class members and the CCR defendants.

It might appear, as the objectors argue, that the financial stability and potential future profitability of the settling defendants in this case would augur against the need for, or approval of, any group settlement of the future claims of the asbestos victims exposed to their products. This Court has concluded to the contrary because of the series of bankruptcies of similarly viable companies which have succumbed to the onslaught of asbestos claims. The time to prevent bankruptcies is before they occur. This settlement allows reliable business and financial planning by the CCR defendants, designed to reasonably assure the availability of funds for the payment of these claims in the future. This not only benefits the businesses but assures the victims that their claims will be paid.

This Court is convinced that the terms of the settlement before it were the result of arms-length adversarial negotiations by extraordinarily competent and experienced attorneys. The attorneys for the plaintiff class are highly respected members of the plaintiffs' asbestos bar, and it is clear to this Court that they intended to negotiate this settlement in compliance with the ethical rules governing the conduct of attorneys. This determination is based upon the evidence of the negotiations themselves, the testimony of the ethics experts and the legal conclusions recited above. Furthermore, the result of the negotiations, that is the settlement itself, is evidence that the attorneys involved were competent representatives of the class. This Court has determined that the terms of the settlement are fair and reasonable to the class and that the settlement itself is an innovative solution to a long-standing problem. The settlement calls for non-adversarial claims resolution procedures, sophisticated recognition of discrete asbestos-related diseases, and has been determined by some of the best medical experts in the field to cover almost all victims who are disabled or die as a result of their exposure to CCR asbestos products.[67]

---

**67.** This Court has recited in its findings of fact the detailed terms of the large sums of money

This Court is also satisfied that the claims resolution procedures will be carried out fairly. While it is true that representatives of CCR will receive the medical data and make the settlement offers, liability has been virtually conceded and there is no basis for CCR to reject a qualified claim and no routine procedures for medical rebuttal by CCR. Under the Stipulation, if CCR does dispute a medical claim, it must meet a heavy burden of proving that the diagnosis was "clearly erroneous." CCR will be motivated to administer the plan fairly because CCR's performance is subject to audit by unencumbered separate class counsel and leaders of the AFL–CIO. CCR has agreed that these same auditors shall also have influence over the appointment of arbitrators and medical panel members. Beyond internal oversight, the incentive to act fairly is strong because of CCR's interest that the settlement succeed. Their plan to extend the settlement terms into the future as authorized by the Stipulation will be for naught if it does not. Finally, this Court will retain jurisdiction over the settlement by its approval of the settlement and incorporation of its terms into the final Order of this Court. Accordingly, the Court will have supervisory power to enforce the agreement.

This Court is confident that due process has been and will be given to the class victims covered by this settlement. As a result of the extensive and expensive notice procedure carried out by the settling parties and cooperating union leaders, over six million union members and retirees and members of the general population received actual notice materials. A national television and print media campaign costing millions of dollars reached millions more people. In short, a very large class received notice of this class action and of the settlement by a massive effort.

Those class members who were either disinterested in the settlement or who opposed the settlement, were given the opportunity to opt out of the class. Those persons who have properly opted out of this class will no longer be a concern of this settlement and their rights and remedies are not changed.[68] Another group, the unimpaired class members, do not currently impact significantly upon the case flow predictions under this settlement. While many of them may qualify for benefits in the future, their deferral from entry into the case flow procedures unless and until they become ill will tend to insure that the case flow predictions and maximums will be achieved. Thus this Court is convinced that the large numbers of cases settled by or commenced against the CCR defendants since 1992 is in no way a prediction of the numbers of claims which will be made under this settlement and any argument to the contrary is not supported by the record.

In sum, this settlement is a fair solution for these parties to a problem that left alone would cause unfair results for the asbestos victims and predictably unfortunate financial downfall for these defendants. Just as the CCR defendants have an interest in the fair compensation of all victims of asbestos disease as a result of exposure to their products, asbestos victims who are in this class have an interest in the continued financial viability of the defendant companies so that they will receive historically-based values for their claims. The settlement approved here resolves these concerns.

An appropriate Order follows.

---

which CCR has agreed to pay in settlement of Class Counsel's inventory of pending claims. Since CCR had determined to settle these claims for historical values, Class Counsel had a duty to their existing clients to resolve those claims. There is no persuasive evidence that these settlement agreements influenced the substance of the settlement presently before this Court for consideration.

68. Although over two hundred thousand opt-out requests were received, the record is silent as to whether these persons are actually members of the class, are or ever will be qualified for damages in the tort system, or thus will ever enter the tort system.

**EXHIBIT B**

COMPENSATION SCHEDULE

Qualifying Claims

| Compensable<br>Medical Category | Minimum Value | Negotiated<br>Average<br>Value Range | Maximum Value |
|---|---|---|---|
| Mesothelioma | 20,000 | 37,000–60,000 | 200,000 |
| Lung Cancer | 10,000 | 19,000–30,000 | 86,000 |
| Other Cancer | 5,000 | 9,500–12,500 | 32,000 |
| Non–Malignant | 2,500 | 5,800– 7,500 | 30,000 |

Extraordinary Claims

| Compensable Medical Category | Negotiated Average Value |
|---|---|
| Mesothelioma (3%) | 300,000 |
| Lung Cancer (3%) | 125,000 |
| Other Cancer (3%) | 50,000 |
| Non–Malignant<br>Conditions(1%) | 50,000 |

---

### ORDER

**AND NOW,** this 16th day of August, 1994, pursuant to the Order of the Honorable Charles R. Weiner that this Court determine the issues related to the fairness of the proposed Stipulation of Settlement and the Rule to Show Cause issued by this Court on March 1, 1993 (Document No. 131), having held hearings and received evidence as to whether the class should be finally certified pursuant to Fed.R.Civ.P. 23(b)(3) and whether the Stipulation of Settlement of this class action (Document No. 5), as amended (Document No. 495), should be approved by the Court pursuant to Fed.R.Civ.P. 23(e), having concluded that the appointment of additional class counsel is necessary to conduct the oversight and supervisory responsibilities of class counsel under the Stipulation of Settlement, and based on the attached memorandum opinion including findings of fact and conclusions of law, this Court concludes that: (1) the Court has subject matter jurisdiction over this class action, (2) the prerequisites for final class certification of the class as defined in the findings of fact are satisfied, (3) the terms of the Stipulation of Settlement, as amended, are fair to the class as a whole pursuant to Fed.R.Civ.P. 23(e), (4) Class Counsel were qualified to represent the class and acted without conflict of interest, without collusion, and appropriately in negotiating the Stipulation of Settlement, and (5) the notice materials, the plan for and the actual dissemination of the notice satisfied the requirements of Fed.R.Civ.P. 23(c)(2) and (e) and the Due Process Clause of the Constitution, and accordingly it is hereby **ORDERED** that an opt-out settlement class is finally **CERTIFIED** pursuant to Fed.R.Civ.P. 23(b)(3) as follows:

1. All persons (or their legal representatives) who have been exposed in the United States or its territories (or while working aboard U.S. military, merchant or passenger ships), either occupationally or through occupational exposure of a spouse or household member, to asbestos or to asbestos containing products for which one or more of the defendants may bear legal liability and who, as of January 15, 1993, reside in the United States or its territories, and who have not, as of January 15, 1993, filed a lawsuit for asbestos-related personal injury or damage, or death in any state or federal court against the defendant(s) (or against entities for whose actions or omissions the defendant(s) bear legal liability).

2. All spouses, parents, children, and other relatives (or their legal representatives) of the class members described in paragraph 1 above who have not, as of January 15, 1993, filed a lawsuit for the asbestos-related personal injury, or damage, or death of a class member described in paragraph 1 above in any state or federal court against the defendant(s) (or against entities for whose actions or omissions the defendant(s) bear legal liability).

It is **FURTHER ORDERED** that the Stipulation of Settlement, as amended, is hereby **APPROVED** as fair to the class as a whole pursuant to Fed.R.Civ.P. 23(e).

It is **FURTHER ORDERED** that the provisions of the Stipulation of Settlement, as amended, are hereby made part of the record in this case and as such shall have the full force and effect of an Order of this Court.

Because there are pending matters and motions which may affect the final resolution of this class action, this is not a final appealable Order.